# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE TESLA MOTORS, INC. STOCKHOLDER LITIGATION | ) ) | **CONSOLIDATED** **C.A. No. 12711-VCS** |

## MEMORANDUM OPINION

Date Submitted: January 18, 2022
Date Decided: April 27, 2022

Jay W. Eisenhofer, Esquire, Christine M. Mackintosh, Esquire, Kelly L. Tucker, Esquire and Vivek Upadhya, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware; Michael Hanrahan, Esquire, Kevin H. Davenport, Esquire and Samuel L. Closic, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Daniel L. Berger, Esquire of Grant & Eisenhofer P.A., New York, New York; Lee D. Rudy, Esquire, Eric L. Zagar, Esquire, Justin O. Reliford, Esquire, Matthew Benedict, Esquire of Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania; Randall J. Baron, Esquire and David T. Wissbroecker, Esquire of Robbins Geller Rudman & Dowd LLP, San Diego, California, Attorneys for Plaintiffs.

David E. Ross, Esquire, Garrett B. Moritz, Esquire and Benjamin Z. Grossberg, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware and Evan R. Chesler, Esquire, Daniel Slifkin, Esquire, Vanessa A. Lavely, Esquire and Helam Gebremariam, Esquire of Cravath, Swaine & Moore LLP, New York, New York, Attorneys for Defendant Elon Musk.

Kevin R. Shannon, Esquire, Berton W. Ashman, Jr., Esquire, Jaclyn C. Levy, Esquire and Nicholas D. Mozal, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Nominal Defendant Tesla, Inc.

**SLIGHTS, Vice Chancellor**

In 2006, Elon Musk, co-founder, CEO and Chairman of Tesla Motors, Inc., publicly declared in a so-called "Tesla Motors Master Plan" (the "Master Plan") that "Tesla's mission is to accelerate the world's transition to sustainable energy" and, more specifically, "to help expedite the move from a mine-and-burn hydrocarbon economy towards a solar electric economy . . . ."[1] Ten years later, Tesla purported to execute the Master Plan when it announced on June 21, 2016, that it would acquire a solar energy company, SolarCity Corporation, in a stock-for-stock merger (the "Acquisition") valued at the time at approximately $2.6 billion. Several Tesla stockholders have alleged the Acquisition, as consummated, was the product of breaches of fiduciary duty and other wrongdoing. They have sued members of the Tesla board of directors (the "Tesla Board") and, separately, Elon as Tesla's controlling stockholder seeking damages and equitable remedies. After denying defense motions to dismiss and cross-motions for summary judgment, the Court convened an eleven-day trial.[2] This is the Court's post-trial verdict.

---

[1] Plaintiffs named both Elon Musk and his brother, Kimbal Musk, as defendants. To avoid confusion, I will refer to the brothers Musk by their first names. I intend no familiarity or disrespect.

[2] All named defendants, except Elon, settled with the plaintiffs in advance of trial, leaving Elon as the sole remaining defendant.

1

As will be described in detail below, Elon owned approximately 22% of Tesla's common stock at the time of the Acquisition. In addition to his leadership roles at Tesla, Elon was Chairman of the SolarCity board of directors (the "SolarCity Board") and the largest stockholder of that company. He was also the catalyst and a vocal proponent of the Acquisition. Despite conflicts among its members, the Tesla Board elected not to form a special committee of independent directors to negotiate the Acquisition. It did, however, condition the Acquisition on the affirmative vote of a majority of the minority of Tesla's disinterested stockholders, even though that vote was not required by Delaware law. While Elon was recused from certain Tesla Board discussions regarding the Acquisition, he actively participated in others. And he had several private discussions directly with the target (SolarCity) and with Tesla's financial advisor for the deal without the knowledge of the Tesla Board.

According to the plaintiffs, as Tesla's controlling stockholder, Elon caused Tesla's servile Board to approve the Acquisition of an insolvent SolarCity at a patently unfair price, following a highly flawed process, in order to bail out his (and other family members') foundering investment in SolarCity. This, say the plaintiffs, was a clear breach of Elon's fiduciary duty of loyalty. Given Elon's status as a conflicted controlling stockholder, the plaintiffs maintain that the Court must

2

review their claims under the entire fairness standard, which requires Elon to prove the Acquisition was the product of a fair process that yielded a fair price.

Elon counters that the plaintiffs failed to prove he was Tesla's controlling stockholder, failed to prove the Tesla Board was conflicted, and failed to prove the Tesla stockholder vote approving the Acquisition was uninformed or coerced. Given these failures of proof, Elon maintains that he is entitled to deference under Delaware's venerable business judgment rule. Should the Court disagree, Elon argues the trial evidence reveals the Acquisition was entirely fair, regardless of which party bore the burden of proof.

Against this factual backdrop, the plaintiffs' claims against Elon, and Elon's defenses, call out like a carnival barker, beckoning the Court to explore a wide range of interesting and arguably unsettled legal issues, including, among others, the contours and nuances of Delaware's controlling stockholder law, the extent to which personal and business relationships among fiduciaries will result in disabling conflicts of interest, the appropriate means by which a corporation's board of directors can disable fiduciary conflicts, the applicability and effect of an eleventh-hour "fraud on the board" theory of fiduciary liability, the applicability and effect of stockholder ratification of fiduciary conduct as a defense to various breach of fiduciary duty claims, the triggers and effects of shifting burdens of proof when litigating claims of fiduciary misconduct under the entire fairness standard of review,

3

and the interaction between fair process and fair price when reviewing a transaction for entire fairness. To be sure, in answer to the barker's call, it is tempting to venture into each tent and confront the legal enigmas that await there. Given the clarity provided by compelling trial evidence, however, there is no need to take on the challenge of discerning the appropriate standard of review by which to decide the plaintiffs' claims. Even assuming (without deciding) that Elon was Tesla's controlling stockholder, the Tesla Board was conflicted, and the vote of the majority Tesla's minority stockholders approving the Acquisition did not trigger business judgment review, such that entire fairness is the standard of review, the persuasive evidence reveals that the Acquisition was entirely fair.

The process employed by the Tesla Board to negotiate and ultimately recommend the Acquisition was far from perfect. Elon was more involved in the process than a conflicted fiduciary should be. And conflicts among other Tesla Board members were not completely neutralized. With that said, the Tesla Board meaningfully vetted the Acquisition, and Elon did not stand in its way. Equally if not more important, the preponderance of the evidence reveals that Tesla paid a fair price—SolarCity was, at a minimum, worth what Tesla paid for it, and the Acquisition otherwise was highly beneficial to Tesla. Indeed, the Acquisition marked a vital step forward for a company that had for years made clear to the market

4

and its stockholders that it intended to expand from an electric car manufacturer to an alternative energy company. The Court's verdict, therefore, is for the defense.

## I. BACKGROUND

The following facts were either stipulated to by the parties or proven by a preponderance of the credible, competent evidence presented during trial.[3]

### A. The Parties and Relevant Non-Parties

Co-lead plaintiffs, Arkansas Teachers Retirement System, Roofers Local 149 Pension Fund, Oklahoma Firefighters Pension and Retirement System, KBC Asset Management NV, Erste Asset Management GmbH, and Stitching Blue Sky Active Large Cap Equity Fund USA (collectively, "Plaintiffs"), were Tesla stockholders at all relevant times.[4] They, along with their counsel, were selected by the Court to prosecute these claims following a vigorous leadership contest.[5]

Nominal defendant, Tesla, is a publicly traded Delaware corporation that designs, develops, manufactures and sells electric vehicles ("EVs") and energy

---

[3] I cite to the joint trial exhibits as "JX __"; the docket items as "D.I. __"; the trial transcript as "Tr. __ (witness name)"; the Amended Stipulated Joint Pre-Trial Order (D.I. 454) as "PTO [paragraph number]"; and depositions lodged as evidence as "(Name) Dep. __."

[4] PTO ¶¶ 27–32.

[5] D.I. 86, 92–93.

storage products.[6]  At the time of the Acquisition, its stock traded at $185.02 per share.[7]  As of this writing, the stock trades at about $900.00 per share.[8]

Defendant, Elon Musk, is Tesla's co-founder and largest stockholder.[9]  At the time of the Acquisition, he owned approximately 22% of Tesla's common stock.[10] He also served as the chairman of the Tesla Board from April 2004 to November 2018,[11] and has continuously served as Tesla's CEO since October 2008.[12]  Elon directs Tesla's operational and strategic decisions.[13]  Tesla is "highly dependent on [his] services," and his departure from the company would likely "disrupt [its] operations, delay the development and introduction of [its] vehicles and services, and negatively impact [its] business, prospects and operating results."[14]  According

---

[6] PTO ¶¶ 120–21.

[7] PTO ¶ 180.

[8] *See Tesla, Inc. (TSLA)*, Yahoo! Finance (last accessed Apr. 27, 2022), https://finance.yahoo.com/quote/TSLA/.

[9] PTO ¶ 125; Tr. 81:24–82:1 (Elon) (describing himself as "co-founder" of Tesla).

[10] PTO ¶ 41.

[11] PTO ¶ 33.

[12] PTO ¶ 34.

[13] *See, e.g.*, Tr. 2222:6–8 (Jurvetson) (describing Elon as Tesla's "chief product architect and visionary" and "[a]n incredible leader and motivator of people"); JX 3109 (Elon tweets: "Working on Top Secret Tesla Masterplan, Part 2"); Tr. 78:24–79:19 (Elon) (testifying he wrote the Master Plan himself).

[14] JX 824 at 21.

6

to Musk, he tried "very hard not to be the CEO of Tesla," "[but], unfortunately, [he] had to or the company was going to die."[15]

Non-party, SolarCity, was a publicly traded Delaware corporation founded in 2006 by Elon's cousins, Peter Rive and Lyndon Rive.[16]  It installed and financed solar photovoltaic ("PV") systems.[17]  Elon served as the Chairman of the SolarCity Board from the company's formation in 2006 until the Acquisition closed.[18]  He was also SolarCity's largest stockholder, holding approximately 21.9% of its common stock.[19]

Non-party, Space Exploration Technologies Corporation ("SpaceX"), is a private aerospace manufacturer and space transport services company founded by

---

[15] Tr. 72:12–14 (Elon).  As of March 15, 2021, Elon can add the title "Technoking of Tesla" to his resume.  *See* Tesla, Inc., Current Report (Form 8-K) (Mar. 15, 2021); Tr. 89:14–24 (Elon) ("Q.  You crowned yourself 'Technoking' in 2021.  Right?  A.  Well, I, you know, do have a sense of humor.  I think—I think I'm funny.  Q.  But it's not just a joke, Mr. Musk.  You actually officially changed your title to Technoking.  Correct?  A.  Well, and also the CFO was added 'Master of Coin.'  Q.  Yes.  A.  Let's not forget that.").

[16] PTO ¶¶ 45, 131.  Just as I address Elon and Kimbal by their first names, I refer to Peter Rive and Lyndon Rive by their first names for clarity.  Again, no disrespect or familiarity is intended.

[17] PTO ¶ 133.

[18] PTO ¶¶ 36, 131.

[19] PTO ¶ 42; JX 2121 at 184.

Elon in 2002.[20]  Between March 2015 and March 2016, SpaceX purchased $255 million in SolarCity corporate bonds called "Solar Bonds."[21]

At the time of the Acquisition, Tesla's sitting directors were Elon, Kimbal, Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, and Stephen Jurvetson.[22]  According to Plaintiffs, except for Denholm, each Tesla director was conflicted (in varying degrees) with respect to the Acquisition.

Buss served on the Tesla Board from November 2009 until June 2019.[23] At Elon's request, Buss became SolarCity's CFO in 2014 and remained in this position until February 2016.[24]  After stepping down as CFO, Buss worked as a

---

[20] Elon has served as the Chief Executive Officer and Chief Technology Officer of SpaceX since 2002.  PTO ¶ 35.

[21] PTO ¶¶ 104–06.

[22] *See* PTO ¶¶ 50, 57, 66, 73, 89, 94.

[23] PTO ¶ 94.

[24] Tr. 2383:8–23, 2396:3–2397:14 (Buss); PTO ¶ 95.  Plaintiffs allege that Buss earned more than $30 million in compensation while serving as SolarCity's CFO.  *See* Second Am. Verified Class Action and Deriv. Compl. ("Compl.") (D.I. 102) ¶ 29; JX 995 at 44 (SolarCity's April 2016 proxy statement).  At trial, however, Buss credibly testified that his compensation "was nowhere near that [amount].  It was a fraction."  Tr. 2386:2–6 (Buss).  Although SolarCity's April 2016 proxy statement reported that Buss's total compensation for 2015 was approximately $31 million, this amount included unvested equity awards.  Tr. 2386:24–2387:7 (Buss).  The overwhelming majority of these equity awards, consisting of restricted stock awards and option awards, never vested.  Tr. 2387:3–2389:21 (Buss).  The amount of compensation Buss actually earned, as he credibly testified, was less than 10% of the amount proffered by Plaintiffs and, according to Buss, was "actually below market."  *Id.*

8

consultant for SolarCity until March 2016.[25] When the Tesla Board was considering the Acquisition, approximately 45% of Buss's wealth was attributable to his relationship with Elon and Elon's companies.[26] At the time the Acquisition closed, Buss beneficially owned 111,241 shares of Tesla common stock[27] and 37,277 shares of SolarCity common stock,[28] meaning his investment in Tesla was worth significantly more to him than his investment in SolarCity.[29] According to Tesla's public disclosures, Buss did not qualify as an independent director under the NASDAQ Listing Rules.[30]

Ehrenpreis is co-founder and co-managing partner of DBL Equity Fund-BAEF II, L.P. ("DBL"), a venture capital fund he started with Nancy Pfund to pursue "impact investing."[31] Pfund served on SolarCity's Board and its special committee

---

[25] Tr. 2397:15–2298:22 (Buss); PTO ¶¶ 95–96.

[26] JX 3215 at 4 (Buss's declaration stating that as of September 23, 2016, he owned Tesla shares valued at $23.1 million, SolarCity shares valued at $720,000, and more than $30 million in net assets exclusive of his Tesla and SolarCity holdings); Tr. 2442:6–2443:2 (Buss) (same).

[27] PTO ¶ 98.

[28] PTO ¶ 97.

[29] JX 2862 at ¶¶ 27–30.

[30] *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *3 (Del. Ch. Feb. 4, 2020) (denying defendants' motion to dismiss) (the "MTD Opinion") (citing JX 345 at 24). The MTD Opinion is filed as D.I. 128.

[31] Tr. 2257:8–21 (Ehrenpreis); *see also* Ehrenpreis Dep. 13:6–14.

for the Acquisition.[32]  DBL held 928,977 shares of SolarCity common stock at the

time of the Acquisition, making it one of SolarCity's largest investors.[33]  DBL also

invested several million dollars in SpaceX.[34]  Ehrenpreis personally held

254,713 shares of SpaceX stock at the time of the Acquisition.[35]  SpaceX, in turn,

held millions of dollars of SolarCity bonds at the time of the Acquisition and would

have been adversely affected had SolarCity failed.[36]  DBL's promotional materials

identify Tesla, SolarCity and SpaceX as DBL portfolio companies, and identify Elon

and Lyndon as "Advisors" to DBL.[37]  While he denies a "personal friendship,"[38]

Ehrenpreis acknowledges that Elon has had a "significant influence on [his]

---

[32] PTO ¶¶ 107–08.

[33] JX 2121 at 185.

[34] Tr. 2329:8–2330:17 (Ehrenpreis); JX 2741 at 9.

[35] JX 2741 at 9; Tr. 2329:8–2330:6 (Ehrenpreis).

[36] *See* Tr. 170:18–21 (Elon) ("Q.  But to be clear, SpaceX was the primary purchaser of bonds from SolarCity; correct?  A.  I think the single biggest, but there were many others."); JX 2121 at 121 (describing the ownership of Solar Bonds, including the amounts purchased by SpaceX, Elon and other parties).

[37] JX 577 at 4 ("Over the last eleven years, the success of our portfolio companies and double bottom line assistance to our management teams has helped to put impact investing on the map.").

[38] Tr. 2279:12–15 (Ehrenpreis).

10

professional career" and that his continued status as a Tesla director has been "a real benefit in fund-raising."[39]

Gracias, like Elon, was a director of both Tesla (since May 2007)[40] and SolarCity (from February 2012 until the Acquisition closed).[41] Gracias was recused from certain discussions regarding, and from voting on, the Acquisition.[42]

Jurvetson served on Tesla's Board from June 2009 to July 2020.[43] He was a managing director of a venture capital firm, Draper Fisher Jurvetson ("DFJ"), SolarCity's third-largest institutional stockholder, which held 4,827,000 shares as of the Acquisition.[44] Jurvetson personally owned 417,000 shares of SolarCity common stock,[45] but he testified that his personal holdings in SolarCity were equivalent to routine single-day swings of his net worth.[46] At the time of the Acquisition, Jurvetson also personally held 50,000-plus shares of Tesla stock,[47] and beneficially

---

[39] Ehrenpreis Dep. 10:10–13, 62:20–63:6.

[40] PTO ¶ 57.

[41] PTO ¶ 60.

[42] JX 2121 at 68.

[43] PTO ¶ 73.

[44] JX 1234 at 16; JX 2121 at 115.

[45] Tr. 2229:10–24 (Jurvetson).

[46] Tr. 2231:20–2232:21 (Jurvetson).

[47] Tr. 2235:3–24 (Jurvetson).

owned 7,008,576 shares of SpaceX.[48]  Additionally, Jurvetson's partner at DFJ, John Fisher, was on the SolarCity Board.[49]  Jurvetson was also serving as a SpaceX director at the time of the Acquisition.[50]

Kimbal is Elon's brother.[51]  As such, he "did not qualify as independent under the NASDAQ rules, which have a bottom line standard that a director is not independent if [he] has 'a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment.'"[52]  He was also a SolarCity stockholder and had significant margin loans on his SolarCity shares at the time of the Acquisition.[53]  Kimbal was not recused from discussions regarding, or the Tesla Board vote on, the Acquisition.[54]

---

[48] PTO ¶ 81.

[49] Tr. 2242:19–23 (Jurvetson); PTO ¶ 79.

[50] JX 2744 at 8–10; PTO ¶ 79.

[51] Tr. 99:21–24 (Elon); PTO ¶ 44.

[52] *Sandys v. Pincus*, 152 A.3d 124, 126 (Del. 2016) (quoting NASDAQ Marketplace Rule 5605(a)(2)); *see id.* at 131 ("[T]he Delaware independence standard is context specific and does not perfectly marry with the standards of the stock exchange in all cases, but the criteria NASDAQ has articulated as bearing on independence are relevant under Delaware law and likely influenced by our law.").

[53] JX 2742 at 8–9, 17–18; JX 519.

[54] PTO ¶ 56.

Denholm has continuously served on Tesla's Board since August 2014[55] and has served as the Tesla Board chair since November 2018.[56] She has never held any financial interest in SolarCity.[57] Her disinterest in the Acquisition and her independence were not seriously questioned at trial.[58]

Several other non-party fact witnesses testified at trial or via deposition: (1) George Bilicic, the 30(b)(6) representative from Lazard Ltd., which served as SolarCity's financial advisor for the Acquisition;[59] (2) Courtney McBean, the 30(b)(6) representative from Evercore Partners, which served as Tesla's financial advisor for the Acquisition;[60] (3) Tanguy Serra, the President and CFO of SolarCity from early 2016 until just before the Acquisition closed;[61] (4) Jeffrey Straubel, a co-founder of Tesla, who was a member of the SolarCity Board and

---

[55] PTO ¶ 66.

[56] PTO ¶ 67.

[57] PTO ¶ 69.

[58] As this Court observed previously in this litigation, Denholm was not a dual fiduciary, and she had no financial interest in SolarCity. *In re Tesla Motors, Inc. S'holder Litig.*, 2020 WL 553902, at *12 (Del. Ch. Feb. 4, 2020) (denying defendants' motion for summary judgment) (the "SJ Opinion"); *see also* PTO ¶¶ 69–72. The SJ Opinion is filed as D.I. 385.

[59] PTO ¶ 187.

[60] PTO ¶ 188.

[61] Tr. 893:5–8 (Serra); Serra Dep. 22:14–24:15.

Tesla's CTO at the time of the Acquisition;[62] (5) Jason Wheeler, Tesla's CFO from November 2015 to April 2017;[63] (6) Toby Corey, SolarCity's former chief revenue officer;[64] (7) Hayden Barnard, SolarCity's chief revenue officer at the time of the Acquisition;[65] (8) Donald Kendall, a SolarCity director and member of its special committee;[66] and (9) Radford Small, a capital markets executive at SolarCity who became its CFO just before the Acquisition.[67]

The parties also presented several expert witnesses. Plaintiffs offered the expert opinions of Ronald Quintero, Murray Beach and Juergen Moessner. Quintero testified that, in his opinion, SolarCity was "insolvent" and "would have been unable to satisfy its financial obligations . . . as a standalone entity, absent the merger."[68] Beach testified that SolarCity could not have executed a seasoned equity offering as of a specific date, suggesting that SolarCity's ability to finance itself was

---

[62] PTO ¶¶ 114–15.

[63] PTO ¶ 116.

[64] Corey Dep. 16:4–7, 19:15–20:23.

[65] Barnard Dep. 34:18–22.

[66] *See* PTO ¶ 161.

[67] Small Dep. 14:18–16:23.

[68] JX 2840 at 4.

14

dangerously limited prior to the Acquisition.[69]  Moessner testified that the financial projections used by SolarCity and Tesla (and their financial advisors) to value SolarCity were overly optimistic.[70]

For his part, Elon offered the expert testimony of Dan Reicher, Jonathan Foster, Frederick Van Zijl and Daniel Fischel.  Reicher testified that the combination of an EV company and a solar company could achieve several strategic synergies, and the Acquisition provided those benefits to Tesla.[71]  Foster testified that the Tesla Board's process was consistent with custom and practice.[72]  Van Zijl offered rebuttal testimony and, in particular, countered the position that SolarCity was insolvent.[73]  And Fischel testified that Tesla did not overpay for SolarCity.[74]

## B. The Tesla Motors Master Plan

In 2006, Elon authored and released the Master Plan.[75]  There, he declared that Tesla would "accelerate the world's transition to sustainable energy" by

---

[69] JX 2834 at 1, 30, 33.

[70] JX 2833 at 4–5.

[71] JX 2841 at 4–5.

[72] JX 2842 at 7–8.

[73] JX 2853 at 3–6.

[74] JX 2839 at 7.

[75] JX 12; Tr. 21:3–17 (Elon).

15

"help[ing] to expedite the move from a mine-and-burn hydrocarbon economy towards a solar electric economy."[76] As the Master Plan explained, EVs, by themselves, are not a complete solution to reducing carbon emissions because the traditional source of electricity used to power EVs is, itself, derived from fossil fuels.[77] With this in mind, the Master Plan was built upon "three fundamental pillars": (1) sustainable energy generation from clean sources, such as solar power; (2) energy storage in batteries; and (3) energy consumption through EVs.[78] Tesla's directors uniformly testified that they understood from the outset that Tesla's long-term goal was to "accelerate the world's transformation to an alternative energy future."[79]

---

[76] JX 12 at 1; Tr. 86:18–20 (Elon).

[77] JX 12 at 2; Tr. 25:10–26:16 (Elon).

[78] Tr. 21:13–24:8, 409:7–410:19 (Elon); JX 12 at 2.

[79] Tr. 445:24–446:16 (Kimbal); Tr. 1953:15–17 (Denholm) ("The entire mission of the company was to accelerate the world's transition to sustainable energy."); Tr. 2215:22–2216:9 (Jurvetson) ("[W]hen we first invested in Tesla, we were aware of the master plan. . . . And if I look out 50 years, it seems inevitable that we will have a future that is all electric vehicles with storage and renewable sources of electricity to feed them. You couldn't . . . make an electric [vehicle] without also dealing with the electricity supply problem."); Tr. 2261:22–2262:8 (Ehrenpreis) ("A. Tesla had published what was known as the master plan, which laid out the long-term strategy. Q. And what did you understand that long-term strategy to be? A. The strategy was a design to essentially shift from a fossil-fuel-reliant economy to a more sustainable economy and do so through a set of stages that started with the production of a vehicle, and then ultimately added a storage component to that, and then ultimately a renewable generation component."); Tr. 2371:22–2373:21 (Buss) (testifying that he was "super passionate" about "the master plan concept" to

16

SolarCity was part of this vision.[80]   It is specifically mentioned in the Master Plan, where Tesla announced it would be co-marketing "modestly sized and priced" solar panels from SolarCity along with Tesla's sports car.[81]

## C. Tesla Before the Acquisition

As the industry leader for both EVs and battery technology,[82] Tesla was uniquely positioned vertically to integrate EVs, solar energy, and stationary battery storage.[83]   Tesla's leadership understood that energy generated from the sun can produce "ridiculous amounts of power" using little space; it is also more affordable and scalable than other clean energy alternatives.[84]   On the other hand, they also understood that consumers historically viewed solar energy as unreliable because, when the sun is not shining, traditional solar power systems do not generate or

___

become "the leader and model for sustainable energy" and that solar was "definitely a big part" of Tesla's future plans).

[80] Indeed, Elon explained that it was "largely an accident of history" that SolarCity was formed separately from Tesla.  JX 1618 at 2; *see* Tr. 447:12–448:17 (Kimbal) (explaining that it was always understood SolarCity would and should be part of Tesla).

[81] JX 12 at 3; Tr. 23:13–24:8 (Elon).

[82] Tr. 27:7–9 (Elon).

[83] Tr. 1911:13–1912:6 (Reicher).

[84] JX 2992; *see also* Tr. 898:14–24 (Serra); Tr. 485:3–24 (Kimbal).

17

deliver energy.[85]  Another piece was "needed to [facilitate] a proper transition to the sustainable energy world"—high capacity stationary battery storage.[86]

Well before the Acquisition, Tesla invested heavily in batteries for its EVs and energy storage products.  In February 2014, Tesla announced the construction of its "Gigafactory," a massive lithium-ion battery manufacturing factory.[87] The Gigafactory "was intended to produce more [lithium-ion] batteries . . . than the entire manufacturing battery production of every other manufacturing facility on the planet earth combined."[88]  To achieve economies of scale, the Gigafactory would have to be fully utilized.[89]  Tesla anticipated that the Gigafactory would easily meet its need for batteries to power Tesla EVs,[90] but the excess manufacturing capacity

[85] Tr. 26:17–27:6, 407:3–409:1 (Elon); JX 2992; Tr. 1840:2–17 (Peter); Tr. 1910:1–16 (Reicher).

[86] JX 2992; *see also* Tr. 2834:10–17 (Gracias); Tr. 2266:6–2267:3 (Ehrenpreis).

[87] JX 169 at 8.

[88] Tr. 2265:12–2266:5 (Ehrenpreis); *see also* JX 2382 at 1 ("Already, the current structure has a footprint of 1.9 million square feet, which houses 4.9 million square feet of operational space across several floors.  And we are still less than 30% done.  Once complete, we expect the Gigafactory to be the biggest building in the world.").

[89] *See* Tr. 2216:10–19 (Jurvetson) ("We were going to start producing batteries at a scale that was unprecedented at the time.  And whenever you build a new factory with an enormous capacity for a new product like batteries . . . you want to fully utilize that factory from day one.  You want to be at 100 percent capacity utilization to make the business make business sense."); JX 2382 at 1–2.

[90] Tr. 2425:21–2426:14 (Buss); Tr. 2832:5–2833:2 (Gracias); Tr. 1954:3–15 (Denholm); Tr. 2215:19–2217:15 (Jurvetson).

presented opportunities to advance the goals stated in the Master Plan with the design and production of solar energy storage products, including "Powerwalls," designed to store solar energy for home use, and "Powerpacks," designed to store solar energy for commercial use.[91]

The Tesla Board toured the Gigafactory while it was under construction on March 3, 2015.[92] At the conclusion of the tour, having witnessed firsthand the massive scale and capacity of the facility, the Tesla Board discussed Tesla's long-stated goal of acquiring a solar company.[93] A little over a month later, Tesla publicly launched Tesla Energy and debuted its Powerwall and Powerpack products.[94] At the launch, Elon explained the company's vision: "[T]he path that I've talked about, the

---

[91] Tr. 451:9–452:12 (Kimbal); Tr. 2215:14–2217:15 (Jurvetson) ("Where would those batteries go? Products like Powerwall, right, stationary storage . . . ."); JX 824 at 10 (Tesla Form 10-K describing production at the Gigafactory); *see also* Tr. 38:4–16 (Elon) (describing Powerwalls).

[92] JX 306 at 1 (Tesla Board minutes); Tr. 2217:16–2218:21 (Jurvetson); Tr. 453:7–455:11 (Kimbal).

[93] JX 849 at 1 (recognizing that the Tesla Board had "a number of previous discussions" about "a potential acquisition of SolarCity," including "at the regular meeting of the Board on March 3, 2015"); Tr. 2833:3–9 (Gracias); Tr. 454:5–18 (Kimbal); Tr. 1954:3–15 (Denholm). As Plaintiffs point out, the discussion regarding a solar company acquisition was not documented in board minutes. But each member of the Tesla Board testified consistently and credibly that the discussion occurred. Perhaps the reason there are no minutes is that the conversation occurred while the Tesla directors were touring the roof of the Gigafactory. Tr. 2832:5–2833:9 (Gracias).

[94] JX 2992; Tr. 2267:13–2268:4 (Ehrenpreis).

solar panels and the batteries, it's the only path that I know that can do this. And I think it's something that we must do and we can do and that we will do."[95]

Having now built the Gigafactory and reiterated the goals of the Master Plan, Tesla set the stage for a combination of its battery storage capabilities with solar energy. Prior to the Acquisition, Tesla had explored partnering with SolarCity at arm's length. Specifically, the two companies formed a joint venture to convert the power supply on an island in American Samoa from diesel generators to solar power.[96] But the related-party nature of the companies' dealings made cooperation between engineers "very difficult" and ultimately caused the project to fail.[97] If Tesla was to collaborate with SolarCity effectively, the two companies would need to combine.[98]

## D. SolarCity Before the Acquisition

As explained below, SolarCity had an innovative and aggressive business model that prioritized growth and relied on external financing to fund that growth.

---

[95] JX 2992.

[96] JX 2331; Tr. 1844:14–1846:2 (Peter).

[97] Tr. 1846:3–20, 1852:14–1854:16 (Peter); Tr. 448:18–450:1 (Kimbal) (describing the related-party nature of the companies' relationship as "very difficult and frustrating" and "an enormous headache for [Tesla] that would reach the board level").

[98] *See, e.g.*, JX 1618 ("We can't [integrate energy generation and storage] well if Tesla and SolarCity are different companies, which is why we need to combine and break down the barriers inherent to being separate companies.").

20

This model, combined with macroeconomic headwinds, resulted in liquidity problems for SolarCity in late 2015 into 2016.

### 1. The SolarCity Business Model

At bottom, SolarCity designed, sold, installed and financed solar PV systems for residential and commercial customers.[99] SolarCity sold these systems through various means, including internal call centers, door-to-door sales, in-store sales at Home Depot, a channel partner network, and a customer referral program.[100] Because most consumers cannot afford to purchase expensive solar panels outright, SolarCity offered financing options.[101] If a customer chose to finance the solar system, SolarCity would pay the cost of installing and activating the solar panels in exchange for the customer's commitment to repay SolarCity incrementally, with interest, over a period of 20–30 years.[102] The vast majority of SolarCity's customers chose to finance their systems,[103] and the delinquency rate was less than 1%.[104]

---

[99] PTO ¶ 133.

[100] PTO ¶ 135.

[101] Tr. 1638:3–1639:7 (Lyndon); Tr. 898:6–13 (Serra); *see* PTO ¶¶ 136–42.

[102] Tr. 1209:1–13 (Van Zijl); JX 199 at 21; Tr. 900:3–12 (Serra).

[103] Tr. 900:3–12 (Serra); Tr. 1650:4–10 (Lyndon).

[104] Tr. 936:15–938:17 (Serra); JX 772 at 8 ("Delinquencies of 180+ days remain comfortably below 1%."); JX 700 at 27 (showing delinquency rates consistently below 1%).

To facilitate this business model, SolarCity organized itself into two segments: DevCo and PowerCo. "DevCo represent[ed] growth and investment"— booking new customers and installing new systems; PowerCo "represent[ed] the long-term return on" SolarCity's investment in the form of a "steady stream of energy, revenue and cash flow over the estimated 30-year" life of SolarCity's contracted solar installations.[105] Within the organization, SolarCity referred to DevCo as the "Goose That Lays Golden Eggs" and PowerCo as the basket containing those eggs.[106]

This financing model (and SolarCity's prodigious growth) required SolarCity to raise capital to bridge the gap between its short-term costs and long-term cash flows.[107] SolarCity historically monetized a portion of its long-term recurring cash flows through variable interest entities (with third-party investors) and financing structures (primarily tax equity funds and asset-backed notes).[108] SolarCity also sold

---

[105] JX 530 at 6; Tr. 1436:5–17 (McBean); Tr. 1984:7–1985:8 (Denholm).

[106] JX 718 at 7–8, 18; Tr. 966:11–968:18, 970:3–972:1 (Serra).

[107] *See* JX 700 at 58 (observing "M[egawatts ("MW")] Have Grown 80% Per Year Since 2013"); JX 2853 at 11 (observing that between 2012 and 2015 SolarCity's revenues had a compound annual growth rate of 47% and its customer compound annual growth rate was 90%); Tr. 161:19–162:5 (Elon); Tr. 901:15–20 (Serra); Tr. 1641:23–1642:24 (Lyndon); Tr. 684:14–18 (Moessner); JX 2853 at 16; Tr. 1209:1–13 (Van Zijl); Tr. 1144:14–18 (Beach).

[108] JX 2853 at 7, 18; Tr. 1209:22–1210:6 (Van Zijl).

Solar Bonds, principally to Elon and SpaceX.[109]   When Evercore diligenced SolarCity in connection with the Acquisition, it was struck by the success of the SolarCity financing model and the sophistication of its capital markets team.[110] At the end of 2016, SolarCity sponsored over 54 financing funds with 22 investors[111] and carried substantial debt.[112]

In 2014, Elon asked Buss, who had considerable solar and public company CFO experience, to join SolarCity as CFO to "clean up" SolarCity's financial accounting.[113]  Following Buss's arrival, SolarCity attempted to integrate vertically by acquiring solar-cell manufacturer Silevo LLC in September 2014.[114]  But Silevo was a startup and had no experience with high-volume manufacturing.[115]

---

[109] *See* Tr. 170:18–21 (Elon) ("Q.  But to be clear, SpaceX was the primary purchaser of bonds from SolarCity; correct?  A.  I think the single biggest, but there were many others."); JX 2121 at 121 (describing the distribution of Solar Bonds, including the amounts purchased by SpaceX, Elon and other parties).

[110] Tr. 1409:1–11 (McBean).

[111] PTO ¶ 144.

[112] JX 1231 at 18 (SolarCity—Summary Debt Overview).

[113] Tr. 2384:11–2385:10 (Buss).

[114] PTO ¶ 134; JX 241 at 2.

[115] Straubel Dep. 112:13–24; *see also* JX 1917 (email from Straubel stating that "Silevo is certainly not ready [to produce the solar roof] at any kind of volume"); JX 1708 (email from Chang stating that Silevo was expected to supply "a fraction of [SolarCity's] overall module consumption" and observing a "[l]ack of maturity in Silevo manufacturing; still very much in R&D stage"); Tr. 2304:5–11 (Ehrenpreis) ("Q.  Was SolarCity in the

Consequently, by 2015, SolarCity was incurring substantial costs building-out Silevo's factories.[116]

## 2. SolarCity's Liquidity Problems

By the fall of 2015, the culmination of massive capital outlays for Silevo, debt maturities coming due, and lower-than-expected installations caused SolarCity's management to believe that a "major liquidity crisis" was on the horizon.[117] On September 29, 2015, a SolarCity executive reminded his superiors that SolarCity needed to maintain an average monthly cash balance of approximately $116 million to remain compliant with its revolving debt facility's "Liquidity Covenant."[118] A breach would trigger a default on SolarCity's revolver and cross-defaults on other debts.[119] At the same time, management projected that cash could drop to

---

manufacturing business at all at the time of the acquisition? A. Just some. They had a small part of the business known as Silevo, producing some panels."); Tr. 1650:23–1651:14 (Lyndon) (testifying that Silevo manufacturing was a "[v]ery small part of [SolarCity's] business" at the beginning of 2016 because they "were still ramping up manufacturing" and "[t]he technology was a new technology"); JX 1096 (email from Straubel expressing concerns about manufacturing).

[116] JX 1587 at 54, 277 (Tesla Board presentation explaining that "SolarCity's manufacturing operations, Silevo, require significant expenditures" and detailing those expenditures); JX 780 at 68–69, 146.

[117] JX 491 at 1; *see also* Tr. 2408:14–20 (Buss) (describing looming liquidity crisis).

[118] JX 486 at 2–3.

[119] JX 2002 at 3; *see* Serra Dep. 83:13–84:16.

$35 million by the week of November 20, 2015.[120]  The next day, SolarCity's new CFO, Serra, informed management that SolarCity's "total war chest" of available cash, which had filled to $1.1 billion in January 2015, would be drawn down to only $200 million by year-end.[121]  To manage the company's cash position, Lyndon immediately instituted "weekly cash meeting[s]."[122]

On October 15, 2015, Buss and Lyndon told the SolarCity Board, including Elon and Gracias, that SolarCity needed $180 million to $300 million in additional cash to meet its various obligations.[123]  SolarCity management also reported that 2015 installations were expected to be "920MW versus budget of 1.05GW [gigawatts]," thereby "reduc[ing] cash inflow."[124]  On October 21, 2015, following a weekly cash meeting, SolarCity management confirmed that "updated forecast[s] project[] our December monthly average balance at ~$91 million, which is $24 million below our revolver covenant threshold."[125]  At the next SolarCity Board meeting, management informed SolarCity's directors that management had spoken

---

[120] JX 486 at 2–3.

[121] JX 491 at 1.

[122] JX 503 at 1; JX 505; Lyndon Dep. 38:15–39:7.

[123] JX 506 at 4.

[124] *Id.* at 3.

[125] JX 522 at 1.

25

with two investment banks the company had been working with about a potential equity raise, but "both banks d[id] not recommend an equity raise" at the time because market volatility would likely result in "a meaningful discount."[126]

In late 2015, macroeconomic headwinds exacerbated SolarCity's liquidity problems. One of SolarCity's competitors, SunEdison, Inc., filed for bankruptcy.[127] This increased market scrutiny of solar companies, which, in turn, increased the time needed to close asset-backed refinancing deals.[128] Changes in net metering laws also had a profound—and highly publicized—effect on SolarCity.[129] In addition, certain federal tax credits available to solar customers were set to expire, and although Congress had historically extended the tax credits, it had yet to do so.[130]

---

[126] JX 527 at 8; *see also* JX 514 at 5; Buss Dep. 172:23–173:3. The presentation suggested other options, stating "[a]n At The Market [ATM] program is an option as well as a traditional marketed deal or bank bought deal." JX 527 at 8.

[127] JX 3180.

[128] Tr. 2697:12–2698:24 (Moessner).

[129] Net metering allows solar customers to sell excess solar energy back to the power grid, reducing their electricity bills. Tr. 1645:10–1646:8 (Lyndon); *see also* Tr. 1839:13–20 (Peter) ("Q. What is net metering? Could you remind us what net metering is? A. Sure. . . . The customer essentially gets full retail credit for their excess solar production during the day that they can count against their nighttime usage when the sun isn't shining."); Tr. 1661:19–1665:5 (Lyndon) (explaining effects of changes in net metering laws on SolarCity).

[130] *See, e.g.*, JX 2841 at 12 ("While the credit was initially set to expire at the end of 2007, Congress voted to extend the credit on three separate occasions—in 2006, 2008 and again in 2015."); JX 596 (letter and emails discussing the tax credits).

To combat its liquidity issues, SolarCity increased monetization. Serra developed a four-year plan to solve the cash crisis, which he presented to SolarCity executives in December 2015.[131] Among other components, Serra introduced the idea of "cash equity" transactions—selling a portion of the future cash flows from recurring customer payments to a third-party investor in exchange for an upfront payment.[132] SolarCity was quick to implement the plan; it completed the industry's first cash equity transaction with John Hancock Financial in May 2016.[133] Two similar transactions followed in 2016,[134] and by Q1 2016, SolarCity's DevCo was cash-flow positive.[135] SolarCity retained the rest of its future cash flows, which it estimated to be worth billions of dollars.[136]

---

[131] Tr. 956:5–18, 957:17–20, 961:12–964:7 (Serra); JX 604 at 1.

[132] Tr. 1210:7–17 (Van Zijl); JX 2853 at 7, 18–19; JX 1855 at 10; Tr. 981:20–982:7 (Serra). These cash equity transactions have now become standard in the solar power industry. Tr. 981:20–984:19 (Serra); JX 1008 at 12; JX 2853 at 19.

[133] Tr. 982:1–3 (Serra); JX 2853 at 19; Tr. 1243:17–23 (Van Zijl).

[134] Tr. 2690:6–2692:15 (Moessner); Tr. 2720:14–2722:15 (Beach).

[135] Tr. 984:20–985:3, 1022:18–1023:10 (Serra). As Plaintiffs point out, SolarCity was not "generating [positive] cash flows [solely] from operations," as the SEC noted. JX 1185 at 8; *see also* JX 1849 ("[W]e cannot use the words 'cash flow positive' [in our Q2 shareholder letter and slide deck]. The SEC sent us a letter saying we should not use those words. The reason for being cash flow positive is the financing of the assets.").

[136] JX 1855 at 9; Tr. 1215:22–1217:1 (Van Zijl); Tr. 923:20–932:11 (Serra). Using a "retained value" methodology (calculating the net present value ("NPV") after accounting for the repayment of associated debt), SolarCity valued its future cash flows as of Q2 2016

27

Despite achieving success with its creative financing strategies, SolarCity still did not have the cash it needed "to sustain the growth and produce new volume in line with [its four-year] plan."[137] By Q1 2016, the SolarCity Board decided to shift focus to cash sales and began reducing costs.[138] These steps reduced "deployments" and that, in turn, caused SolarCity to fall short of Serra's bullish four-year plan.[139] Yet SolarCity management felt the company was "in a very good position" at the beginning of 2016, given that it "had cash [on hand] of about $360 million."[140]

Meanwhile, SolarCity's lenders were concerned about its declining creditworthiness.[141] In early 2016, the Office of the Comptroller of Currency—one

---

at $2.2 billion (NPV) in retained value. This amount was available for monetization at the time of the Acquisition. Tr. 1215:11–1217:1, 1226:24–1227:21 (VanZijl); Tr. 923:20–932:11, 964:4–16, 1013:1–14, 1070:18–1071:21 (Serra); Tr. 873:9–13 (Quintero); Tr. 684:8–13 (Moessner); JX 1855 at 9.

[137] Tr. 2686:6–17 (Moessner).

[138] Tr. 1681:17–1682:11 (Lyndon) (testifying that SolarCity determined it could "reduce capital expenditures," "reduce headcount" and work with vendors to "push out payables"); Tr. 1682:15–18 (Lyndon) ("The—the right-sizing the company, we definitely wanted to do. The slowing down manufacturing and deploying that and slowing down that capital, we—we didn't necessarily want to do that.").

[139] *See* Tr. 640:2–14 (Moessner) ("[I]f you lack the capability to underwrite because you're liquidity-constrained, then that slows your machinery, slows your operation, and your growth is significantly hampered. You simply can't process the volume anymore.").

[140] Tr. 1680:21–24 (Lyndon).

[141] Tr. 645:11–646:20 (Moessner); Tr. 1309:10–1310:5 (Van Zijl); Tr. 1687:3–1688:1 (Lyndon).

28

of the primary regulators of SolarCity's banks—downgraded SolarCity's credit rating.[142] Even so, in the first quarter of 2016, SolarCity was able to secure $305 million in tax equity financing, although that amount fell well short of the $940 million originally projected.[143]

Despite its cash problems, the evidence leaves little doubt that SolarCity was still a valuable company in 2016.[144] It was the undisputed market share and cost leader in the solar energy sector, with over 30% market share for U.S. residential solar, 22% market share for U.S. commercial solar, and 15% of total U.S. solar.[145]

---

[142] Tr. 994:11–13 (Serra).

[143] Tr. 1304:1–1306:1 (Van Zijl); *compare* JX 669 at 3, *with* JX 951 at 2.

[144] Plaintiffs argue that SolarCity was becoming increasingly less valuable with every customer transaction because "SolarCity historically spent more than $2.00 in operating and equipment costs to generate $1.00 in revenue. By 2015, SolarCity spent more than $1.00 in sales and marketing costs alone to produce $1.00 in revenue." Pls.' Post-Trial Br. ("POB") (D.I. 476) at 63. This is misleading. As Elon correctly observed, "Plaintiffs focus only on costs and revenue *within a single accounting recognition* period, ignoring that SolarCity's entire business model was creating long-term assets that would generate recurring revenue for 20–30 year periods." Def.'s Answering Post-Trial Br. ("DAB") (D.I. 481) at 21–22; *see also* Tr. 1211:5–1212:21 (Van Zijl) (testifying that the present value per watt installed and activated was over 50 cents higher than the cost); Tr. 1665:16–1666:21 (Lyndon) (explaining the SolarCity business model "is to raise capital and deploy it into solar assets that produce long-term recurring revenue streams"); Tr. 2846:14–2849:7 (Gracias). As Serra testified, SolarCity was the residential solar industry's cost leader and its installation costs per watt were "dramatically cheaper than anyone else." Tr. 907:18–909:22, 950:5–951:9 (Serra); *see also* JX 2853 at 16 ("SolarCity also had the lowest all-in unit costs in the industry in the year leading up to the Initial Tesla Proposal. . . . In exchange for incurring [] upfront costs, SolarCity received long-term cash flows . . . .").

[145] JX 700 at 13; Tr. 903:22–905:16 (Serra); Tr. 1643:1–10 (Lyndon).

With respect to residential solar installations and revenues, SolarCity exceeded its two closest competitors (Vivint and Sunrun) combined.[146] And with respect to costs, SolarCity's were 30% lower than its competitors.[147] As noted, as of Q2 2016, SolarCity had accumulated what it estimated to be $2.2 billion (NPV) in retained value,[148] using a 6% discount rate and assuming 100% contract renewals.[149] And it continued to raise billions of dollars from sophisticated financial institutions that had deep access to SolarCity's financials.[150] SolarCity's cash challenges were ramifications of rapid growth, not market disinterest in its product or poor business execution.[151]

---

[146] Tr. 873:14–24 (Quintero).

[147] Tr. 1653:19–1654:19 (Lyndon).

[148] Tr. 1215:22–1216:6 (Van Zijl); Tr. 923:20–932:11 (Serra); JX 1855 at 9.

[149] Tr. 2687:9–15 (Moessner).

[150] JX 2853 at 21, 62 (illustrating that SolarCity raised $2.7 billion from 2015 to the first half of 2016); Tr. 981:5–19 (Serra).

[151] *See* Tr. 1219:17–24 (Van Zijl) ("[T]he management had a number of things that were their prerogative, one of which was to simply slow down their growth. If they had stopped their growth, the company would have become very cash positive. That would have been bad for their equity, it wasn't advisable to do that, but they could have slowed down their growth rate. Growing over 45 percent on a sustained basis is a very, very rapid rate of growth.").

**E. The Tesla Board Rebuffs Elon's Initial Acquisition Overtures**

In February 2016, Lyndon convened an emergency "cash planning" meeting with Elon and SolarCity management to discuss "how we are going to manage our cash needs."[152]  Among other things, SolarCity management discussed measures to conserve cash,[153] including ranking accounts payable to modulate costs.[154]  Management also developed "finance postpone guidelines" to suspend certain installations based on their cash impact.[155]  Immediately following this February 2016 meeting, Elon and Lyndon discussed Tesla potentially acquiring SolarCity.[156]

---

[152] Tr. 1755:11–16 (Lyndon); *see also* JX 777; Tr. 162:23–163:12 (Elon).

[153] Tr. 1755:7–10 (Lyndon); Lyndon Dep. 71:14–21; JX 812; JX 794; JX 1110 at 1–2.

[154] JX 882 (SolarCity cash forecast).

[155] JX 891 at 4.

[156] Tr. 1755:21–24 (Lyndon).  Plaintiffs argue that the Tesla stockholder vote on the Acquisition was not informed because the Joint Proxy Statement/Prospectus ("Proxy") did not disclose Lyndon and Elon's preliminary discussions about the Acquisition. *See* JX 2121; POB at 54–55.  But the Proxy *did* disclose that Elon and Lyndon "have at various points . . . discussed . . . the possibility of Tesla acquiring SolarCity," including that "[i]n February 2016, Mr. Elon Musk suggested to Mr. Lyndon Rive that he believed more serious consideration of a potential combination between Tesla and SolarCity was in order." JX 2121 at 66–67.  Any discussions that occurred later happened outside of the merger *negotiations* context. *See* Tr. 1703:13–23 (Lyndon) ("Q. Yeah. Okay.  So after the public offer was made, did you continue to discuss the parameters of the transaction, the merger, with your cousin Elon Musk?  A.  No.  At that point, we established a special committee, and I was removed for the most part of the process.  Q.  Did you have any conversations with Elon Musk?  A.  Yes, I still had plenty of conversations relating to the operations of SolarCity."); JX 1278 at 1 (discussing the "economic value creation of [the] transaction"); JX 1340 at 1 (discussing the impact of SolarCity's debt on Tesla's balance sheet); JX 1455 at 1 (discussing SolarCity's cash balances).

31

On February 27, 2016, Elon called Tesla's CFO, Jason Wheeler, and asked him to prepare a financial analysis of a Tesla/SolarCity merger for presentation at a special Tesla Board meeting two days later.[157] Before the meeting, Lyndon and Elon arranged for the law firm Wilson Sonsini Goodrich & Rosati—which had historically represented both companies—to waive conflicts and attend Tesla's Board meeting.[158]

At this special meeting of the Tesla Board, Tesla's directors considered a potential acquisition of SolarCity to "complement the Company's Tesla Energy business . . . and to create other product, service and operational synergies."[159] Wheeler presented preliminary financial information, including information highlighting SolarCity's historically low stock price.[160] While the Tesla Board recognized the significant potential product synergies,[161] it ultimately declined to proceed with an acquisition, notwithstanding Elon's strong endorsement, so that

---

[157] Wheeler Dep. 30:8–31:7.

[158] JX 833. Plaintiffs emphasize that the conflict waiver was not disclosed to Tesla stockholders. POB at 54. While that is true, it is difficult to see how the disclosure would have been material. After the February 2016 Tesla Board meeting attended by Wilson Sonsini, during which the Board decided *not* to proceed with the Acquisition, the firm had nothing more to do with the Acquisition. *See* JX 849; Tr. 393:6–15 (Elon).

[159] JX 849 at 1.

[160] *Id.*; JX 855 at 5 (comparing current stock price to 52-week high and low).

[161] JX 849 at 1; Tr. 1958:10–1959:6 (Denholm); Tr. 395:5–23 (Elon); Tr. 457:18–458:15 (Kimbal).

Tesla management could focus on resolving Tesla Model X production and delivery challenges.[162] The Tesla Board did, however, "authorize management to gather additional details and to further explore and analyze a potential transaction with SolarCity or other related businesses."[163]

Beginning around March 2, 2016, investment websites and newspapers reported that Elon might take SolarCity private, following which SolarCity's stock price rose from $18.01 on March 1 to $22.49 on March 3.[164] The Tesla Board, however, was not yet ready to move forward.

At a March 2016 board meeting, Tesla's Board once again discussed the possibility of acquiring SolarCity.[165] And, just as before, it "determined not to

---

[162] JX 849 at 2 (noting "the potential impact [of an acquisition] on the management team's time and resources in the near term"); Tr. 1959:7–1960:13 (Denholm); Tr. 457:4–17 (Kimbal); Tr. 2837:23–2838:12 (Gracias); JX 950 at 4; JX 1049 at 6. According to Elon, the Model X production was behind schedule to such a degree that he was "sleeping in the factory for Model X production in order to make the production system work." Tr. 130:18–21 (Elon).

[163] JX 849 at 2; *see also* Tr. 1700:7–1701:2 (Lyndon) (expressing disappointment that the Tesla Board did not authorize moving forward with the SolarCity acquisition); Tr. 1959:7–1960:13 (Denholm); Tr. 457:4–17 (Kimbal); JX 950 at 4; JX 1049 at 6; Tr. 2837:23–2838:12 (Gracias).

[164] PTO Ex. C; JX 870; JX 3106; JX 3107; JX 3108; JX 868.

[165] JX 902.

proceed" with an acquisition,[166] reiterating that "this is something that we should postpone to a later date."[167] Even so, Tesla's Board discussed with management preparatory steps that should be taken "in the event that [a solar] acquisition were to be considered in the future."[168] These steps included engaging the law firm Wachtell, Lipton, Rosen & Katz to advise the Tesla Board regarding the potential transaction. This marked the first time that Tesla had engaged Wachtell.[169] As Tesla and the Tesla Board focused on other challenges, Elon asked Lyndon to manage

---

[166] JX 902 ("[T]he Board determined not to proceed with evaluating a potential acquisition of SolarCity or other similar businesses at this time, and directed management to instead focus its efforts on the execution of current business matters[.]").

[167] Tr. 261:22–263:3 (Elon). Plaintiffs point out that the Proxy did not disclose this meeting. See POB 19; JX 2121 at 67. This omission is not material given that it was a repeat of what had occurred at the February meeting (which was disclosed in the Proxy)— Elon proposed moving forward with the Acquisition and the Tesla Board said, in essence, "not now." Id.

[168] JX 902 at 2.

[169] Tr. 1964:11–13 (Denholm); Tr. 2840:8–12 (Gracias). Plaintiffs make much ado about how Elon, Gracias and Maron (Tesla's general counsel) engaged Wachtell to be deal counsel for Tesla before the Tesla Board had decided it wanted to pursue a transaction, and then the Tesla Board failed to disclose that fact in the Proxy. POB at 19, 23, 54; Plaintiffs' Post-Trial Answering Br. ("PAB") (D.I. 481) at 21, 24, 34; Tr. 263:23–265:12 (Elon); JX 922; JX 3226 at 8. What Plaintiffs have failed to do, however, is to explain persuasively how this timing presents a reason to question Wachtell's independence or how the non-disclosure was material. Plaintiffs did not demonstrate a longstanding relationship or conflict between Elon or Tesla and Wachtell. To the contrary, based on the evidence, I am satisfied that Wachtell was an independent and effective advisor to the Tesla Board. For this reason, the failure to disclose the circumstances or timing of Wachtell's engagement in the Proxy was immaterial. See JX 2121 at 67.

34

SolarCity's financial position until May 2016, when he would ask the Tesla Board to revisit a potential acquisition.[170]

## F. SolarCity's Outlook Worsens

With $32 million in net negative cash flow in the first quarter of 2016, SolarCity projected over $139 million in additional negative cash flow for the second quarter before achieving positive cash flow in the third and fourth quarters.[171] By April 2016, SolarCity management acknowledged that, in the short term, the company had "no room for error."[172]

At a SolarCity Board meeting on April 26, 2016, Lyndon addressed "important/disturbing" issues.[173] SolarCity expected installations of only 900MW for 2016, 28% fewer than the 1,250MW guidance provided just two months earlier.[174] Importantly, Lyndon also warned that "May–August are at risk of tripping

---

[170] Tr. 1684:14–1685:9, 1700:7–1701:2 (Lyndon).

[171] JX 1008 at 16; Tr. 1016:11–24 (Serra). A Q2 report observed that "Cash Consumption of ~$216 million in Q2 2016 was mainly because of: Project financing delays of ~30 days due to the proposed Tesla acquisition" and "Investment in module manufacturing operations and R&D." JX 1855 at 11.

[172] JX 982 at 1; Tr. 1041:19–1042:1 (Serra); *see also* JX 1855 at 11 (reporting cash crunch but noting "[c]ash balance expected to increase by the end of Q3 2016 . . . and to further increase by the end of Q4 2016").

[173] JX 1007; *see also* JX 1010 (email containing SolarCity Board Q2 2016 meeting materials).

[174] JX 1010 at 23.

[the revolver] covenant," and presented an "Updated 2016 Liquidity by Month" report that showed intra-month cash balances dropping to $73 million and remaining below the Liquidity Covenant through October 2016 before increasing at the end of the year.[175]

After SolarCity announced disappointing first quarter results, its stock price dropped, with an excess negative return of 17.4% relative to its peers.[176] Internal bookings reports were "drenched in a sea [of] red."[177] The company was fighting

---

[175] *Id.* at 18. Notably, despite the chart showing that the revolver covenant could be breached in February, the "covenant was not tripped." *Id.* Plaintiffs seize on the fact that SolarCity's Form 10-Q for the first quarter of 2016 failed to disclose these issues and reported instead that SolarCity would have sufficient cash to "meet cash requirements for the next 12 months." JX 1072 at 41. And management only lowered guidance to 1,000–1,100MW rather than the 900–1,000MW range in management's 2016 Reforecast. *See* JX 1066 at 9. But, as Plaintiffs admit, SolarCity did in fact have sufficient cash to meet its requirements and never breached its Liquidity Covenant. *See* POB at 65 ("Plaintiffs proved that SolarCity was . . . *likely to breach* its Liquidity Covenant . . . .") (emphasis added); Pls.' Post-Trial Reply Br. (D.I. 484) at 18 (mentioning "SolarCity's many *near-breaches* of its Liquidity Covenant") (emphasis added); Tr. 1196:2–4 (Beach); Tr. 380:2–4 (Elon); Tr. 991:21–24 (Serra); Tr. 2705:7–10 (Moessner). And although Lyndon recommended to the SolarCity Board that the company conservatively reduce 2016 guidance to 900MW on April 26, 2016, SolarCity ultimately forecasted additional international MW because of "a strong pipeline in Mexico" that was "just getting started" and ultimately generated the installation of a "large system of over 30 megawatts," bringing guidance above 1,000MW. Tr. 1694:22–1696:20 (Lyndon); JX 1010 at 29.

[176] Tr. 2721:4–8 (Beach).

[177] JX 1387 at 2.

36

"turnover" and "morale" problems among its sales staff and was "exposed and vulnerable" to losing its top sales talent.[178]

Meanwhile, SolarCity continued to raise cash, but in lower amounts than originally projected.[179]  It was able to close two tax equity transactions during Q2 2016, including a reduced $80 million commitment by Bank of America, one of SolarCity's largest tax equity lenders.[180]  SolarCity reported $145.7 million in cash and cash equivalents as of June 30, 2016—less than $30 million above the Liquidity Covenant.[181]  To save cash, SolarCity worked with vendors on accounts payable and slowed the Silevo deployment.[182]

Elon and Lyndon again spoke privately about the Acquisition in May 2016.[183] Lyndon wanted to proceed with the Acquisition immediately, but Elon told him Tesla would have to "push[] it out to June."[184]  In a later call between the two, Lyndon emphasized that he "need[ed] to know that [SolarCity would] get a bridge

---

[178] Corey Dep. 37:2–38:10, 42:18–43:21; Barnard Dep. 65:3–7; JX 1000.

[179] JX 951; JX 1230; Tr. 1308:8–20 (Van Zijl) (acknowledging that in Q2 2016, "SolarCity brought in substantially less" than forecasted).

[180] Tr. 1308:4–7 (Van Zijl); JX 951 at 3 (Cast3 Fund).

[181] JX 1854 at 4, 50.

[182] Tr. 1791:1–1792:10 (Lyndon).

[183] Tr. 1778:4–13 (Lyndon); JX 1451.

[184] Tr. 1700:20–1701:12, 1785:7–1786:5 (Lyndon).

loan when the offer" arrived, or else he would need to "put the deal off so we can go raise equity."[185]  Elon told Lyndon that Tesla would provide a bridge loan to SolarCity along with its acquisition proposal.[186]

## G. Acquisition Talks Heat Up

On May 31, 2016, Elon again brought the idea of acquiring SolarCity to the Tesla Board.[187]  This time, the Board thought the timing was right for an acquisition. Tesla had stabilized Model X production and was poised to commence Model 3 production, which it expected to be difficult but manageable in light of the Model X experience.[188]

### 1.  The Initial Advice from Independent Advisors

The Tesla Board authorized management to: (1) engage an independent financial advisor; (2) assess a potential solar acquisition; and (3) instruct Tesla's deal counsel, Wachtell, to undertake a legal review.[189]  The Tesla Board later selected Evercore as the financial advisor for the potential merger.[190]  Elon and Gracias were

---

[185] Tr. 1701:3–12 (Lyndon).

[186] Tr. 1776:9–15 (Lyndon); Elon Dep. 275:7–13; JX 1451.

[187] JX 1131.

[188] Tr. 1962:18–1963:3 (Denholm); Tr. 405:22–406:17 (Elon); Tr. 462:23–463:6 (Kimbal); Tr. 2872:14–22 (Gracias).

[189] JX 1131 at 1–2.

[190] JX 2121 at 67; Tr. 2355:1–5 (Foster); JX 2842 at 19–20.

not involved in Evercore's selection and, like Wachtell, Evercore had not previously worked for Tesla or SolarCity.[191]

On June 20, 2016, Elon called another special meeting of the Tesla Board.[192] Prior to the meeting, he reviewed a draft offer letter and blog post announcing the offer,[193] as well as a draft presentation from Evercore.[194]

Once the Tesla Board decided it would pursue an acquisition of SolarCity, following discussions with counsel,[195] it was determined that Elon and Gracias should be recused from any vote relating to the transaction given, among other conflicts, their roles on the SolarCity Board.[196] But the Tesla Board believed that Elon and Gracias' perspectives regarding the solar industry and SolarCity,

---

[191] Tr. 2840:13–18 (Gracias); Tr. 465:15–17 (Kimbal); Tr. 1368:8–15 (McBean); Tr. 1964:11–1965:14 (Denholm).

[192] JX 1228.

[193] JX 1231 at 114–22; JX 1224; Tr. 279:23–280:6 (Elon).

[194] JX 1227.

[195] JX 1228 at 4–5; JX 2121 at 68.

[196] JX 1233 at 5; JX 2121 at 68; Tr. 1969:19–1970:17 (Denholm). For reasons unclear, the Tesla Board "didn't discuss whether [Kimbal] should be recused along with [Elon]." Tr. 525:24–526:2 (Kimbal).

in particular, would be helpful, so it was agreed that the two could participate in certain high-level strategic discussions regarding the Acquisition.[197]

At the June meeting, Evercore presented an overview of potential solar acquisition targets.[198] Based on Evercore's analysis, SolarCity was the "clear market leader" and "the most attractive asset in the solar market."[199] The Tesla Board

[197] JX 2121 at 68; Tr. 30:15–22 (Elon); Tr. 2842:3–8 (Gracias). Plaintiffs argue that the extent of Elon's recusal was overstated in the Proxy. But as Elon points out, the Proxy disclosed that Elon was recused from any *vote* relating to the Acquisition, which he was. *See* Tr. 1377:21–1378:14 (McBean) (testifying that the Proxy description was "consistent with what actually happened" and that Elon did not "vote on any matters relating to the SolarCity acquisition"). The Proxy disclosed that Elon's "strategic vision, expertise and perspectives . . . would continue to be helpful to the Tesla Board's evaluation of a potential acquisition," and so he was not fully recused. JX 2121 at 68. Additionally, the Proxy disclosed the Tesla Board meetings Elon attended. *Id.* at 73, 75–76. With that said, as discussed below, the recusal protocol was not precise, and the fluidity of its enforcement revealed a flaw in the deal process.

[198] JX 1228 at 3; JX 1231 at 33–40; Tr. 1379:21–1380:12 (McBean); Tr. 1966:12–17 (Denholm).

[199] JX 1231 at 9; Tr. 1378:15–1382:12 (McBean); JX 1228 at 3. In this regard, I am satisfied that Evercore performed a more than adequate survey of solar targets before recommending Elon's preferred target. Evercore, and the Tesla Board, believed SolarCity was the obvious choice and for good reason. *E.g.*, Tr. 2399:15–2401:1 (Buss) ("Q. Did you personally have a view on which target Tesla should pursue? A. Yes. It was very obvious to me. Q. And what was that view? A. Really was SolarCity. . . . I think with the vision and scale of where Tesla was and where we expected it to go, not doing a market leader really wouldn't have made sense. . . . And then the other big factor in the solar space is really cost. You need to be a low-cost provider. And they were the lowest-cost provider out there. . . . And obviously, my prior company, SunPower, was on the list. Right? I think they were number four. And I wouldn't have supported that either."); Tr. 1382:1–12 (McBean) ("So you say 'Clear Market Leader' here. Was it a close call, in Evercore's view, as to which company was the best target? A. No, not at all. Q. Can you explain that? A. Because of their position in the market, it was just—and the vertical integration, it was a very obvious choice. As I said, they had, you know, a much higher market share

40

discussed SolarCity's financial condition and "ability to meet its current and future debt obligations and financing needs."[200]   Evercore presented its preliminary valuation and its recommendation that market conditions favored a stock-for-stock deal.[201]   With Evercore's guidance, the Tesla Board was focused on the strategic rationale for the transaction and recognized the "significant synergies" a solar acquisition would bring to the table.[202]   It discussed how it would structure an acquisition, including the need to pay a premium over SolarCity's closing stock price.[203]   According to notes from an Evercore team member, Elon, in attendance, noted that the price had to be "publicly defensible," meaning "in the middle . . . of precedent premia paid."[204]

The Tesla Board expressed that it was not willing to do the deal unless it made sense financially for Tesla and discussed "a walkaway price."[205]   Evercore

_____

than the other participants.  And it just wasn't—it was kind of a no brainer.  It's not usually that obvious; it was in this situation.").

[200] JX 1228 at 3; Tr. 1982:12–1983:9 (Denholm).

[201] JX 1228 at 3; JX 1231 at 11.

[202] JX 1238 at 1; *see also* Tr. 1389:20–1390:6 (McBean) (testifying that the Tesla Board did not approve the deal "to bail out SolarCity" but was "really focused on the strategic rationale and the combination of solar and storage").

[203] JX 1228 at 2–3; Tr. 1987:2–24 (Denholm).

[204] JX 1238 at 2.

[205] Tr. 1389:13–19 (McBean).

recommended a stock exchange ratio equating to a $25–$27 per share offer.[206]

For his part, Elon observed that, given SolarCity's much higher "historical trading

performance," "[p]remia to current prices don't mean that much" or "might come in

a bit low."[207] While not entirely clear in the evidence, Elon appears to have proposed

a 30% premium over SolarCity stock's 4-week trailing price, which amounted to

$28.50 per share.[208] The Tesla Board discussed the specific exchange ratio of

"0.122x to 0.131x" (equating to $26.50–$28.50 per SolarCity share).[209] Elon was

"not a fan of using ranges," but Denholm insisted that "giving a range [] provides

flexibility" in due diligence.[210] Elon and Gracias then left the meeting, and the

remaining directors continued to discuss the potential acquisition.[211]

---

[206] JX 1239 at 5 (notes from second Evercore deal team member: "Our thoughts–risk vs return: if our offer is 25–27, upside is relatively limited."); JX 1238 at 2 (notes from Evercore deal team member: "What range are we actually suggesting? $25–27 under EVR's suggested exchange ratio.").

[207] JX 1238 at 2.

[208] *See id.* ("Robyn–what's the best way to arrive at specific prices? Stu–FF indicates mid-to-high 20s, 30-day premium . . . Elon–30% over 4-week trailing (~$28.50).").

[209] *Compare* JX 1228 at 3 *and* JX 1238 at 2, *with* JX 2121 at 68.

[210] JX 1238 at 2.

[211] JX 1228 at 4–5.

## 2. The Initial Offer

With Elon and Gracias recused, the Tesla Board approved a preliminary, non-binding proposal to acquire SolarCity, subject to due diligence, using an exchange ratio range of 0.122–0.131 shares of Tesla common stock per share of SolarCity common stock.[212] The exchange ratio represented a premium of approximately 21% to 30% over SolarCity's trading price at the time.[213] Even though not required under Delaware law, the Tesla Board also determined that any acquisition proposal would be conditioned "on the approval of a majority of disinterested SolarCity stockholders *and* Tesla stockholders voting on the transaction."[214] Notably, despite Elon's request, the Tesla Board did not include a bridge loan in the preliminary proposal,[215] as Evercore and the Tesla Board "didn't think it was in Tesla's best interest."[216]

---

[212] JX 1228 at 5; JX 1233 at 2; Tr. 1993:17–1994:21 (Denholm).

[213] JX 1275 at 2; JX 1233.

[214] JX 1233 at 2 (meeting minutes) (emphasis added); *see* JX 2121 at 68 (description of required votes in the Proxy); Tr. 1973:22–1974:13 (Denholm).

[215] JX 1233; Tr. 1701:20–23 (Lyndon).

[216] Tr. 1517:13–16 (McBean); *see also* Tr. 2186:4–18 (Denholm) (testifying that she "was not in favor of doing a bridge loan at all, that we would discuss it at the board, but, for me, it didn't sound like a good idea"); Tr. 2187:10–21 (Denholm) ("Q. Was it, in fact, the case that Tesla did not want to do a bridge loan? A. Yes. I mean, I didn't want to do a bridge loan. And in the subsequent discussions with the rest of the board, the board agreed with me that we did not want to do a bridge loan. Q. And, again, what was Mr. Musk's position, as far as you understood at the time, on whether Tesla should do a bridge loan to SolarCity? A. Again, my understanding was he wanted to do a bridge loan and thought it would be best if that bridge loan came from Tesla.").

43

On June 20, 2016, Tesla made an offer to acquire SolarCity at an exchange ratio of 0.122 to 0.131 Tesla common shares for each SolarCity common share.[217] Tesla announced its preliminary proposal after market close on June 21, 2016.[218] In response to the initial offer, the SolarCity Board formed a special committee consisting of directors Nancy Pfund and Don Kendall.[219]

Following the announcement, Tesla's stock price dropped by more than 10%, or $3.07 billion—an amount greater than SolarCity's entire market capitalization.[220] Evercore's McBean, who spoke with market commentators, explained that "it became very clear that they did not understand" the strategic logic of the combination because "the media and the public thought of Tesla as a car company."[221] Tesla's stock price quickly rebounded and ultimately rose above the unaffected price by mid-July.[222]

---

[217] PTO ¶ 159.

[218] *Id.*

[219] PTO ¶ 161.

[220] JX 1590 at 254; JX 2834 (Beach Expert Report) ¶¶ 33–34.

[221] Tr. 1394:15–1396:21 (McBean); *see also* JX 1590 at 254 (concluding the stock fell "mainly due to investors lack of understanding regarding the timing of the announcement and the strategic rationale").

[222] *See* PTO Ex. A. 10–11.

After the initial offer, Bank of America further downgraded SolarCity's risk rating.[223] One week later, SolarCity ended the second quarter with ~$216 million in negative cash flow.[224] According to SolarCity, Tesla's initial offer created financial strain for SolarCity.[225] In this regard, whether Tesla's offer made it more difficult for SolarCity to finance itself was the subject of much debate at trial, and there is evidence to support both sides.[226] Ultimately, the preponderance of the evidence suggests that Tesla's offer caused delays in SolarCity's financing efforts, which ultimately exacerbated SolarCity's liquidity problem.[227] Despite these problems,

---

[223] JX 1355; Tr. 1792:15–1793:15 (Lyndon).

[224] Tr. 1031:8–1032:4 (Serra); JX 1858 at 12.

[225] Tr. 1701:20–1702:1 (Lyndon).

[226] *See, e.g.*, Tr. 1510:16–21 (McBean) ("Q. SolarCity had liquidity concerns before Tesla made its public offer. Right? A. Yes."); JX 1406 (email from Evercore's Roger Altman: "Mark me down as a skeptic on the argument that this proposed merger makes it harder for them to finance themselves."); Tr. 1510:22–1512:24 (McBean) (discussing Altman's email); Tr. 422:14–423:10 (Bilicic) ("I think the company had a liquidity problem that had almost nothing to do with the presence of the Tesla proposal.").

[227] *See, e.g.*, Tr. 477:19–24 (Kimbal) ("I've been through this a few times with companies I've been part of. If you create a public offer, you freeze the options of your acquisition target, You force any lender or equity provider to come to you and you can, hence, control their options."); Tr. 1703:24–1704:18 (Lyndon) (explaining how "the financial institutions had to now go back to their credit committees and get approval for continuing to invest in SolarCity" and how that caused a delay of "two or three weeks" which "put[] a lot of stress" on the company's cash situation); JX 1360 (email from J.P. Morgan stating that because of the Tesla offer, additional approvals will be needed and "we do not expect to be able to complete the additional approvals in time to make the requested [] closing date"); JX 1858 at 2 ("Because of the Tesla Motors acquisition proposal, we experienced greater than usual delays closing new project financing commitments.").

Bank of America continued to lend and sought to deepen its ties to SolarCity.[228] In fact, when all was said and done, SolarCity's financing counterparties participated in financing transactions with SolarCity worth more than $3 billion from Q4 2015 through Q4 2016, including times when Plaintiffs claim SolarCity was insolvent.[229]

On June 25, 2016, SolarCity's special committee retained Lazard as a financial advisor.[230] Lazard confirmed that SolarCity "was close to breaching a liquidity covenant under the Company's revolving credit facility" and "would be operating with little margin for error until October 2016."[231] One of the Lazard bankers advising SolarCity was worried about the damage a liquidity event could cause the company and was "concerned" that such an event would threaten "the company on a stand-alone basis going forward."[232]

---

[228] Tr. 1235:1–1238:8, 1347:24–1348:24 (Van Zijl); Tr. 998:1–9 (Serra) ("Q. In 2016, did Bank of America ever conclude that SolarCity was not viable as a going concern? A. Quite the opposite. I mean, the investment bank of Bank of America was trying to do more business with us."); JX 1430 at 27.

[229] JX 2384; JX 2028; JX 2853 Ex. 8.

[230] JX 1347 at 2; JX 1350.

[231] JX 1453 at 1; *see also* JX 1721 at 2 (stating that SolarCity was "on the brink of a liquidity event").

[232] Tr. 429:15–430:1 (Bilicic) ("So the company had a liquidity problem based on our analysis, which had a risk of producing a covenant problem but, more generally, had the risk of damaging the overall business. And the other concern we had here was . . . we were concerned about the company on a stand-alone basis going forward.").

### 3. Negotiations Begin

Denholm led due diligence and negotiations with SolarCity,[233] spending nearly six weeks and hundreds of hours on the Acquisition.[234] She met with the chairman of SolarCity's special committee,[235] managed the due diligence team,[236] reported to the Tesla Board and led the exchange of offers and counteroffers.[237] In aid of Denholm's efforts, Evercore performed extensive diligence. McBean credibly testified that Evercore's 10-member team spent thousands of hours reviewing SolarCity's financial condition, conducting valuation analyses and negotiating with Lazard.[238]

---

[233] Tr. 2001:14–23 (Denholm); Tr. 30:23–31:14, 279:2–280:9 (Elon); Tr. 1376:3–7 (McBean); Tr. 466:18–467:8 (Kimbal). Plaintiffs dispute this fact because, they say, there are no Tesla Board minutes or resolutions that state the Tesla Board put Denholm in charge of the negotiations. *See* PAB at 23–26. This argument fails. All director testimony is consistent that Denholm was in charge. And there are special meeting minutes that imply the same. *See* JX 1673 at 2–3 (noting that Denholm "updated the other members of the Board with respect to her discussion the prior day with Mr. Donald R. Kendall [regarding SolarCity's counteroffer]"). More importantly, I found Denholm to be an extraordinarily credible witness. If she says she was in charge, then she was in charge.

[234] Tr. 2001:24–2002:8 (Denholm).

[235] Tr. 2024:2–15 (Denholm); JX 2121 at 69.

[236] Tr. 1966:18–1967:24, 2001:14–23 (Denholm).

[237] Tr. 30:23–31:14 (Elon); Tr. 2027:1–19 (Denholm).

[238] Tr. 1466:12–15 (McBean).

Outside the Tesla Board process, Lyndon provided Elon with updates on SolarCity's cash position and need for bridge financing.[239] On July 9, 2016, Lyndon and Elon discussed SolarCity's liquidity needs and the Acquisition.[240] Lyndon reminded Elon that SolarCity was "running crazy close" to its Liquidity Covenant, and he acknowledged he was "really afraid of the domino effect" that would result if SolarCity did not get cash soon.[241] The next day, Lyndon emailed Elon the "cash forecast [he] gave the [SolarCity Board] in April," again warned of the "domino effect" that SolarCity faced due to "delay[s] [in] funding," and asked Elon to speak over the phone about SolarCity's $200 million bridge loan request.[242] In response, Elon informed Lyndon that, contrary to Elon's wishes, Tesla's Board would not authorize a bridge loan.[243]

---

[239] Elon Dep. 272:21–23; Lyndon Dep. 106:6–107:42.

[240] Tr. 1794:2–10 (Lyndon).

[241] JX 1451; Lyndon Dep. 107:5–11; *see also* Elon Dep. 272:10–273:12 (recounting the conversation with Lyndon).

[242] JX 1455; Tr. 1796:10–16 (Lyndon). Plaintiffs point out that this communication was not disclosed in the Proxy. *See* JX 2121 at 71–72. Here again, the missing disclosure was not material as the bridge loan was never approved.

[243] Tr. 1702:24–1703:6, 1798:3–1799:12 (Lyndon).

### 4. The Tesla Board Becomes Aware of SolarCity's Cash Issues

Through due diligence, Evercore discovered SolarCity's significant liquidity concerns.[244] On July 15, 2016, Evercore had a "very concerning" call with Lazard, during which Lazard claimed it was unaware that SolarCity was at risk of tripping its Liquidity Covenant.[245] McBean immediately telephoned Elon.[246] Elon "was surprised . . . that [Lazard] didn't know that [SolarCity] could potentially default on its revolver."[247] But Elon did not appear surprised by the liquidity problems;[248] instead, changing the subject, he advised McBean that he was "very concerned about the pace of diligence."[249]

Within an hour of that call, Elon arranged daily meetings with the Evercore team to push along the pace of due diligence.[250] It is not clear from the record if

---

[244] JX 1471; Tr. 1513:18–1515:24 (McBean). Plaintiffs correctly observe that Elon did not disclose these issues to his fellow Tesla Board members, likely because he was wearing his SolarCity Board hat when he received the information.

[245] JX 1512; Tr. 1518:12–1519:2 (McBean).

[246] JX 1528; Tr. 1520:18–1521:1 (McBean).

[247] McBean Dep. 163:20–164:8, 238:3–12; *see also* Tr. 1521:2–5 (McBean).

[248] McBean Dep. 164:9–12, 238:14–17.

[249] Tr. 1521:6–23 (McBean).

[250] Tr. 1521:2–1522: 21 (McBean). Plaintiffs argue that Elon's daily calls with Tesla's advisors and management were not disclosed to stockholders. *See* POB at 30. That is true, and the omission may well have been material given Elon's conflicts.

Elon's meetings with Evercore came at the suggestion of the Tesla Board. McBean testified that she thought the idea originated at the board level.[251] Denholm knew about "a daily call with Evercore and the due diligence team, many of which [she] sat in on, and Elon was on some of those," but testified she did not know that Elon "was having [] private conversations with Evercore."[252] Regardless, the evidence suggests that the purpose of any calls with Evercore likely was for the bankers to update Elon on the progress and speed of the deal so Elon could prod SolarCity to respond to outstanding diligence requests.[253]

The first "daily call" took place the following morning, on July 16, 2016,[254] and addressed "the status of all the work streams."[255] Less than 30 minutes after the start of the call, McBean emailed her team: "We are running out of time. Plan is to sign this week and fairness is on Monday," which was in two days.[256]

Over the next 48 hours, Evercore created its own "downside" case projections. On July 18, 2016, these projections were presented to Evercore's Fairness

---

[251] Tr. 1402:18–1403:18, 1526:5–1527:19 (McBean).

[252] Tr. 2144:17–2145:1, 2152:22–2154:3 (Denholm).

[253] Tr. 1403:3–6 (McBean); *see also* JX 1526 at 2 ("[W]e're going to have a daily check-in call with Elon to discuss gating items and progress.").

[254] JX 1526; Tr. 1523:2–7 (McBean).

[255] Tr. 1527:24–1528:24 (McBean).

[256] JX 1527 at 2; Tr. 1534:12–1535:18 (McBean).

Committee, which proposed some changes.[257]  Later that day, Evercore sent Wheeler the same downside case it shared with its Fairness Committee and McBean called Elon.[258]

At the next Tesla Board meeting on July 19, Evercore presented on SolarCity's dire liquidity situation.  Evercore explained that SolarCity could trip its Liquidity Covenant by July 30, 2016,[259] and warned that disclosure of an event of default "could lead to potential cross defaults" and "impair SolarCity's ability to monetize future assets."[260]  Evercore further detailed SolarCity's significant

---

[257] Tr. 1561:4–16 (McBean); JX 1575 ("We just finished a call with our opinion committee and they would like us to make a number of changes to the analysis . . .  SolarCity just sent us some data that we needed to complete our analysis this morning . . . .").

[258] JX 1553; Tr. 1561:19–1563:12 (McBean).  Plaintiffs argue that "[a]fter talking with Musk, Evercore's projections doubled overnight," implying that Evercore changed its projections at Elon's request.  POB at 32.  That implication is not supported by the credible evidence.  McBean was asked if Elon "ever ask[ed] Evercore to change one of its presentation or advice that it was providing to the Tesla board" or if "Evercore [was] seeking approval from Elon Musk on valuation," in response to which she credibly testified, "No.  Never."  Tr. 1628:1–8 (McBean).  To the contrary, McBean testified that "around the same time we were working with Tesla to finalize the sensitivity case," Tesla was continuing to give Evercore adjustments, and Evercore "would have received signoff from Jason [Wheeler]" for additional changes.  Tr. 1565:20–1569:24 (McBean).  SolarCity was also supplying relevant information at the last minute.  See JX 1575.  In any event, the final deal price implicated the middle of the *lowest sensitivity case* before any adjustments were made.  See POB at 32 (showing a DCF range of $15–$25); Tr. 1572:3–1573:1 (McBean).

[259] JX 1588 at 28, 30; Tr. 1573:6–1575:6 (McBean).

[260] JX 1588 at 28, 30; *see also* Tr. 1573:6–1575:6 (McBean) (describing Evercore's advice regarding the SolarCity Liquidity Covenant).  Plaintiffs argue the fact that Evercore advised the Tesla Board that breaching the Liquidity Covenant would threaten SolarCity's

51

upcoming expenses in connection with Silevo.[261] From McBean's perspective, the Tesla Board fully understood and was "particularly concerned" about SolarCity's financial challenges.[262]

The day after his fellow directors learned the extent of SolarCity's liquidity crisis, Elon self-published the so-called "Master Plan Part Deux."[263] In addition to promising that Tesla's EVs would feature self-driving capabilities and touting the prospect of heavy-duty EV trucks and urban transport, Elon explained that "the time has come" for Tesla to acquire SolarCity and "sell integrated solar and energy storage systems."[264] With this declaration, Elon went directly to Tesla's stockholders to explain that Tesla's vision for the future could not be achieved without a solar company.[265]

---

solvency was not disclosed to stockholders. While true, the fact remains that SolarCity never breached the Liquidity Covenant.

[261] JX 1588 at 28; Tr. 1579:19–1580:8 (McBean).

[262] Tr. 1576:13–1577:4 (McBean).

[263] JX 1618.

[264] *Id.*

[265] Tr. 574:8–22, 576:9–19 (Kimbal). I note that Oppenheimer stated that the Master Plan Part Deux did not come as a shock to the market. *See* JX 1617 at 1. ("That TSLA plans to move into higher powered vehicles like semi and pick-up trucks, introduce/coordinate a fleet of autonomous driving vehicles, *and sell integrated solar and energy storage systems will not surprise many investors*.") (emphasis added).

Given the information discovered in diligence, Evercore decided to recommend that Tesla lower its offer.[266] The recommendation was communicated to Elon during a call on July 21 and to the Tesla Board the following day.[267]

On July 24, the Tesla Board met to discuss the merger and whether to revise the offer.[268] Elon agreed that SolarCity's liquidity issues should lower the deal value but reiterated his belief that the "strategic rationale was still intact."[269] After Elon, Gracias and Straubel left the meeting, Evercore "provided an update of [its] valuation analysis."[270] Among other things, the Tesla Board discussed whether to make a revised offer before the release of SolarCity's Q2 2016 results and reduced installation guidance, which they anticipated would lower SolarCity's stock price.[271] After discussion, the Tesla Board "determined to make a revised proposal to acquire SolarCity at a lower price that reflected [Tesla's] due diligence findings, prior to

---

[266] JX 1619; Tr. 1592:20–24 (McBean).

[267] JX 1619; JX 1655 at 2–3. Plaintiffs point out that Evercore's call with Elon was not disclosed to the stockholders or the Tesla Board. *See* POB at 34. The fact that Evercore told management that they were planning on making a formal recommendation to the Tesla Board is not material evidence of a conflict. There is no evidence Elon resisted or pushed back on the idea; indeed, he agreed that SolarCity's liquidity issues should affect the price Tesla was willing to pay. *See* Tr. 1603:20–1605:5 (McBean).

[268] JX 1673.

[269] Tr. 1603:20–1605:5 (McBean).

[270] JX 1673.

[271] Tr. 1598:5–1599:23 (McBean).

SolarCity's announcement of its second quarter results."[272]  The Tesla Board lowered the offer to an exchange ratio of 0.105 shares of Tesla stock per SolarCity share, and negotiations continued.[273]

## H. The Final Terms of the Acquisition

On July 30, 2016, the Tesla Board offered to pay 0.110 shares of Tesla stock for each share of SolarCity stock[274]—well below the initial offer range of 0.122–0.131.  As detailed below, Evercore provided a fairness opinion to the Tesla

---

[272] JX 1673.  I note that Tesla protected itself from a SolarCity liquidity event by requiring as a condition of the Acquisition that SolarCity remain in compliance with its debt covenants.  JX 2121 at 249–50 (§ 7.02(e)); Tr. 1407:2–23 (McBean).  And, of course, SolarCity's second quarter and third quarter results were a matter of public knowledge by the time the Tesla stockholders voted on the Acquisition.  Tr. 2029:19–2030:1 (Denholm).

[273] Tr. 2160:9–2161:1 (Denholm).  Plaintiffs argue that before this lowered offer, the Tesla Board called Elon to ask whether Tesla could acquire the Silevo assets instead of SolarCity in total, to which "[Elon] said no."  POB at 35.  This is not a fair characterization of the exchange.  Denholm testified that, in discussing price (with Elon and Gracias recused), the Tesla Board "wanted to understand if there was an alternative strategy around acquiring a certain set of technologies of SolarCity rather than the entirety of the company."  Tr. 2032:16–2033:5 (Denholm).  The Tesla Board was exploring alternatives in case the revised offer they contemplated of 0.105 was rejected outright, given that SolarCity had counteroffered with a price above the range Tesla initially proposed, and Tesla had planned to counter with a proposal even lower than the initial range.  *Id.*  In other words, this alternative was being considered "if we couldn't get to a negotiated outcome."  Tr. 2033:6–12 (Denholm).  Without discussing price, the Tesla Board called Elon to discuss "the technology assets themselves," and ultimately decided not to make a separate offer for just Silevo because "it would not allow [Tesla] to do the integrated product that was key to the strategy."  Tr. 2033:13–2034:1 (Denholm).

[274] JX 1736 at 2–3.

54

Board,[275] which concluded that the Acquisition consideration was fair to Tesla.[276] In fact, the Acquisition price fell within or below each of the seven stock price ranges Evercore presented to the Tesla Board (plus two illustrative reference ranges).[277]

## I. The Merger Agreement Is Executed and the Acquisition Is Announced

Tesla and SolarCity executed the Agreement and Plan of Merger (the "Merger Agreement") on July 31, 2016, and announced the Acquisition the following day.[278] The Merger Agreement limited SolarCity's ability to issue equity or take on

---

[275] JX 2121 at 83.

[276] *Id.* Plaintiffs argue that "Evercore's fairness opinion was unreliable." POB at 60 (citing *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 420–21 (Del. 2013) (affirming trial court's finding that a financial advisor had "compromise[d] its professional valuation standards to achieve the controller's unfair objective"), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013)). I disagree. The preponderance of the evidence reveals this opinion was reliable, honest and independently given. Evercore was a diligent advisor with no previous ties to Tesla, and McBean credibly explained and defended its work and advice. Tr. 1401:4–12, 1414:6–18, 1421:15–1428:13, 1448:4–1458:1 (McBean); *see also* Tr. 1467:20–1468:6 (McBean) ("Q. One final question. Sitting here today, do you stand by Evercore's work and the fairness opinion that was issued for this deal? A. Absolutely. Tesla paid a great price for a very valuable company. As I said many times, the strategic rationale is sound and it just becomes clearer every day. The combination of solar and storage is incredibly compelling, and they were able to get this company at a very good price. So absolutely."). As explained below, however, Evercore's fairness opinion is just one of many pieces of evidence that justify the price paid in the Acquisition.

[277] JX 1735 at 23.

[278] PTO ¶¶ 1, 173–74; JX 2121 at 79.

additional debt without Tesla's consent.[279]  Importantly, it also required SolarCity to remain in compliance with its debt covenants pending closing.[280]

In the Form 8-K Tesla filed to disclose the Merger Agreement, Tesla informed its stockholders that the Acquisition exchange ratio represented an equity value for SolarCity of approximately $2.6 billion, or $25.37 per share, based on the 5-day volume-weighted average price of Tesla stock as of July 29, 2016.[281]  At the time the Acquisition closed, however, the agreed upon exchange ratio resulted in Tesla paying a good bit less—an equity value of $20.35 per share of SolarCity common stock (or approximately $2.1 billion).[282]

With the executed Merger Agreement in hand, SolarCity still faced short-term liquidity tightness that it needed to address into August 2016 to avoid tripping its Liquidity Covenant prior to closing.[283]  Lyndon recognized that, given delays in financing, SolarCity could not close on available debt fast enough and was "now at the last resort stage."[284]  Although SolarCity could have improved its liquidity

---

[279] JX 2121 at 226–27 (§ 5.01(b)); Tr. 1716:21–1717:11 (Lyndon).

[280] JX 2121 at 249–50 (§ 7.02(e)).

[281] JX 1762 at 163.

[282] JX 2839 ¶ 12; JX 2443 at 76–77.

[283] Tr. 1717:12–19, 1719:24–1720:7 (Lyndon).

[284] JX 1850; *see also* JX 1869 (SolarCity cash meeting materials).

position through macro changes, such as scaling back installations, these changes would not solve SolarCity's short-term liquidity problem, nor would they comply with the Merger Agreement's ordinary course covenant.[285] To make matters worse, SolarCity could not access funds from its usual investors as a result of the pending Acquisition, its recent failure to secure certain credit approvals, and the quick turnaround required to satisfy SolarCity's financing needs.[286]

With other sources more difficult to access, SolarCity turned to its existing shelf registration for Solar Bonds to meet its need for cash.[287] On August 23, Elon

*Remainder of Page Intentionally Left Blank*

---

[285] Tr. 1717:12–1718:2 (Lyndon); JX 2121 at 226–27 (§ 5.01(b) (ordinary course covenant)).

[286] Tr. 1718:12–1720:7 (Lyndon); JX 1885 at 3.

[287] Tr. 1720:13–20 (Lyndon); Tr. 33:15–20 (Elon); JX 1907 at 2.

and his cousins purchased $100 million of 12-month 6.5% Solar Bonds,[288] which solved SolarCity's short-term cash needs.[289]

## J. The Tesla Stockholder Vote

On August 31, 2016, Tesla filed a preliminary proxy that included: (1) an explanation of the Acquisition's strategic rationale; (2) descriptions of the deal process, including the scope of Elon's and Gracias' recusals; (3) estimated cost synergies; (4) the financial advisors' projections and sensitivity cases; (5) the fairness opinions and valuation methods of Lazard and Evercore; (6) disclosures of the Tesla directors' holdings in related companies; and (7) a description of the risks posed by SolarCity's liquidity challenges.[290]

---

[288] JX 1921 at 2. Plaintiffs argue that Elon and the Rive brothers' purchase of Solar Bonds should have been disclosed to Tesla stockholders to underscore the lengths to which SolarCity was forced to go in order to raise cash. POB at 57. The argument mischaracterizes the record. While the parties may dispute the desirability of the rates imposed for the short-term bridge financing available to SolarCity in advance of closing, or the timing in which a financing deal could have been consummated, the preponderance of the evidence shows SolarCity was discussing bridge financing with various banks and other investors in advance of closing, and I am satisfied that these options presented viable (albeit less attractive) alternatives to the sale of Solar Bonds to insiders. *See, e.g.*, JX 2853 at 34–37 (highlighting various financing options SolarCity was exploring).

[289] Tr. 1723:24–1724:2 (Lyndon).

[290] JX 1952 at 11, 65–123, 209–305. Plaintiffs maintain that "[Elon] did not disclose that SolarCity was insolvent; could not pay its bills or employees on time without breaching debt covenants; could not raise equity; and had no viable solution to a 'liquidity crisis' that began in 2015." POB at 2. I address those contentions below.

The preliminary proxy also disclosed three sets of SolarCity financial projections to the Tesla stockholders: (1) the SolarCity Base Case: the base case reflecting the best view of SolarCity's management on the company's future as of 2016;[291] (2) the Evercore Sensitivity Case: the sensitivity case prepared by Evercore and Tesla by adjusting the SolarCity Base Case to "reduce[] SolarCity's projected capital needs;"[292] and (3) the Lazard Sensitivity Case: the sensitivity case prepared by Lazard and SolarCity that assumed SolarCity faced challenges accessing the capital markets and with borrowing costs.[293]

Evercore's initial fairness analyses were based on the SolarCity Base Case and Evercore Sensitivity Case because the Lazard Sensitivity Case was not yet provided to Tesla or Evercore.[294] Upon learning that Lazard had developed a downside case, Evercore immediately obtained a copy and re-ran its cash flow analyses.[295] Evercore determined that the Evercore Sensitivity Case was more

[291] JX 2121 at 85. The SolarCity Base Case is referenced in the Proxy as the "Unrestricted Liquidity Case."

[292] Id. at 109. The Evercore Sensitivity Case is referenced in the Proxy as the "Revised Sensitivity Forecasts."

[293] Id. at 85; Tr. 2521:22–2522:16 (Fischel). The Lazard Sensitivity Case is referenced in the Proxy as the "Liquidity Management Case."

[294] Tr. 1245:16–22, 1437:3–6, 1458:5–1459:3 (McBean).

[295] Tr. 1459:12–15, 1463:3–7 (McBean).

conservative than the Lazard Sensitivity Case, which generated uniformly higher values for SolarCity.[296] Evercore then presented this analysis to the Tesla Board.[297]

The market's reaction to the Acquisition announcement was mixed, with extensive commentary.[298] After learning that some major Tesla stockholders had concerns about the Acquisition, Elon told Buss that certain things "need to happen to change investor sentiment," including that SolarCity would need to "solv[e] its liquidity crisis," and Tesla stockholders would need a "joint product demo" of a promising SolarCity product in development—the "Solar Roof."[299]

---

[296] JX 2922 at 4; Tr. 1461:16–1464:2 (McBean).

[297] Tr. 1463:8–20 (McBean).

[298] Tr. 2653:1–2655:7 (Fischel); Tr. 1998:11-18 (Denholm). Fischel's Expert Report compiles some of the robust commentary surrounding the Acquisition. *See* JX 2839 at 162–65, 170–72. To highlight just a few, Cowen & Company said the offer was "well short of our $35 price target"; Guggenheim Securities stated, "[w]e think the offer for SCTY is low"; Credit Suisse stated that the price was "too low" and "could be a steal for TSLA shareholders"; Oppenheimer stated the offer range "represents a fair price"; JP Morgan stated that the offer is "slightly above our $25 price target" and expressed skepticism "that there are near-term customer, product or technology synergies"; Roth Capital stated that the Acquisition "would serve as yet another front or major challenge" for both companies; Raymond James thought SolarCity stockholders "are being shortchanged"; and Morningstar stated the proposal "is a great value for SolarCity shareholders." *Id.* at 163–64, 168.

[299] JX 2038 at 1. The Solar Roof integrated solar technology into roof tiles so the roof itself would generate electricity. *See* JX 2200 at 2; Tr. 1847:2–5 (Peter) ("[W]e realized that the only way to make solar power look really good is that it can't be something that is on the roof; it needs to be the roof.").

On October 12, 2016, Tesla and SolarCity filed the definitive Proxy incorporating by reference their recent SEC filings.[300] Proxy advisory firms ISS and Glass Lewis both offered voting recommendations to stockholders. ISS recommended the Acquisition, characterizing it as "a necessary step towards TSLA's goal of being an integrated sustainable energy company" for which Tesla was paying "a low to no premium."[301] Glass Lewis recommended against the deal, calling it a "thinly veiled bail-out plan" and "significantly value destructive" to Tesla because "SolarCity's principal stand-alone business, as it exists today, is increasingly and materially incapable of supporting itself."[302]

Given the mixed market reaction, Tesla took steps to persuade the market of the deal rationale and the value proposition. Denholm led outreach to Tesla's institutional stockholders, ISS, and Glass Lewis.[303] As the CEO of the proposed combined company, Elon participated in some outreach as well to share his vision for the combination.[304] Specifically, Elon focused on selling the "integrated

---

[300] JX 2121 at 191–92.

[301] JX 2249 at 11, 15.

[302] JX 2237 at 7–9.

[303] Tr. 2050:3–17, 2058:24–2060:1 (Denholm); Tr. 2473:1–3 (Foster).

[304] Tr. 31:23–32:9 (Elon).

product" solution to stockholders.[305]  On October 28, 2016, Tesla and SolarCity jointly presented to the market a prototype of the Solar Roof product, showcasing a future combination of the Solar Roof, solar storage through the Powerwall and Tesla EVs powered by solar.[306]  SolarCity had no budget for this product, which was just conceptual in nature and prototyped "for demonstration of the aesthetics."[307] Days after the product launch, Elon tweeted that "first solar roof deployments will start next summer."[308]  On cross examination, Elon admitted that, in 2016, Tesla did not have a formalized plan to begin installing solar roofs in 2017, and that the time from idea phase to volume deployment would likely take up to three years, but he allowed that the roll out could "[p]ossibly" be done in the timeframe he touted to the market.[309]

---

[305] Tr. 343:2–9 (Elon).

[306] JX 2199.

[307] Tr. 343:19–344:8 (Elon) (explaining that the Solar Tiles were not operational at the time of the demonstration); *see also* JX 2304 at 1 (Tesla management commenting, "SCTY Finance has zero visibility on how much it is going to cost [to] make a solar roof, install it, R&D, where it will be manufactured . . . running blind here which may be a big risk?").

[308] JX 2241.  Plaintiffs also point to Elon's statement at an investor Q&A where he said "we expect to start doing the solar roofs in volume somewhere next year," and argue this false representation shaped the Tesla stockholder vote.  JX 2302 at 9; *see* POB at 38. But this comment was made *after* the Acquisition was approved by stockholders. *See* JX 2302 at 6.

[309] Tr. 346:3–13 (Elon) ("Q.  But this is more than optimistic.  This is just plain out false. There is no way with an idea that is in existence at Q3 2016 that you would [] start doing solar roofs in volume by 2017; correct?  A.  Well, I think—it's not out of the question,

During a special stockholder meeting held on November 17, 2016, Tesla's stockholders overwhelmingly voted to approve the Acquisition.[310] Approximately 85% of votes cast by Tesla's stockholders were voted in favor of the deal.[311] Most of those votes were cast by sophisticated institutional investors.[312]

---

18 months later, thereabouts, that we could start production of it, but not deployment. Q. And certainly not volume. A. I don't know. Possibly. It's not out of the question."); Tr. 339:20–340:23 (Elon) (confirming that it would take three to four years to take a product idea like the Solar Roof from idea phase to volume production).

[310] JX 2302 at 6; JX 2320 at 7. At the time of special meeting, Tesla had 1,792,626 total shares outstanding. The results of the vote were: 68,788,787 shares voted in favor of the Acquisition (excluding the Tesla shares owned, directly or indirectly, by SolarCity directors and named executive officers or their affiliates); 12,067,314 shares voted in opposition of the Acquisition; and the holders of 569,421 shares abstained from voting. PTO ¶ 179.

[311] JX 2320 at 7. I note Plaintiffs have argued that votes cast by institutional investors who held stock in both Tesla and SolarCity cannot be counted as disinterested votes. MTD Opinion at *10 n.183 (discussing Plaintiffs' argument that votes of stockholders who held shares in both Tesla and SolarCity should not be counted when addressing the defendants' stockholder ratification defense). Because I have not considered the ratification defense in reaching my verdict, I need not address this interesting argument, and leave it to others to decide whether similar arguments are persuasive. *Cf. Lockton v. Rogers*, 2022 WL 604011 at *10 (Del. Ch. Mar. 1, 2022) (holding that *Corwin* cleansing will not be triggered by a stockholder vote where the majority of votes cast were not truly disinterested) (citing *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015)); *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 416 (Del. Ch. 2010) (observing that a stockholder with "roughly equivalent equity interests" in the seller and the acquirer has "materially different incentives" than a stockholder invested in only one company, "thereby calling into question the effectiveness of the majority-of-the-minority condition").

[312] JX 2237 at 2 (listing Tesla's largest stockholders by percentage); Tr. 2529:9–2530:1 (Fischel) ("Q. Now, you note on this slide that almost 62 percent of Tesla's stock was held by large, sophisticated institutional investors including some of the top-40 wealth management firms in the United States. Okay. So to you, what is the weight of those facts? A. I think just it adds credibility to the importance of the shareholder vote . . . .");

## K. Closing the Acquisition

The Acquisition closed on November 21, 2016.[313]  Despite its liquidity issues in late 2015 and 2016, as of closing, SolarCity brought substantial value to Tesla. It had 15,000 employees,[314] $200 million a month in business,[315] over $3 billion in future cash flows,[316] over 300,000 customers,[317] and net assets in excess of its market capitalization (as confirmed by KPMG), resulting in Tesla booking an $89 million gain on the Acquisition.[318]  As noted, as of closing, SolarCity had accumulated and continued to accumulate substantial net retained value. [319]

Shortly after closing, in early 2017, Tesla faced its most difficult challenge to date—launching the Model 3, the company's first volume production EV.[320]

---

Tr. 860:3–861:13 (Quintero) (acknowledging the sophistication of certain wealth management firms that voted in favor of the Acquisition).

[313] PTO ¶ 181.

[314] Tr. 1733:11–17 (Lyndon).

[315] Tr. 1648:10–1650:22 (Lyndon).

[316] Tr. 1733:11–1734:12 (Lyndon); Tr. 349:4–350:23, 404:6–16 (Elon);  Tr. 2309:24–2310:4 (Ehrenpreis); JX 2971 at 40, 58; Tr. 2857:2–21 (Gracias).

[317] Tr. 1647:22–1648:2 (Lyndon).

[318] JX 2443 at 77.

[319] Tr. 1215:22–1216:6 (Van Zijl); Tr. 923:20–932:11 (Serra); JX 1855 at 9; JX 2853 at 7, 19–20.

[320] Tr. 36:11–37:1, 127:13–20 (Elon).

Notwithstanding its confidence that the experience bringing the Model X to market would ease the strain of the Model 3 rollout, unexpected production delays and other logistical knots surfaced post-Acquisition. Tesla leadership understood that if the Model 3 issues were not solved and solved quickly, then Tesla would face commercial disaster.[321] Recognizing that "Tesla was in extremely dire straits and at mortal risk," Elon repurposed everyone in Tesla—from Tesla Energy (former SolarCity) personnel to Tesla's legal department—to work on the Model 3 launch.[322]

The Tesla Energy personnel helped Tesla survive, but their redeployment to Model 3 substantially slowed the progress of the solar business.[323] By the end of 2016, Tesla Energy had terminated 4,163 employees,[324] including its solar installation workforce.[325] Tesla had also eliminated SolarCity's main sales channels,

---

[321] Tr. 34:8–36:10 (Elon) (testifying "we were headed for bankruptcy, frankly, at a very high speed").

[322] Tr. 35:21–37:1 (Elon).

[323] Tr. 347:10–348:23 (Elon); JX 2863 at 8 ("So for about 1.5 years, we unfortunately stripped Tesla Energy of engineering and other resources and even took the cell production lines that were meant for Powerwall and Powerpack and directed them to the car because we didn't have enough cells. Now that we feel that Model 3 production is in a good place and headed to a great place, we've restored resources to Tesla solar and storage. And that's going to be, I think, the really crazy growth for as far [in the] future as I can imagine."); Tr. 486:24–487:5 (Kimbal); Tr. 1747:11–1748:17 (Lyndon).

[324] JX 2731 at 5.

[325] Tr. 660:22–661:23 (Moessner).

including its "big box" retailer and door-to-door sales.[326]  As of trial, Tesla continued to rely on other solar companies to manufacture, produce, install and sell parts of its solar products.[327]  In other words, the synergistic integration that Tesla hoped for is still a work in progress.

Despite these challenges, Tesla's value has massively increased following the Acquisition.  The preponderance of the evidence suggests that the Acquisition was and is synergistic.  Tesla has realized approximately $1 billion in nominal cash flows and expects, conservatively, to realize at least $2 billion more from the legacy SolarCity systems.[328]  It has achieved cost synergies by eliminating high-cost, traditional solar sales channels (door-to-door marketing and big box stores), using Tesla's high-traffic website and stores to sell solar products instead.[329]  And it has achieved revenue synergies by cross-selling electric cars, battery storage, and solar

---

[326] Elon Dep. 328:25–329:7.

[327] For example, Tesla negotiated a joint venture with Panasonic so that Panasonic, not Silevo, would manufacture Tesla's solar cells in Buffalo.  Straubel Dep. 54:6–24; JX 2147.  As of today, Tesla does not produce "critical components" of its solar PV system.  Tr. 661:24–662:20 (Moessner).  And customers can "still buy a Tesla Powerwall through one of SolarCity's competitors."  Tr. 660:19–21 (Moessner).

[328] Tr. 349:4–350:23, 404:6–16 (Elon); Tr. 2309:24–2310:4 (Ehrenpreis); JX 2971 at 40, 58; Tr. 2857:2–21 (Gracias).

[329] Tr. 37:2–16 (Elon); JX 2679 at 3; Tr. 2866:5–12 (Gracias); JX 2763 at 2–3; Tr. 2301:19–2302:21 (Ehrenpreis).

products to its customers.[330]  One of Elon's expert witnesses, Fischel, provided credible testimony regarding the causal connection between the Acquisition and Tesla's skyrocketing performance.[331]  As long-promised, following the Acquisition, Tesla became "the world's first vertically integrated sustainable energy company, offering end-to-end clean energy products."[332]

## L. Procedural History

This litigation began when several stockholders filed separate actions bringing claims against the entire Tesla Board in connection with the Acquisition.[333]  The Court consolidated the individual actions and appointed certain plaintiffs and counsel to leadership positions.[334]  All defendants moved to dismiss, and after the parties briefed and argued that motion, this Court issued a Memorandum Opinion

---

[330] JX 2993; Tr. 2308:9–2309:5 (Ehrenpreis); Tr. 2870:3–23 (Gracias); JX 3182 at 13; *see* JX 2679 at 3 ("At the end of Q3, there were almost 450,000 Tesla vehicle owners around the world.  Ultimately, we believe this group will become the largest demand generator for our residential solar and Powerwall business.").

[331] Tr. 2667:9–2670:4 (Fischel).  Of course, the evidence does not allow a meaningful assessment of the extent to which the Acquisition has contributed to Tesla's growth, much less a conclusion that the Acquisition helps to explain the Tesla zeitgeist.  Accordingly, I have not based my verdict on any supposition in this regard.

[332] JX 2908 at 4.

[333] PTO ¶ 2.

[334] PTO ¶ 4.

denying the motion (the "MTD Opinion").[335]  Specifically, the Court held, in part, that "the Complaint pleads sufficient facts to support a reasonable inference that [Elon] exercised his influence as a controlling stockholder with respect to the Acquisition."[336]  The MTD Opinion also observed that, even though Plaintiffs carried their burden of well-pleading that Elon's status as Tesla's controlling stockholder was reasonably conceivable at the motion to dismiss stage, "[t]he facts developed in discovery may well demonstrate otherwise."[337]  Defendants filed an application for certification of interlocutory appeal, which this Court (and later the Supreme Court) denied.[338]

On April 18, 2021, the Court entered a Stipulated Order of Class Certification with respect to certain of Plaintiffs' claims.[339]  Plaintiffs and Defendants then filed cross-motions for summary judgment and, after briefing and oral argument,[340]

---

[335] PTO ¶ 7; MTD Opinion.

[336] MTD Opinion at *19.

[337] *Id.* (citing *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192 (Del. Ch. May 22, 2000) (determining the controlling stockholder issue at summary judgment); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 552 (Del. 2003) (determining the controlling stockholder issue post-trial)).

[338] PTO ¶ 8.

[339] PTO ¶ 14; D.I. 234.  At this stage of the litigation, Plaintiffs were pressing their direct class action claims based on *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) (recognizing the viability of certain direct claims based on allegations of dilution and overpayment).

[340] PTO ¶ 15.

the Court issued a Memorandum Opinion (the "SJ Opinion") denying the motions, with limited exceptions not relevant here.[341]

Well before trial, Plaintiffs reached an agreement with all Tesla Board members except for Elon—namely, Kimbal, Gracias, Jurvetson, Buss, Ehrenpreis and Denholm—to settle all claims against them for $60 million, funded by insurance.[342] This partial settlement was approved by the Court on August 17, 2020.[343]

After several delays caused by the COVID-19 pandemic,[344] the Court held a ten-day, in-person trial from July 12–16 and July 19–23, with one additional remote trial day on August 16, 2021.[345] After receiving post-trial briefs,[346] the Court heard post-trial oral argument on January 18, 2022.[347] The matter was deemed submitted for decision on that date.

---

[341] PTO ¶ 17; SJ Opinion at *2.

[342] PTO ¶ 16.

[343] PTO ¶ 23.

[344] PTO ¶¶ 20–22, 24.

[345] D.I. 459–63, 466–70, 475.

[346] D.I. 476–77, 481–82, 484–85.

[347] D.I. 491.

On September 20, 2021, the Supreme Court of Delaware issued its opinion in *Brookfield Asset Management, Inc. v. Rosson*,[348] expressly overruling *Gentile v. Rossette*,[349] and holding that "corporation overpayment/dilution *Gentile* claims, like those present here, are exclusively derivative under *Tooley*."[350] Following this development, the parties stipulated to decertify the class, dismiss the direct claims, and submit only Plaintiffs' derivative claims for decision.[351] I address those claims in turn below.

## II. ANALYSIS

Four counts remain to be adjudicated after motion practice and settlement: Counts I and II assert derivative breach of the duty of loyalty claims against Elon in his capacities as Tesla's controlling stockholder and as a member of the Tesla Board by causing the company to acquire an insolvent SolarCity;[352] Count III asserts a

---

[348] 261 A.3d 1251 (Del. 2021).

[349] 906 A.2d 91 (Del. 2006).

[350] *Brookfield Asset Mgmt.*, 261 A.3d at 1277.

[351] D.I. 480.

[352] Compl. ¶¶ 294–302. As discussed below, neither the Complaint nor the pretrial order assert claims against Elon in his capacity as Tesla's CEO. This is significant since Tesla's certificate of incorporation contains an exculpatory provision, as permitted by Section 102(b)(7) of the Delaware General Corporation Law, that, by its terms, and as a matter of law, exculpates Elon for any breaches of the duty of care as a Tesla director but does not exculpate him for breaches of the duty of care as Tesla's CEO. *See* 8 *Del. C.* § 102(b)(7); JX 19 (attaching Tesla charter), § 8.1 (exculpatory provision).

70

claim of unjust enrichment against Elon in connection with the Tesla stock he received in the Acquisition;[353] and Count VI asserts that the Acquisition constituted waste.[354]

The parties' dispute begins, unsurprisingly, with the "gating question" of what standard of review is implicated by Plaintiffs' showcase claims of breach of fiduciary duty.[355] Again unsurprisingly, Plaintiffs argue the Court should review the fiduciary duty claims under the entire fairness standard, and they proffer the means by which entire fairness is triggered here—namely, that a majority of the Tesla Board was conflicted with respect to the Acquisition and that Elon is a conflicted controlling stockholder. Predictably, Elon counters that the business judgment rule is the correct answer to the standard of review question because he is not a controlling stockholder, a majority of the Tesla Board was not conflicted and, even if it was, the fully informed, uncoerced vote of Tesla's stockholders "cleansed" any fiduciary duty breaches.

I have approached my deliberations in the following sequence. First, I recount the parties' contentions and identify the factual and legal support on both sides.

---

[353] Compl. ¶¶ 303–07.

[354] Compl. ¶¶ 320–25.

[355] *See Larkin v. Shah*, 2016 WL 4485447, at *7 (Del. Ch. Aug. 25, 2016) (noting that standard of review is often the "gating question" that "largely dictates the end result" in breach of fiduciary duty cases).

In doing so, however, I remain focused on the point of post-trial deliberations—to reach a verdict. With this focus in mind, after explaining the factual and legal bases for doing so, I assume Plaintiffs' best case on standard of review—that entire fairness applies—and consider the trial evidence through that lens. After setting the standard of review, I explain my finding that Elon has proven the Acquisition was entirely fair and, therefore, he did not breach his fiduciary duties. The evidence adduced at trial proved the Acquisition process, like most worldly things, had both flaws and redeeming qualities. The linchpin of this case, though, is that Elon proved that the price Tesla paid for SolarCity was fair—and a patently fair price ultimately carries the day. That same finding puts the nail in Plaintiffs' unjust enrichment and waste claims. My reasoning follows.

## A. The Breach of Fiduciary Duty Claims

The gravamen of Plaintiffs' fiduciary duty claims is that Elon breached the duty of loyalty both as a controlling stockholder and director of Tesla by "orchestrat[ing] Board approval of the Acquisition, which unfairly provides SolarCity's stockholders . . . with excessive value."[356] Put simply, Plaintiffs seek to prove that "[Elon] Musk harmed Tesla" by causing Tesla to bail out an insolvent

---

[356] Compl. ¶ 296.

SolarCity.[357]  As noted, Plaintiffs do not allege that Elon breached the duty of care as an officer of Tesla.[358]  Accordingly, I focus, as the parties do, on Elon's conduct as alleged controller and as a member (and Chair) of the Tesla Board to assess whether he breached his fiduciary duty of loyalty.

### 1. The Standard of Review

"The starting point for analyzing a fiduciary breach is to determine the correct standard of review."[359]  "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[360]  As noted, the battle line here is drawn between entire fairness

---

[357] POB at 2.

[358] *See, e.g.*, Compl. ¶¶ 299–300 ("[E]ach of the Individual Defendants had a fiduciary duty to, among other things, act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests.  Each of the Individual Defendants breached his or her fiduciary duty of loyalty by causing and/or allowing Tesla to enter into the self-dealing SolarCity Acquisition."); POB at 3 ("Given Musk's *disloyalty*, the Court has wide discretion to fashion an equitable remedy.") (emphasis added); *id.* at 44 (citing duty of loyalty jurisprudence); *id.* at 78 ("Here, Musk's *disloyal conduct* caused Tesla to pay excessive shares for an insolvent company.") (emphasis added); *see generally id.* (failing to discuss the duty of care or Elon's duties as CEO of Tesla).

[359] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 2021 WL 772562, at *30 (Del. Ch. Mar. 1, 2021).

[360] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

(Plaintiffs' proffered standard)[361] and the deferential business judgment rule (Elon's proffered standard).[362] Neither party has advocated for enhanced scrutiny.[363]

### a. The Competing Standards of Review

To explain my decision to review for entire fairness, it is useful to identify the catalysts for the parties' competing legal arguments. To state it bluntly, the knock-on effects of two decisions of our Supreme Court—*Corwin* and *MFW*—frame the standard of review controversy here.[364] These seminal decisions offer conflicted fiduciaries two pathways to the coveted deference afforded by the business judgment rule.[365] Elon wants that deference; Plaintiffs want to deny him that deference.

---

[361] POB at 44.

[362] Def.'s Opening Post-Trial Br. ("DOB") (D.I. 477) at 2, 83.

[363] Plaintiffs have not asserted a *Revlon* claim presumably because, as stockholders of the buyer, they do not dwell in "Revlon Land." *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986); Mohsen Manesh, *Defined by Dictum: The Geography of Revlon-Land in Cash and Mixed Consideration Transactions*, 59 Vill. L. Rev. 1, 5, 18 (2014) (explaining that when a board decides the company it serves is for sale, and thereby "enters *Revlon*-land, as it is colloquially called, the board loses the presumption of the deferential business judgment rule and becomes subject to enhanced judicial scrutiny under an objective standard of reasonableness") (emphasis in original) (internal citations omitted); *see also* Leo E. Strine, Jr., *Categorical Confusion: Deal Protection Measures in Stock-for-Stock Merger Agreements*, 56 Bus. Law. 919, 927 n.25 (2001) (stating that the "[t]he *Revlon* principle grows out of the traditional principle that fiduciaries must sell trust assets for their highest value").

[364] *Corwin v. KKR Fin. Hldgs.*, 125 A.3d 304, 313–14 (Del. 2015); *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014) ("*MFW*").

[365] *See Corwin*, 125 A.3d at 305–06 (affirming that "the business judgment rule is invoked as the appropriate standard of review for a post-closing damages action when a merger that

74

If Elon is deemed a controlling stockholder of Tesla, he cannot invoke *Corwin* to achieve business judgment deference.[366] Not surprisingly, then, Plaintiffs argue that Elon is a controlling stockholder; Elon steadfastly maintains that he is not.[367] In making their controlling stockholder argument, Plaintiffs, no doubt, are comforted by the fact that Elon, as controller, cannot invoke *MFW* to achieve business judgment review because the Tesla Board elected not to form an independent special committee, a predicate to the operation of *MFW*'s ratchet from entire fairness down to the business judgment rule.[368] If Elon is deemed a controlling stockholder of Tesla, therefore, his conduct will be subject to the "onerous" entire

---

is not subject to the entire fairness standard of review has been approved by a fully informed, uncoerced majority of the disinterested stockholders"); *MFW*, 88 A.3d at 644 ("We hold that business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon *both* the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; *and* the uncoerced, informed vote of a majority of the minority stockholders.") (emphasis added); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (explaining that the business judgment rule embodies a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company"), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[366] *Larkin*, 2016 WL 4485447, at *8 (holding the *Corwin* does not apply in cases involving conflicted controlling stockholders); *In re Merge Healthcare, Inc. S'holders Litig.*, 2017 WL 395981, at *6 (Del. Ch. Jan. 30, 2017) (same).

[367] *See* Gladriel Shobe & Jarrod Shobe, *The Dual Class Spectrum*, 39 Yale J. Reg. 101, 147 (*forthcoming* 2022) ("Shobe") (observing that "questions of whether a shareholder has control can significantly change the standard of review, and therefore the outcome, of fiduciary duty cases").

[368] *MFW*, 88 A.3d at 644.

fairness review since there is no question he was conflicted with respect to the Acquisition.[369]

If Elon clears the controlling stockholder hurdle, he still has to traverse the treacherous terrain of board-level conflicts to reach business judgment arcadia. When "properly reviewable facts reveal that the propriety of a board decision is in doubt because the majority of the directors who approved it were grossly negligent, acting in bad faith, or were tainted by conflicts of interest," the court will review the decision for entire fairness.[370] On the other hand, if the Tesla Board was not conflicted, and Elon was not a controlling stockholder, then the business judgment rule is the standard of review.[371] Thus, the parties understandably clash over the extent to which a majority of the Tesla Board was conflicted with respect to the Acquisition by way of self-interest or a lack of independence from those who were self-interested.

---

[369] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) (characterizing entire fairness review as "onerous"); *see also Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *11 (Del. Ch. Aug. 16, 2021) (holding "the presence of a controller will not *per se* trigger entire fairness review; this heightened standard is only appropriate when a controller 'engage[s] in a conflicted transaction'") (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *14 (Del. Ch. Oct. 24, 2014)).

[370] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

[371] *Id.*

Here again, the spirit of *Corwin* looms large. Even if the Acquisition was approved by a conflicted Tesla Board, assuming Elon is not a controlling stockholder, the uncoerced, fully informed vote of a majority of Tesla's disinterested minority stockholders will "cleanse" any breach of fiduciary duty by triggering business judgment deference.[372] And so, the parties dispute whether Tesla's stockholders were given the full and accurate information they needed to cast an informed vote in favor of the Acquisition.

### b. The Court Will Skip to Entire Fairness

As the above discussion reveals, the parties have explored all of the recesses of Delaware law regarding shifting standards of review, from controlling stockholder liability to stockholder ratification and all of the nooks in between.[373]

---

[372] *In re Merge Healthcare*, 2017 WL 395981, at *6 (holding "the only transactions that are subject to entire fairness that cannot be cleansed by proper stockholder approval are those involving a controlling stockholder").

[373] In a single sentence in their opening post-trial brief, Plaintiffs assert for the first time in this years-long litigation that Elon "withheld critical information from the Board and stockholders about his reasons for the Acquisition and SolarCity's true financial condition" such that he committed "fraud on the board." POB at 42. They cite *Mills Acquisition Co. v. MacMillan*, which held that a fiduciary's silence in the boardroom "in the face of [a] rigorous affirmative duty of disclosure" amounts to a fraud perpetrated upon his fellow board members. *Mills Acq. Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989). If Plaintiffs intended to assert and prove a "fraud upon the board" theory, they should have raised the issue well in advance of their post-trial briefs. *See PharmAthene v. SIGA Techs., Inc.*, 2001 WL 6392906, at *2 (Del. Ch. Dec. 16, 2011) ("The general rule . . . that a party waives any argument it fails properly to raise shows deference to fundamental fairness and the common sense notion that, to defend a claim or oppose a defense, the adverse party deserves sufficient notice of the claim or defense in the first instance."); *ABC Woodlands*

The parties' claims and defenses present provocative questions that could be debated

at even the most fashionable corporate law conferences.[374]  Beyond satisfying idle

*L.L.C. v. Schreppler*, 2012 WL 3711085, at *3 (Del. Ch. Aug. 15, 2012) ("When an argument is first raised in a pretrial brief after the parties already have shaped their trial plans, it is simply too late and deemed waived.").  Even if not deemed untimely, the argument stands wholly undeveloped.  Beyond the off-handed mention in their opening post-trial brief, Plaintiffs did not argue fraud on the board in any other submission to the Court before or after trial.  Nor did they argue fraud on the board during post-trial oral argument. D.I. 491.  Accordingly, I do not consider the argument here.  *See, e.g.*, *Voigt v. Metcalf*, 2020 WL 614999, at *8 (Del. Ch. Feb. 10, 2020) (observing that defendants "invested so little in those arguments that they can be regarded as waived").  Of course, in addressing the entire fairness of the Acquisition, I necessarily have considered the state of the Tesla Board's knowledge at relevant times during the deal process, as discussed in detail below.

[374] The controlling stockholder question is of particular interest.  Elon owned less than 50% of Tesla's voting stock.  At the pleadings stage, and at summary judgment, I held there was a triable issue of fact regarding whether Elon "exercised actual domination and control over the directors" such that "independent directors could not freely exercise their judgment."   MTD Opinion at *12 (cleaned up); *see also* SJ Opinion at *7 (citing *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *6 (Del. Ch. June 5, 2006) ("The question whether a shareholder is a controlling one is highly contextualized and is difficult to resolve based solely on the complaint.")).  Our law regarding controlling stockholders is, and has been for some time, in flux.   *See, e.g.*, Ann M. Lipton, *After* Corwin: *Down the Controlling Shareholder Rabbit Hole*, 72 Vanderbilt L. Rev. 1977, 2011 (2019) ("Delaware's difficulties in dealing with controlling shareholders are not new; inconsistencies and ambiguities go back decades."); *id.* ("[T]he combination of *Corwin*, *C & J Energy*, and *MFW* have spotlighted those doctrinal fissures by requiring courts to draw artificially sharp distinctions between control and noncontrol transactions when in fact control exists on an increasingly nuanced spectrum."); Shobe, at 147–48 (discussing entire fairness review in the evolving context of control exercised via dual-class stock); ***compare*** *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *38 (Del. Ch. May 6, 2021) ("It is an open question under Delaware law whether the Entity Defendants' soft power alone, anchored in historical and commercial ties and the contractual Consent Right, can support including the Entity Defendants [non-stockholders] in a control group and imposing fiduciary duties."); *id.* at *39 (discussing cases where the court "looked beyond the bounds of stock ownership to other sources of soft power");

curiosity, however, there is no point to be served by pondering these questions further here.  And there is certainly no reason to answer them.[375]

---

*Blue v. Fireman*, 2022 WL 593899, at \*16 (Del. Ch. Feb. 28, 2022) (observing that even though "stock ownership is the traditional vehicle through which outsiders gain voting power, [] holding stock is not a prerequisite to exercising voting control that carries the weight of fiduciary duties"); SJ Opinion at \*5–6 (discussing the "inherent coercion" doctrine in the context of minority blockholders acting as controlling stockholders); ***with*** Lawrence Hamermesh et al., *Optimizing the World's Leading Corporate Law: A 20-Year Retrospective and Look Ahead* 6 (Harv. L. Sch. Program on Corp. Governance, Discussion Paper No. 2021-12, 2021), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=3954998 ("[W]e propose limiting the concept of 'controlling stockholder' to the situation where a stockholder's voting power gives it at least negative power over the company's future, in the sense of acting as a practical impediment to any change of control.") ("Hamermesh"); *Corwin*, 125 A.3d at 307 ("In addressing whether KKR was a controlling stockholder, the Chancellor was focused on the reality that in cases where a party that did not have majority control of the entity's voting stock was found to be a controlling stockholder, the Court of Chancery, consistent with the instructions of this Court, looked for a combination of potent voting power and management control such that the stockholder could be deemed to have effective control of the board without actually owning a majority of stock.").

[375] In justifying his decision to assume certain points and skip over others when deciding a motion to dismiss, Chancellor Chandler explained, "[i]t has been said that '[t]he art of life is the art of avoiding pain; and he is the best pilot, who steers clearest of the rocks and shoals with which it is beset.'  Accordingly, I steer a course that will be more comfortable for all involved." *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at \*13 (Del. Ch. May 5, 2010) (quoting Thomas Jefferson, The Jeffersonian Cyclopedia: A Comprehensive Collection of the Views of Thomas Jefferson 503 (John P. Foley ed., Funk & Wagnalls Co. 1900)).  While the controlling stockholder issue, in particular, calls out for guidance from this court and ultimately our Supreme Court, I "steer a course" that avoids the "rocks and shoals" of unsettled questions ever mindful that, unlike my judicial colleagues, I soon will inhabit a place where I am not burdened with the effects of my answers on future cases. *See, e.g.*, *State ex rel. Smith v. Carey*, 112 A.2d 26, 28 (Del. 1955) ("[T]he expression of dictum is ordinarily to be avoided."); *Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1220 (Del. 2012) ("To the extent Delaware judges wish to stray beyond those issues and, without making any definitive pronouncements, ruminate on what the proper direction of Delaware law should be, there are appropriate platforms, such as law review articles, the classroom, continuing legal education presentations, and keynote speeches."); *United*

The parties have proffered evidence on both sides of the controlling stockholder issue, the board-level conflicts issues, and the "*Corwin* cleansing" issue (particularly regarding the quality of the disclosures made to Tesla stockholders).[376] This is not a case where business judgment deference is obviously justified from undisputed or clearly proven facts. Whether by virtue of Elon's control,[377] or by

*States v. Leon*, 468 U.S. 897, 963 (1984) (Stevens, J., concurring in part) ("[W]hen the Court goes beyond what is necessary to decide the case before it, it can only encourage the perception that it is pursuing its own notions of wise social policy, rather than adhering to its judicial role.").

[376] With regard to board-level conflicts, I acknowledge Plaintiffs' arguments that each member of the Tesla Board, save Denholm, was either interested or lacked independence with respect to the Acquisition. I have already reviewed the relevant evidence in that regard as I introduced each Tesla Board member in the Background section of this opinion. Suffice it to say, there is a *bona fide* dispute regarding whether a majority of the Tesla Board was conflicted as it considered, negotiated and ultimately approved the Acquisition. There is, therefore, a factual basis to justify an assumption that entire fairness is the standard of review on this basis alone.

[377] I pause here to emphasize that the source of Elon's control was hotly disputed. Plaintiffs focused at trial on Elon's "managerial supremacy," not his stock ownership or the voting power flowing from his stock. POB at 51 (quoting *Cysive*, 836 A.2d at 553). Of course, that argument brings the controlling stockholder debate in clear focus. *See* Hamermesh, at 36 ("Being valuable to the company does not make an executive a controlling stockholder, nor does it implicate the concerns underlying *Lynch*—namely, the potential to use affirmative voting power to unseat directors and implement transactions that the minority stockholders do not like, and use blocking voting power to impede other transactions."); Matt Levine, *Elon Musk Never Wanted to be CEO*, Money Stuff, Bloomberg Law (July 13, 2021), https://news.bloomberglaw.com/banking-law/matt-levines-money-stuff-elon-musk-never-wanted-to-be-ceo ("[T]his is a matter of being a charismatic founder-CEO, not *a controlling shareholder*. The fact that [Elon] owns 18% or 22% of Tesla's stock is not what gives him power over Tesla; what gives him power over Tesla is that he is the CEO and product architect and visionary and social media manager, and it would die without him, or so he and the board and let's face it the shareholders think. This has nothing to do with his shareholder voting power or his ability

virtue of irreconcilable board-level conflicts,[378] there is a basis for assuming that entire fairness is the governing standard of review. Accordingly, I will give no deference to Elon (or his fellow Tesla Board members) and will review Plaintiffs' breach of fiduciary claim with the highest degree of scrutiny recognized in our law.

---

or inability, as a matter of technical corporate governance, to remove directors who disagree with him. It has to do with his personality, and his job as CEO, and the love that retail shareholders have for him, and the general backdrop that boards of directors of public tech companies tend to be very deferential to charismatic founder-CEOs regardless of how many shares they own."). Again, I have chosen not to enter into the fray of this debate, as the outcome does not depend on whether Elon is or is not a controller (or a controlling stockholder, if that is different). In avoiding the question, I take some comfort in the observation of a noted scholar that "some *ex ante* doubt about controller status" may better incentivize boards to "be strict about cleansing mechanisms." Ann Lipton, *Will He or Won't He?*, Law Professor Blogs Network (July 17, 2021), https://lawprofessors.typepad.com/business_law/2021/07/will-he-or-wont-he.html (observing that the Court could reach its verdict in this case without deciding the controlling stockholder issue).

[378] In this regard, this case presents yet another question not yet answered in Delaware, at least not directly. Each of the allegedly conflicted directors was asked directly, under oath, whether he made his decision regarding the Acquisition based on conflicted motivations or whether he considered only the best interests of Tesla and its stockholders. Each arguably conflicted director credibly testified (and, in detail, explained how) he made his decision consistent with his duty of loyalty. Yet the facts implicating the potential for self-interest or lack of independence, all similar to scenarios where Delaware courts have found a reasonably conceivable disabling conflict on pled facts, were proven at trial (*e.g.*, familial ties, personal friendships, "thick" business relationships, cross-investments, etc.). This raises the question whether credible (and convincing) testimony revealing loyal decision making can overcome proven facts revealing recognized scenarios where the *potential* for conflict exists. Here again, I raise but do not answer the question.

## 2. The Acquisition Was Entirely Fair

"The concept of fairness has two basic aspects: fair dealing and fair price."[379] Fair dealing (or fair process) "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[380] Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[381]

Entire fairness is a composite. "Although the two aspects may be examined separately, 'the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.'"[382] And while it is generally understood that "perfection is not

---

[379] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983); *see also Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) ("*Technicolor II*") (explaining that under entire fairness review, the defendant (absent a burden-shifting) must prove "to the court's satisfaction that the transaction was the product of both fair dealing and fair price") (internal quotation marks omitted).

[380] *Weinberger*, 457 A.2d at 711.

[381] *Id.*

[382] *Trados*, 73 A.3d at 56 (citing *Weinberger*, 457 A.2d at 711); *see also Owen v. Cannon*, 2015 WL 3819204, at *32 (Del. Ch. June 17, 2015) ("Under the entire fairness standard, I must make a unitary conclusion as to whether the Merger was entirely fair.").

possible, or expected" when designing and executing a deal process,[383] "[e]vidence of fair dealing [or not] has significant probative value to demonstrate the fairness of the price obtained."[384] As our Supreme Court has explained, though, "[t]he paramount consideration [] is whether the price was a fair one."[385] Much like the idiom "all roads lead to Rome," in our law, while there are necessary stops along the way, all roads in the realm of entire fairness ultimately lead to fair price.[386]

---

[383] *Weinberger*, 457 A.2d at 709 n.11; *Technicolor II*, 663 A.2d at 1179 ("Thus, 'perfection is not possible, or expected' as a condition precedent to a judicial determination of entire fairness.") (citation omitted); *see also Brinckerhoff v. Texas E. Prod. Pipeline Co., LLC*, 986 A.2d 370, 395 (Del. Ch. 2010) ("Perfection is an unattainable standard that Delaware law does not require, even in a transaction with a controller.").

[384] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1244 (Del. 2012); *see also Reis,* 28 A.3d at 467 ("A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."); *Trados*, 73 A.3d at 78 ("As the Delaware Supreme Court has recognized, an unfair process can infect the price, result in a finding of breach, and warrant a potential remedy."); *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result.").

[385] *Ams. Mining Corp.*, 51 A.3d at 1244.

[386] *See, e.g.*, *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 42 (Del. Ch. 2010) ("Price, however, is the paramount consideration because procedural aspects of the deal are circumstantial evidence of whether the price is fair."); *Weinberger*, 457 A.2d at 711 ("[I]n a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger."); 2 Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 16.09[c], 16-126 (2d ed. 2020) ("[T]he Court of Chancery has been reluctant to exercise its discretion in favor of awarding monetary damages when plaintiffs receive a fair price in a transaction that does not comport with entire fairness solely because of an unfair process."); *Oliver v. Boston Univ.*, 2006 WL 1064169, at *25 n.239 (Del. Ch. Apr. 14, 2006) (finding of fair price precluded damages (except nominal damages) even when there was "*no process* to protect the interests of the minority shareholders") (emphasis added).

That fair price is the preponderant consideration in entire fairness review makes perfect sense. Just as "[a] strong record of fair dealing can influence the fair price inquiry,"[387] a demonstrably fair price is inconsistent with the notion that a fiduciary disloyally attempted to channel value to himself or third parties at the expense of the beneficiaries of his duties.[388] That being said, this court has held that a fair price "does not ameliorate a process that was beyond unfair."[389] "Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could

---

[387] *Reis*, 28 A.3d at 467.

[388] *See, e.g.*, *Ams. Mining Corp.*, 51 A.3d at 1253 (finding that "defendants breached their duty of loyalty" by channeling value away from stockholders through the exchange of "over $3 billion worth of actual cash value for something that was worth much less"); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 36 (Del. Ch. 2014) ("[T]he members of the Board . . . owed a duty of loyalty to the stockholders to seek the alternative that maximized the value of their residual claims without regard to the particular interests of the controller."); *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at *17 (Del. Ch. June 23, 2021) (finding evidence that a conflicted fiduciary channeled consideration away from stockholders to himself supported the archetypical case of breach of the duty of loyalty).

[389] *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *1 (Del. Ch. Sept. 4, 2014); *see also id.* at *3 "[A]lthough [the transaction at issue] was approved and implemented at a fair price, [it] was not entirely fair because of the Defendants' *grossly unfair* dealing.") (emphasis added); *Ravenswood Inv. Co., L.P. v. Estate of Winmill*, 2018 WL 1410860, at *17 (Del. Ch. Mar. 21, 2018) (observing that the court "arguably could end the [entire fairness] analysis" after holding that "Defendants failed to prove fair process"), *aff'd*, 210 A.3d 705 (Del. 2019) (TABLE); *William Penn P'ship v. Saliba*, 13 A.3d 749, 756–57 (Del. 2011) ("A party does not meet the entire fairness standard simply by showing that the price fell within a reasonable range that would be considered fair.").

lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved."[390]

Turning briefly to the burden of proof, when a transaction is subject to entire fairness review, the burden of persuasion typically rests with the defendant, but the burden can shift to the stockholder challenging the transaction if the defendant "show[s] that the transaction was approved either by an independent board majority (or in the alternative, a special committee of independent directors) or, assuming certain conditions, by an informed vote of the majority of the minority shareholders."[391] In this case, the parties dispute who bears the burden of persuasion and, given the many genuine disputes of material fact at play, I was unable to decide that issue prior to trial.[392] Having now deliberated the evidence, "[f]or reasons of

---

[390] *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *37 (Del. Ch. July 6, 2018), *aff'd sub nom Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 341142, at *19 (Del. Ch. July 21, 2017) (same), *aff'd*, 184 A.3d 1291 (Del. 2018). To be clear, given the unitary nature of the entire fairness inquiry, "the fact that the directors did not follow a fair process does not [alone] constitute a separate breach of duty." *Trados*, 73 A.3d at 78. Instead, the failure to execute a demonstrably fair process will force the fiduciary "to prove at trial that the [transaction at issue] was entirely fair"—if she succeeds, she will defeat the breach of fiduciary duty claim; if she does not, she will be held liable. *Id.*; *see also Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, 2020 WL 2111476, at *43 (Del. Ch. May 4, 2020) ("Because this decision has found that the defendants' actions were entirely fair, there was no fiduciary breach . . . .").

[391] *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 788 (Del. Ch. 2011), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

[392] *See* SJ Opinion at *7 n.54.

efficiency and clarity of logic," I have determined that I need not decide the burden of proof question and may, instead, "jump right into the thick of the fairness inquiry."[393] In my view, the evidence favoring the defense is that compelling. [394]

Before addressing the merits, I cannot help but observe that Elon (and the rest of the Tesla Board members) likely could have avoided this expensive and time-consuming litigation had they just adopted more objectively evident procedural protections. Delaware law incentivizes parties "to employ deal techniques that provide protection to [] stockholders that [are] substantially equivalent to arm's length bargaining."[395] That Elon and the Tesla Board failed to follow this clear guidance and yet prevailed here should not minimize those incentives or dilute the

---

[393] *Cysive*, 836 A.2d at 553 (noting that "[t]he intermediate issue of burden-shifting might possibly be of moment in some cases but not in this one"); *see also In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *4 (Del. Ch. Aug. 27, 2015) (stating that "the Delaware Supreme Court has explained that the real-world benefit of burden-shifting is 'modest' and only outcome-determinative in the 'very few cases' where the 'evidence is in equipoise'") (quoting *Ams. Mining Corp.*, 51 A.3d at 1242).

[394] I emphasize here that the court's "judgment concerning 'fairness' will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case." *Cinerama Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1140 (Del. Ch. 1994) ("*Technicolor I*"), *aff'd*, 663 A.2d 1156 (Del. 1995). The standard is not "endlessly elastic"; it is, instead, "a standard which in one set of circumstances or another reasonable minds might apply differently." *Id.*

[395] Lawrence A. Hamermesh & Michael L. Wachter, *The Importance of Being Dismissive: The Efficiency Role of Pleading Stage Evaluation of Shareholder Litigation*, 42 J. Corp. L. 597, 638 (2017) (collecting cases); *see also* Andrew F. Tuch, *Reassessing Self-Dealing: Between No Conflict and Fairness*, 88 Fordham L. Rev. 939, 977 (2019) (observing that "interested directors nevertheless have powerful incentives to invoke exceptions before the transaction occurs").

implications of the onerous entire fairness standard of review. Their choices constricted the presumptive path to business judgment deference and subjected Elon's conduct to post-trial judicial second-guessing. In other words, if Chancery opinions are "parables,"[396] let this be a parable of unnecessary peril, despite the outcome.[397]

### a. Fair Process

As I begin my review of the evidence regarding the Tesla Board's deal process, I am mindful that my assumptions justifying entire fairness review carry certain implications. In the controlling stockholder analysis, "[t]he requisite degree of control can be shown to exist generally or with regard to the particular transaction that is being challenged."[398] In either circumstance, this court has recognized that

---

[396] *See* William B. Chandler III, *Our National Challenge: A Blueprint for Restoring the Public Trust*, 6 U. St. Thomas L. J. 421, 423 (Winter 2009) ("[T]he opinions of the Court of Chancery [are] akin to parables; that is, they read like morality stories describing the behavior of directors and managers, both the good behavior and the bad.").

[397] This point cannot be emphasized enough. There was a right way to structure the deal process within Tesla that likely would have obviated the need for litigation and judicial second guessing of fiduciary conduct. First and foremost, Elon should have stepped away from the Tesla Board's consideration of the Acquisition entirely, providing targeted input only when asked to do so under clearly recorded protocols. The Tesla Board should have formed a special committee comprised of indisputably independent directors, even if that meant it was a committee of one. The decision to submit the Acquisition for approval by a majority of the minority of Tesla's stockholders was laudable, and had the deal process otherwise been more compliant with the guidance provided by this court and our Supreme Court over many decades, it is likely there would be no basis to challenge the stockholder vote as uninformed. Of course, none of that happened.

[398] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013).

the controlling stockholder brings with him into the boardroom an element of "inherent coercion."[399] Thus, in keeping with an assumption that Elon possesses some sort of general "managerial control" over Tesla and the Tesla Board, as asserted by Plaintiffs,[400] I searched during my deliberations for persuasive evidence that Elon exploited the coercion inherent in his status as a controller to influence the Tesla Board's decision-making with regard to this "particular transaction."[401]

As discussed below, the evidence reveals that any control Elon may have attempted to wield in connection with the Acquisition was effectively neutralized by a board focused on the *bona fides* of the Acquisition, with an indisputably independent director leading the way.[402] Elon did not "engage[] in pressure tactics that went beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior."[403] In other words, even assuming Elon had the

---

[399] *See In re Pure Resources, Inc. S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002); SJ Opinion at *5–6.

[400] POB at 51.

[401] *Carsanaro*, 65 A.3d at 659.

[402] *See Basho Techs.*, 2018 WL 3326693, at *28 ("Invariably, the facts and circumstances surrounding the particular transaction will loom large. Probative evidence can include statements by participants or other contemporaneous evidence indicating that a defendant was in fact exercising control over a decision.").

[403] *Voigt*, 2020 WL 614999, at *13; *cf. Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114, 1119 (Del. 1994) (observing that the controller made threats to the board to get his way); *In re Dole Food*, 2015 WL 5052214, at *5 ("Criticizing [the controller] was unthinkable. On the rare occasions in the record where [he] was challenged, he responded

88

ability to exercise control over the Tesla Board, the credible evidence produced at trial shows that he simply did not do so with respect to the Acquisition.[404] To be sure, his presence in the boardroom, at times, was problematic. In particular, as described below, Elon's recusal from deliberations was fluid and the evidence reveals that, when he was present, he simply could not help but to "voice [his] opinion, obviously."[405] But the preponderance of the evidence reveals that Elon's influence did not degrade the entire fairness of the Acquisition.[406]

---

aggressively . . . ."); *Basho Techs.*, 2018 WL 3326693, at *28 (finding that the plaintiffs proved at trial that the controller exercised effective control over the company "for purposes of the decision to consummate the [disputed transaction]" as a result of a combination of factors). I note that none of the factors listed in *Basho* are present here.

[404] *See Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386 (Del. Ch. 1999) (holding that the majority stockholder did not exercise de facto control over the holding company's board of directors); *see also Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) ("[T]he focus of the inquiry has been on the de facto power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability to dominate the corporate decision-making process. The concern is that the significant shareholder will use its power to obtain (or compel) favorable actions by the board to the ultimate detriment of other shareholders.").

[405] Elon Dep. 284:3–4.

[406] *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at *23 (Del. Ch. Apr. 28, 2003) ("Of greater concern is that Hall and/or Berlin were present at some of those meetings. Where director conduct is reviewed under the entire fairness standard, process laxity of this kind cannot be condoned, and (as this Court has found) it should not have been allowed to occur. Neither Hall nor Berlin should have been present at any of the non-affiliated directors' meetings or deliberations, or allowed to have any direct contact with their advisors. To the extent that did occur, however inadvertently, it must be regarded as some evidence of unfair dealing. But, in this case, that evidence does not overcome the preponderating force of the other credible evidence which persuades this Court that the

I have also assumed that a majority of the Tesla Board was conflicted, either by self-interest in the Acquisition or by a lack of independence. Elon certainly has a factual basis to challenge that assumption, but there is also a factual basis to support it. As I considered the Tesla Board's process, therefore, I was mindful of the conflicts and scrutinized carefully each director's decision-making and rationale for supporting the Acquisition. Ultimately, under the direction and influence of a "disinterested decisionmaker," Denholm, I am satisfied that the Tesla fiduciaries placed the interests of Tesla stockholders ahead of their own.[407]

### i. Process Flaws

The process flaws flow principally from Elon's apparent inability to acknowledge his clear conflict of interest and separate himself from Tesla's consideration of the Acquisition. Although the Tesla Board conditioned the Acquisition on the approval of a majority of disinterested stockholders, for reasons unexplained, it did not implement the other standard protection—an independent special committee.[408] With no formal independent negotiating body to manage

---

non-affiliated directors were, in fact, independent-and acted independently-of Hall."), *aff'd*, 840 A.2d 641 (Del. 2003).

[407] Principles of Corp. Governance § 5.02 (Am. L. Inst. 1994) ("[A] corporation's interest will be better protected if it is independently represented in negotiating the transaction by a person who has no conflict of interest in the transaction.").

[408] *See In re John Q. Hammons Hotels, Inc. S'holder Litig.*, 2009 WL 3165613, at \*12 (Del. Ch. Oct. 2, 2009) (noting that a "majority of the minority vote serves as a complement

90

conflicts, Elon was permitted to participate in the deal process to a degree greater than he should have been:

- Elon had several communications (undisclosed to Tesla's Board) with SolarCity's management about the Acquisition.[409] For example, without any approval or knowledge of the Tesla Board, Elon declared to Lyndon that Tesla would acquire SolarCity, and later assured Lyndon that Tesla would extend a bridge loan to SolarCity.[410]

- Having made the declaration to Lyndon, Elon then pressed the Tesla Board to consider the Acquisition on several occasions.[411] And, unbeknownst to the Tesla Board, he directed Tesla's CFO to prepare a financial analysis of a potential transaction before first presenting his proposal that Tesla acquire SolarCity to the Tesla Board.[412]

---

to, and a check on, the special committee," and emphasizing that the formation of the special committee is still "paramount" in providing procedural protection to stockholders in conflicted transactions). Surprisingly, there is no clear explanation in the trial record for why the Tesla Board elected not to form a special committee. *See, e.g.*, Tr. 2133:1–21 (Denholm) (acknowledging there was no special committee but not explaining why that was so); Foster Dep. 220:17–222:5 ("I have no idea what advice, if any, Wachtell Lipton gave Tesla as regards forming or not forming a special committee."); Kimbal Dep. 106:18–107:9 (unable to explain why Tesla did not form a special committee). To the extent Plaintiffs would have me surmise that the failure to form a special committee was somehow Elon's doing, there is simply no evidence to support that. Indeed, Elon was not asked a single question about the formation of a special committee over the course of two depositions or two days of trial testimony.

[409] JX 1451; Tr. 1755:21–24, 1756:11–22 (Lyndon); Tr. 2101:9–2103:5 (Denholm).

[410] Tr. 1755:21–24, 1756:11–22 (Lyndon); Tr. 2101:9–2103:5 (Denholm); JX 2789 at 274:4–13. Of course, a bridge loan was not extended.

[411] *E.g.*, JX 902; JX 1131.

[412] Wheeler Dep. 30:8–31:7. But, as explained both above and below, the Tesla Board rebuffed Elon until it determined the timing was right for Tesla.

91

- Once the Tesla Board agreed to explore the Acquisition, Elon participated in the selection of Tesla's outside deal counsel.[413]

- Once the Tesla Board decided to pursue the Acquisition, Elon reviewed Tesla's offer letter and the blog post announcing the first proposal.[414]

- Elon was involved in preliminary discussions regarding price during Evercore's initial presentation and explained why a 30% premium—higher than Evercore recommended but still in the range of fairness—might be needed to close the deal.[415]

- Elon was in frequent communication with Evercore outside the boardroom throughout the process, obtaining regular updates on timing and diligence.[416]

- Elon self-published the Master Plan Part Deux in the middle of negotiations in an apparent attempt to garner Tesla stockholder support for the Acquisition while the Tesla Board was still considering Tesla's options.[417]

---

[413] Tr. 1755:11–16 (Lyndon); Tr. 162:23–163:12, 265:7–12 (Elon); JX 27; JX 777; JX 3226 at 8. Even though Elon should not have been involved in the selection of counsel to advise the Tesla Board, as explained above, I am convinced that Wachtell was a qualified, independent advisor, not beholden to Elon in any way.

[414] JX 1228; JX 1231 at 114–22; JX 1224. According to Elon, he reviewed the materials "to explain to the public . . . the rationale for an acquisition. But this was, of course, premised on a successful negotiation run by independent board members." Tr. 279:23–280:6 (Elon).

[415] JX 1238 at 1–2; JX 1239 at 5–6. As explained, this conversation ultimately did not set the price paid, as the Tesla Board, led by Denholm, negotiated the price down well below the initial offer range.

[416] *See* Tr. 1521:2–1522:21, 1563:14–1564:4 (McBean). As noted above, the preponderance of the evidence suggests the purpose of these meetings was to speed up diligence, not to influence the bankers regarding substantive aspects of the Acquisition.

[417] JX 1618; Tr. 574:8–22, 576:9–19 (Kimbal); JX 1606. Although the Master Plan Part Deux did discuss "a sustainable energy economy" and the integration of "energy generation and storage," it also focused on self-driving capabilities, electric "heavy-duty trucks" and

- When Evercore decided to recommend that the Tesla Board lower its offer, it informed Elon of that advice before its meeting with the Tesla Board.[418]

- Elon was present for part of a Tesla Board meeting where the Tesla Board discussed the revised offer for SolarCity.[419]

- Before the Tesla stockholder vote, Elon publicly demonstrated the (inoperable) Solar Roof and made promises about the timing of the product launch to the market.[420]

---

high passenger-density urban transport," along with ride-sharing. JX 1618. And, while the Tesla Board members did not know Elon was going to publish the Master Plan Part Deux, the contents of the plan were well-known to Tesla Board members and the public. *See* Tr. 600:6–601:15 (Kimbal) (testifying that "[b]efore" Part Deux was published "we talked about it"); Tr. 83:10–84:5 (Elon) ("As for what is in the master plan part deux, these issues were all discussed at the board multiple times. So they were fully aware that this was, in fact, the plan. . . . [I]n fact, if you just summed up prior statements of what we were going to do, I think almost everything, if not everything, that was said in various disparate public statement and was discussed at multiple board meetings was in that secret master plan part deux. Because, in fact, it was not secret."). Elon's testimony is corroborated by an Oppenheimer report about the Master Plan Part Deux. *See* JX 1617 at 1 ("That TSLA plans to move into higher powered vehicles like semi and pick-up trucks, introduce/coordinate a fleet of autonomous driving vehicles, and sell integrated solar and energy storage systems *will not surprise many investors*.") (emphasis added).

[418] JX 1619; JX 1655; Tr. 1592:20–24 (McBean). This conversation appears to be no more than Evercore providing Elon with an update of its analysis; as noted, Elon did not oppose lowering the price.

[419] JX 1673; Tr. 1597:16–1599:14 (McBean). But, as McBean credibly testified, Elon was "not part of the discussion where we made any decisions." Tr. 1602:13–22 (McBean); *see also* McBean Dep. 290:6–12 ("I believe his view was that the strategic rationale was still intact and we should take all of the information that we learned during diligence in our perspective on value. But, again, when it came down to the board deliberations on whether and when to go back to SolarCity, he recused himself.").

[420] Tr. 343:2–9 (Elon); JX 2303 at 9. Although the Solar Roof demonstration was intended to garner stockholder support for the Acquisition, these statements either occurred after the stockholder vote, were qualified or were accurate. I am satisfied investors knew the Solar Roof was a part of Tesla's "vision for the future" and a "goal," not a ready-for-market product offering. JX 2206; JX 2220.

93

- Elon's brother, Kimbal, was not recused from Tesla Board discussions or the vote to approve the Acquisition.[421] Other arguably conflicted Tesla directors likewise were not recused.[422]

Elon's involvement was problematic because Tesla "should have been able to negotiate [] unhindered" by his "dominating hand."[423] If these facts comprised the entirety of the deal process, one would be justified in characterizing the process as broken. But they do not. The Tesla Board's process included several redeeming features that emulated arms-length bargaining to the benefit of Tesla stockholders.

### ii. Process Strengths

As noted, an inquiry into fair process studies "how [the transaction] was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[424] I consider these and other relevant factors below.

Timing. Plaintiffs assert that Elon bailed out SolarCity on a schedule that worked for him.[425] But there was no bailout and the facts illustrate the timing was

---

[421] PTO ¶ 56.

[422] *See, e.g.*, JX 2121 at 68–81 (detailing the background of the Acquisition and noting that only Elon and Gracias were recused).

[423] *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 442 (Del. 1996).

[424] *Weinberger*, 457 A.2d at 711.

[425] POB at 43.

right for Tesla. Because of macroeconomic headwinds in the industry, solar company stocks were trading at historic lows.[426] The Tesla Board declined to explore a transaction when Elon originally asked, choosing instead to pursue the Acquisition only after Tesla had dealt with the Model X rollout and before it attempted its biggest launch yet—the Model 3.[427] And Tesla was poised to extract full value from SolarCity to achieve its long-held mission to become a vertically integrated alternative energy company. Its Gigafactory was massive and well-positioned to produce batteries that could store electric power to fuel Tesla's growing fleet of EVs and larger batteries that could store the energy generated by SolarCity's solar power systems.[428] The Acquisition allowed Tesla to utilize the Gigafactory's massive output to its fullest capacity on both fronts.

Structure. The Tesla Board conditioned the Acquisition on the approval of a majority of disinterested stockholders.[429] As one of the most extolled and powerful protections afforded Delaware stockholders, such approval is "compelling evidence

---

[426] Tr. 350:24–353:13 (Elon); Tr. 1662:18–1663:1 (Lyndon); Tr. 2390:22–2393:2 (Buss); JX 1234 at 36–38.

[427] JX 849 at 2; JX 950 at 4; Tr. 457:4–17, 462:23–463:6 (Kimbal); Tr. 1959:7–1960:13, 1962:18–1963:3 (Denholm); Tr. 2837:23–2838:12, 2872:14–22 (Gracias).

[428] JX 169 at 8; JX 2382 at 1–2; Tr. 2216:10–19 (Jurvetson); Tr. 2832:5–2833:2 (Gracias).

[429] JX 1233 at 2; JX 2121 at 68; Tr. 1973:22–1974:13 (Denholm).

95

that the price was fair."[430] As noted, Tesla selected independent, top-tier advisors to represent the Tesla Board in the Acquisition (Wachtell and Evercore). Elon and Gracias were not involved in Evercore's selection, but Denholm, an indisputably independent director, was "directly involved" in the selection.[431] Evercore reviewed the solar industry as a whole before recommending SolarCity as the obvious choice to be acquired.[432] After deliberations, the Tesla Board shared that view.[433] Although Elon and Gracias were not wholly recused from Acquisition-related discussions,

---

[430] *ACP Master*, 2017 WL 3421142, at *29; *see also Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1148 (Del. Ch. 2006) ("[T]his court has suggested repeatedly that the presence of a non-waivable 'majority of the minority' provision is an indicator at trial of fairness because it disables the power of the majority stockholder to both initiate and approve the merger."). I have given less weight to the Tesla stockholders' approval of the Acquisition than I might have otherwise in recognition of Plaintiffs' disclosure arguments and their argument that the magnitude of the approval vote might be overstated given the likelihood that many stockholders who approved the Acquisition also owned SolarCity stock. That being said, the stockholder vote is strong evidence against Plaintiffs' contention that SolarCity was worth nothing—an overwhelming majority of stockholders, many of them highly sophisticated, likely would not have voted to acquire a worthless company.

[431] Tr. 1965:1–14 (Denholm); Tr. 2840:13–18 (Gracias).

[432] JX 2121 at 68; Tr. 1374:22–1375:10 (McBean); *cf. In re Appraisal of Columbia Pipeline Gp., Inc.*, 2019 WL 3778370, at *29–*31 (Del. Ch. Aug. 12, 2019) (observing that favoring one buyer during the sale process was not an indicator of unfairness in that case because that party "offered higher and more certain value than the alternatives" and was "the optimal buyer").

[433] *See, e.g.*, Tr. 1968:16–1969:8 (Denholm); Tr. 2399:14–2402:2 (Buss) (testifying that SolarCity was the clear choice and that he would not have supported an acquisition of his former company, SunPower).

they were recused from the final decision-making on price and from voting on the Acquisition.[434]

Due Diligence Used to Lower Offer.  As noted, Denholm led the diligence and negotiations.  The record reflects that Evercore was dutiful in keeping the Tesla Board apprised of new developments and concerns, including the concerns relating to SolarCity's growing liquidity challenges.[435]  The information discovered during the due diligence process was used to lower the price substantially—even below the original offer range.  Price increases or decreases that are the products of hard-nosed negotiations are strong evidence of fairness.[436]

The Tesla Board Was Not "Dominated" by Elon.  As noted, Plaintiffs assert that the deal process was dominated by Elon,[437] but the record contains several instances where the Tesla Board simply refused to follow Elon's wishes.  Elon brought up acquiring SolarCity in early 2016 and wanted to move quickly; the Tesla

---

[434] JX 1233 at 5; JX 2121 at 68; Tr. 1969:19–1970:17 (Denholm); JX 1702 at 1 (special meeting where the Tesla Board decided the final offer for SolarCity); JX 1736 at 1 (special meeting where the Tesla Board approved the Acquisition).

[435] Tr. 1408:7–21, 1457:3–6, 1466:6–11 (McBean).

[436] *See, e.g.*, *In re Panera Bread Co.*, 2020 WL 506684, at *19–20 (Del. Ch. Jan. 31, 2020) (noting that "extraction of multiple price increases" indicated fairness); *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 28 (Del. 2017) (noting one indicium of a fair deal price was that the bid was raised several times).

[437] POB at 51–52.

Board rebuffed him numerous times, telling him the timing was not right for Tesla.[438]

Once the Tesla Board agreed to explore an acquisition, Elon proposed an initial offer above the range initially recommended by Evercore (though still deemed fair); the Tesla Board declined to extend that offer and used the fruits of due diligence to negotiate a price well below that mark.[439] Elon wanted Tesla to provide a bridge loan to SolarCity and even promised Lyndon that Tesla would do so; the Tesla Board declined to provide the loan based on its own assessment and Evercore's recommendation.[440] The Tesla Board also insisted on a walkaway right in case SolarCity breached any debt covenant, which was meaningful given what it knew about SolarCity's liquidity challenges.[441] Elon wanted to expedite the Acquisition; the Tesla Board and Evercore took their time to do extensive diligence.[442] These facts suggest an ultimately productive board dynamic that protected the interests of stockholders, despite Elon's assumed "managerial supremacy" and the assumed

---

[438] *See* JX 849 at 2; JX 950 at 4; JX 1049 at 6; Tr. 457:4–17 (Kimbal); Tr. 1959:7–1960:13 (Denholm); Tr. 2837:23–2838:12 (Gracias).

[439] Tr. 2025:17–2026:24, 2030:5–13, 2037:1–8 (Denholm).

[440] Tr. 1702:24–1703:6; 1798:3–1799:12 (Lyndon); Tr. 1517:13–16 (McBean); Tr. 2186:4–18 (Denholm).

[441] *See* JX 2121 at 249–250 (§ 7.02(e)); JX 1588 at 28, 30; Tr. 1573:6–1575:6 (McBean).

[442] Tr. 1401:1–1402:10 (McBean) (testifying that the amount of time Evercore spent on the diligence process compared to other deals was "among the highest" and that it was "a very thorough diligence process" that took "[a]bout six weeks").

board-level conflicts.[443]   Indeed, each Tesla Board member credibly testified as to why he or she supported the Acquisition.[444]

---

[443] POB at 51.  To be clear, while Elon did not dominate the Tesla Board's process, he inexplicably was given the opportunity to attempt to influence it.  As stated, that should not have happened.

[444] Tr. 485:4–21 (Kimbal) ("Q. SolarCity was acquired by Tesla and is now part of the company.  Do you think that acquisition made strategic sense?  A. Yes.  Q.  Do you think it made sense for Tesla shareholders?  A.  Yes, absolutely.  Q.  Can you explain why? A.  We were, at the time, considered a car company, and we had been telling the world forever that we are an alternative energy company.  And we needed the world to understand our bigger vision, which we have succeed[ed] at achieving that.  But to be honest, the solar industry is going to be the biggest industry in the world.  It is much, much bigger than the car industry.  We never saw ourselves as purely a car company.  And the strategic—it made total strategic sense.");  Tr. 2173:22–2174:11 (Denholm) ("Q.  Why did you vote for the transaction?  A.  Because I believed that it was in the best interests of Tesla shareholders to actually continue the mission of Tesla, which was to accelerate the world towards sustainable energy.  And the best way to do that was to have the solar generation capability within the four walls of Tesla so that we could continue in terms of the technology journey that it would take to satisfy the mission, and I believed that it was in the best interests of all Tesla's shareholders.  Q.  If you had not believed that, how would you have voted? A.  I would not have voted for the deal.");  Tr. 2399:19–2402:15 (Buss) ("Q. Did you personally have a view on which target Tesla should pursue?  A. Yes.  It was very obvious to me.  Q. And what was that view?  A.  Really was SolarCity. . . . [I]t was the dominant company by far.  I mean, it was, I don't know, 30, 35 percent market share. . . .  And they were the lowest-cost provider out there.  And they had a very good, solid roadmap for down the road.  So to buy something subscale that didn't have the cost, I wouldn't have supported it, to be quite honest. . . . [T]he timing was beautiful, in my mind. . . . [T]hings were kind of lining up where it was like, okay, wow, we could really get this really good asset that was part of our long-term vision really at a great price . . . .  I think we got it at a discount, personally.");  Tr. 2215:14–2217:15 (Jurveston) (testifying that he "thought it was in the best interests of Tesla shareholders" based on synergies and long-term strategy); Tr. 2873:7–19 (Gracias) (testifying that he was not worried about the "very short blip" in integration because, thanks to the Acquisition, Tesla is "disrupting entire industries" and "remaking the way you produce and consume energy in the world");  Tr. 2262:9–22 (Ehrenpreis) (testifying that because of the Acquisition, Tesla is "uniquely, a fully integrated, sustainable energy company and really the only one of its kind" and is "being valued as such").

Market and Tesla Board Knowledge.  The material aspects of the Acquisition were known to Tesla stockholders.  Tesla's stock was well-covered by analysts and, when news of the Acquisition hit the market, the analysts reveled in well-publicized debates and transaction modeling.[445]  The market generally understood SolarCity's liquidity challenges.[446]  Some analysts called the Acquisition a bail-out;[447] others believed Tesla was getting "a steal."[448]  As for the Tesla Board, its members were well informed by Evercore about the Acquisition generally,[449] and

---

[445] *See, e.g.*, Tr. 2653:1–2655:7 (Fischel) (discussing articles about the Acquisition, projected synergies, the motivation behind the deal, etc.); Tr. 1998:11-18 (Denholm) (testifying the public reaction to Tesla's offer was "mixed"); JX 2839 at 162–65, 170–72 (Fischel report collecting analyst research, recommendations and observations).

[446] *See, e.g.*, JX 2852 at 10 (concluding that "[a]nalysts and news articles also discussed SolarCity's liquidity position at length, both before and after the release of the Tesla S-4"); *id.* at 39–50 (detailing "SolarCity Analyst Commentary on Liquidity" and "News Commentary on Liquidity"); JX 1068 (Credit Suisse "Decrease Target Price" Report on SolarCity).

[447] JX 2237 at 7–9.

[448] JX 1390 at 1; *see also* Tr. 1998:11–18 (Denholm); JX 2839 at 162–65, 170–72.

[449] *See, e.g.*, JX 1678 (Evercore materials for July 24, 2016 meeting with Tesla Board); JX 1703 (Evercore materials for July 27, 2016 meeting with Tesla Board); JX 1746 (Evercore materials for July 30, 2016 meeting with Tesla Board).

about SolarCity's liquidity issues specifically.[450] The bridge loan request itself signaled to the Tesla Board that SolarCity was urgently in need of cash.[451]

Denholm. Denholm emerged as an independent, powerful and positive force during the deal process who doggedly viewed the Acquisition solely through the lens of Tesla and its stockholders.[452] She had served as chair of Tesla's audit committee since 2014 and was acutely aware of Tesla's financial condition and challenges.[453] She directed Evercore in its selection of acquisition targets and was actively engaged with Evercore with respect to the development and delivery of its fairness opinion.[454]

---

[450] *See, e.g.*, JX 1588 at 28, 30 (Evercore presentation materials for the Tesla Board detailing SolarCity's "liquidity situation" and "significant liquidity concerns," including that "cash balances were projected to be below the revolver liquidity"); JX 1678 at 6–7 (Evercore presentation materials for the Tesla Board explaining that "[d]uring diligence, there were several key discoveries made that impact valuation," including "liquidity concerns"); Tr. 1408:7–21 (McBean) ("Q. What was Evercore trying to convey to the Tesla board with this slide? A. This is a snapshot of SolarCity's liquidity and cash flow, and specifically, it shows that at several points SolarCity could potentially go below the [$]116 million required by the revolver if they weren't able to raise additional capital. Q. So this is information that the Tesla board had during the due diligence process? A. Yes.").

[451] JX 1588 at 28, 30; Tr. 1573:6–1575:6 (McBean); Tr. 2010:20–24 (Denholm) ("Q. First, was there a discussion of why SolarCity needed or was asking for a bridge loan at this point? A. Yeah, for their short-term liquidity needs that we discussed earlier.").

[452] Tr. 2133:15–21 (Denholm) ("Q. You were just one of five directors that considered and voted on the SolarCity transaction; true? A. I was one of five, but I led the process and sort of acted as the sort of corralling force. And I spent a lot of time on the due diligence itself.").

[453] Tr. 2068:19–2069:5 (Denholm).

[454] Tr. 1976:20–1977:9, 2039:1–2049:8, 2050:3–20 (Denholm).

And, importantly, as a director who was not, and would not be, unduly influenced by Elon, she served as an effective buffer between Elon and the Tesla Board's deal process.[455] Her credible and unequivocal endorsement of the Acquisition is highly persuasive evidence of its fairness.[456]

* * * * *

Elon was undoubtedly involved in the deal process in ways he should not have been, but fortunately, the Tesla Board ensured nevertheless that the process led to a fair price. And Elon did not push back against them—there were no threats, fits or fights.[457] While *involved*, Elon did not *impede* the Tesla Board's pursuit of a fair

---

[455] Tr. 1952:8–19 (Denholm); *see also* Tr. 2200:10–24 (Denholm) (testifying that she and Tesla's general counsel "tag team[ed]" to ensure that Elon and Gracias were recused when needed); Tr. 2198:2–4 (Denholm) (testifying that she ensured Elon's communications with Lyndon had "no impact . . . on what myself or the team or Evercore were doing").

[456] Tr. 2173:23–2174:8 (Denholm) (explaining why she endorsed the Acquisition: "Because I believed that it was in the best interests of Tesla shareholders to actually continue the mission of Tesla, which was to accelerate the world towards sustainable energy. And the best way to do that was to have the solar generation capability within the four walls of Tesla so that we could continue in terms of the technology journey that it would take to satisfy the mission, and I believed that it was in the best interests of all Tesla's shareholders.").

[457] *See, e.g.*, Tr. 2376:18–2378:22 (Buss) (testifying credibly that Elon "never" dictated at Tesla Board meetings and that he was "not at all" worried about "retribution from Elon if [he] or the other board members disagreed with him"); Tr. 2280:24–2281:3 (Ehrenpreis) ("Q. Were you influenced in any way by any fear or concern that Mr. Musk would react negatively if you didn't vote in favor of the transaction? A. Absolutely not."); Tr. 2219:12–15 (Jurvetson) ("Q. Did Mr. Musk ever suggest in any way that there would be any repercussions or retribution if you disagreed about this transaction? A. No, not at all. No hint of that.").

price.  Tesla declared that it would enter the solar energy industry long before Elon proposed the Acquisition; the Tesla Board decided the timing was right to acquire a solar energy company based on an evaluation of legitimate business considerations; Evercore did a meaningful industry survey and credibly recommended SolarCity as the target; and the Tesla Board offered a fair price range and negotiated it down to well below that range.  In other words, despite its assumed conflicts, under Denholm's leadership, the Tesla Board meaningfully vetted the Acquisition.  In sum, Elon proved that the process did not "infect" the price.  And "[t]he proof lies in the results."[458]

### b. Fair Price

Unlike determining fair value in an appraisal case, the fair price component of an entire fairness analysis "is not itself a remedial calculation."[459]  Instead of picking a single number, the court's task is "to determine whether the transaction price falls within a range of fairness."[460]  This approach provides flexibility

---

[458] *Emerald P'rs*, 2003 WL 21003437, at *24.

[459] *Reis*, 28 A.3d at 465; *see In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *25–27 (Del. Ch. May 31, 2016) (distinguishing between the task of determining fair value in an appraisal action and assessing fair price in a plenary breach of fiduciary duty action), *aff'd in part, rev'd in part sub nom. Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1 (Del. 2017).

[460] *In re Dole Foods*, 2015 WL 5052214, at *33.

"to accommodate the reality that the value of a corporation is not a point on a line, but a range of reasonable values.'"[461]

Typically, evaluating the price of a transaction for entire fairness requires the court to consider whether the transaction was one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."[462] Of course, in this case, the focus is on the other side of the table; the Court's task is to determine whether the price the *buyer* paid was "a price that is within a range that reasonable men and women with access to relevant information might [have paid]."[463]

To determine that range, the Court "assess[es] which [valuation] methodologies are most appropriate under Delaware law and in light of the particular

[461] *In re Orchard Enters.*, 88 A.3d at 30 (internal quotation marks and alterations omitted); *see also Reis*, 28 A.3d at 466 ("[A] range of fairness permits a court to give some degree of deference to fiduciaries who have acted properly; it is not a rigid rule that permits controllers to impose barely fair transactions.").

[462] *Technicolor I*, 663 A.2d at 1143.

[463] *Kahn v. Tremont Corp.*, 1996 WL 145452, at *1 (Del. Ch. Mar. 21, 1996), *rev'd on other grounds*, 694 A.2d 442 (Del. 1997); *see also Technicolor I*, 663 A.2d at 1143 ("A fair price does not mean the highest price financeable or the highest price that fiduciary could afford to pay. At least in the non-self-dealing context, it means a price that is one that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."); *see also DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 370 (Del. 2017) ("[F]air value is just that, 'fair.' It does not mean the highest possible price that a company might have sold for had Warren Buffett negotiated for it on his best day and the Lenape who sold Manhattan on their worst.'").

circumstances of this case."[464] "Delaware law does not have a rigid hierarchy of valuation methodologies, nor does it have a settled formula for weighting them."[465] In our adversarial system, the parties and their experts must convince the law-trained judge of the reliability and persuasiveness of their proffered methodology, consistent with the other evidence presented at trial.[466] In other words, in a plenary breach of fiduciary duty action, the court's function when assessing fair value is not to conduct its own appraisal but to land where the preponderance of the credible and competent evidence of value takes it.

Here, Elon presented the most persuasive evidence regarding SolarCity's value and the fairness of the price Tesla paid to acquire it. The evidence he presented revealed that: (1) SolarCity was far from insolvent, as Plaintiffs argue; (2) discounted cash flow ("DCF") analyses are not helpful here; (3) market evidence supports the price Tesla paid; (4) SolarCity's current and future cash flows support a finding of fair price; (5) Evercore's fairness opinion and valuation work accurately

---

[464] *S. Muoio & Co. LLC v. Hallmark Ent. Invs. Co.*, 2011 WL 863007, at *16 (Del. Ch. Mar. 9, 2011), *judgment entered*, (Del. Ch. 2011), *and aff'd*, 35 A.3d 419 (Del. 2011).

[465] *Merion Cap. L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *30 (Del. Ch. Dec. 16, 2016).

[466] *Cf. In re Appraisal of Jarden Corp.*, 2019 WL 3244085, at *1–3, 23 (Del. Ch. July 19, 2019) (observing the unusual nature of appraisal litigation where the court must assess fair value to reach an "independent appraisal" of the target even if the parties' proffered evidence of fair value is deemed unreliable), *aff'd sub nom. Fir Tree Value Master Fund, L.P. v. Jarden Corp.*, 236 A.3d 313 (Del. 2020).

captured SolarCity's value; and (6) the fair price analysis must account for the substantial synergies flowing to Tesla from the Acquisition.[467]

For their part, Plaintiffs went "all in" on insolvency, arguing that SolarCity was worthless when Tesla acquired it, so any price paid by Tesla was too high.[468] More specifically, they rested their fair price case on four arguments: (1) SolarCity was insolvent and lacked a viable business model; (2) SolarCity's unaffected stock price did not reflect non-public information regarding its liquidity issues; (3) Tesla realized no cognizable synergies from the Acquisition; and (4) Evercore's fairness opinion was unreliable.[469]

With the battle lines drawn, I address the parties' competing fair price arguments in turn.

---

[467] *See* DOB at 43–58.

[468] *See, e.g.*, POB at 65 ("Musk's failure to prove solvency precludes a finding of fair price."); Tr. 696:11–17 (Quintero) (concluding that "on a standalone basis, the equity of SolarCity was worthless"); Tr. 765:4–7 (Quintero) (testifying that SolarCity's "equity was worthless" as of the merger date); Tr. 789:1–4 (Quintero) ("Q. Okay. So your opinion is that on a net liquidation value, SolarCity's equity was worthless as of the merger date. Right? A. Yes, sir."); Tr. 796:10–16 (Quintero) (testifying that SolarCity was "worthless" on a "going-concern basis").

[469] *Id.* at 60.

### i. SolarCity Was Not Insolvent

At trial, Plaintiffs placed their valuation case entirely in Quintero's hands,[470] and Quintero, in turn, relied exclusively on a single valuation theory: insolvency.[471] In other words, by Plaintiffs' lights, SolarCity was "worthless" at the time of the Acquisition.[472] To be sure, Quintero offered valuation opinions as alternatives to his insolvency opinion, but when pressed by the Court at trial, he doubled down on his sworn testimony that SolarCity was worth nothing.[473] Setting aside whether net liquidation value is a proper methodology to value SolarCity, a point the parties dispute,[474] "[Quintero]'s conclusion that [SolarCity] is worth [] nothing is incredible

---

[470] Plaintiffs' other experts did not opine on valuation. DOB at 57; *see* Tr. 2789:10–12 (Beach) ("Q. And you are not offering any valuation opinions to this Court, correct? A. Correct.").

[471] *See, e.g.*, JX 2840 at 6 ("Because SolarCity was not a going concern as of the Merger Date, SolarCity's value is most appropriately determined based on a net liquidation value. Based on a net liquidation value, SolarCity's equity was worthless as of the Merger Date.").

[472] *Id.*

[473] Tr. 889:17–891:2 (Quintero).

[474] *Compare* DOB at 76 ("Quintero's net liquidation valuation, which concededly depends on his insolvency conclusion, should be rejected."), *with* POB at 72 ("Plaintiffs produced a liquidation analysis from a certified distressed business valuation expert who has valued hundreds of financially troubled and insolvent companies during his career. That analysis showed SolarCity's net liquidation value was a negative $1.952 billion.").

on its face."[475]  As explained in detail below, the credible evidence persuasively demonstrated that SolarCity, while cash-strapped to a dangerous degree,[476] was solvent, valuable and never in danger of bankruptcy.[477]  "In the shadow of [Quintero's unequivocal yet unconvincing] testimony [to the contrary], as is often the case when one swings for the fences, [Quintero] failed to make contact altogether."[478]  By relying so heavily on Quintero, in the eyes of this factfinder, Plaintiffs undermined the credibility of their fair price case completely.

Aside from Quintero's testimony and SolarCity's liquidity issues, Plaintiffs also point to two pieces of trial evidence to argue SolarCity was worthless—Bilicic's testimony that Lazard was "concerned about the company on a stand-alone basis going forward,"[479] and an Ernst & Young ("EY") report that purportedly stated

---

[475] *Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, 2021 WL 2886188, at *26 n.244 (Del. Ch. July 9, 2021).

[476] *See, e.g.*, Tr. 207:1–3 (Elon) (testifying that "[b]oth SolarCity and Tesla needed cash"); Tr. 160:17–19 (Elon) (testifying that he "was aware that liquidity was going to be difficult in 2016 for SolarCity" and "the same is true of Tesla").

[477] Tr. 1731:22–1734:18, 1737:16–1738:7 (Lyndon); Tr. 997:18–998:9 (Serra); Tr. 2393:3–2396:2 (Buss); Tr. 1835:5–10 (Peter); Tr. 376:7–15 (Elon).

[478] *Bardy Diagnostics*, 2021 WL 2886188, at *26; *see also Trados*, 73 A.3d at 68 ("[T]he threat of bankruptcy, the viability of the business plan, and the size of [the company's] market were all concerns, but the [Plaintiffs]' portrayal at trial was overly strident.  In evaluating fairness, I have taken these issues into account, but as risks rather than mortal crises.").

[479] Tr. 429:15–430:1 (Bilicic).

SolarCity was not viable as a standalone entity.[480]  Neither dilutes Elon's persuasive evidence to the contrary.[481]

*First*, Bilicic's "concern[]" that a liquidity event could "risk []damaging the overall business" does not suggest that Lazard thought SolarCity was worthless.[482]  On the contrary, Lazard made clear its view that SolarCity had significant positive value that it would transfer to Tesla in the Acquisition.[483]

*Second*, as Elon points out, "[t]he draft EY analysis on which Plaintiffs rely— from January 2017, months after the Acquisition closed—concluded that, if SolarCity were a standalone entity in 2017 (it was not), it might face a going concern issue in 2017 (the year *after* the Acquisition closed)" in the event of certain contingencies.[484]  The EY report does not prove insolvency at any time, and certainly not as of the Acquisition.

---

[480] JX 2398.

[481] *See, e.g.*, JX 2420 at 4 (contemporaneous valuation done by KPMG showing SolarCity was not insolvent); JX 2443 at 76–77 (Tesla's 10-K reporting an $89 million gain on the Acquisition); JX 1599 at 9 (Evercore presentation reporting that SolarCity was not worthless); Tr. 2486:11–16 (Fischel) (testifying that "obviously, the [Tesla] directors didn't believe [that SolarCity was worthless]"); Tr. 2497:23–2498:3 (Fischel) ("Q. And did the market believe SolarCity to be worthless? A. No. Q. Or insolvent? A. No.").

[482] Tr. 429:15–430:1 (Bilicic).

[483] JX 2121 at 97–104.

[484] DAB at 15 (citing JX 2398).

To reiterate, Plaintiffs' failed attempt to prove insolvency did nothing to dilute Elon's persuasive valuation evidence. If anything, it diluted the persuasive force of their other proffered evidence of fair price.

### ii. The DCF Analyses Were Unhelpful

Quintero and Fischel both performed DCF valuations.[485] I recognize that, in certain situations, "[p]roperly conducted DCF analyses can be a useful valuation tool to 'corroborate' market prices and evidence."[486] Here, however, neither expert persuaded me that a DCF analysis is the proper method by which to value SolarCity given the facts of this case, and so I decline to rely on the DCFs when analyzing whether the Acquisition price was fair to Tesla's stockholders.[487] In any event, the

---

[485] *Highfields Cap., Ltd. v. AXA Fin., Inc*., 939 A.2d 34, 53 (Del. Ch.), *judgment entered*, (Del. Ch. 2007) (explaining that a "DCF assigns a value to an enterprise by adding (1) an estimation of net cash flows that the company will generate over a period of time to (2) a terminal value equal to the future value, as of the end of the projection period, of the company's cash flows beyond the projection period").

[486] DOB at 50 (citing *In re Jarden Corp.*, 2019 WL 4464636, at *4 (Del. Ch. Sept. 16, 2019)).

[487] Tr. 868:19–24 (Quintero) ("Q: So to be clear, you regard DCF in this case as an unreliable valuation approach? A: Yes, sir. Q: Okay. And your opinion is that, in this case, it is a highly speculative approach? A: Yes, sir."); Tr. 2516:15–21 (Fischel) ("Q: Are you relying on a DCF for valuation here? A: I think it's relevant, but I think there's enough market evidence, certainly, to reject the claim that SolarCity was insolvent. As I said, I don't believe there is any evidence to support that claim."); Tr. 2579:14–21 (Fischel) (Q: "And you believe your market values in this case are more reliable than your DCF values; right? A: Again, it depends on which value you're talking about, but, overall, yes, I do. I believe the market evidence in this case is more probative, more reliable than an after-the-fact DCF analysis conducted by me or anybody else.").

parties did not focus on DCF at trial or in their post-trial briefs, so I choose not to dwell on it further here.[488]

### iii. The Market Evidence of Fair Price

Delaware courts recognize that "[m]arket prices are typically viewed [as] superior to other valuation techniques because, unlike, e.g., a single person's discounted cash flow model, the market price should distill the collective judgment of the many based on all the publicly available information about a given company and the value of its shares."[489] Market evidence is a reliable indicator of fair price, however, only when "the evidence reveals a market value forged in the crucible of objective market reality."[490]

After a careful review of the market-based evidence presented at trial, I am satisfied that the market was sufficiently informed to reach a reliable assessment of

---

[488] *See In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *12 (Del. Ch. May 3, 2004) ("This Court views the parties' virtual non-treatment of the comparable company valuation as a tacit concession that that alternative valuation is a 'throwaway' of no material significance."); *compare* DOB at 54 ("Even Plaintiffs' expert Quintero, for his now-abandoned *ex post* DCF analysis, employed a cost of equity below the midpoint of this range."), *with* PAB at 59 ("In his Opening Brief, Musk ignores Fischel's abandoned DCF analysis . . . .").

[489] *DFC Glob.*, 172 A.3d at 369–70; *see also id.* at 366 ("[S]econd-guessing the value arrived upon by the collective views of many sophisticated parties with a real stake in the matter is hazardous."); *In re Loral Space & Commc'ns Inc.*, 2008 WL 42937819, at *27–32 (Del. Ch. Sept. 19, 2008) (giving "substantial weight to the actual trading price").

[490] *In re PetSmart, Inc.*, 2017 WL 2303599, at *27 (Del. Ch. May 26, 2017) (internal citation marks omitted).

111

SolarCity's value. And that evidence also supports Elon's argument that Tesla paid a fair price for SolarCity.

The Market for SolarCity Was Efficient. Experts for both parties testified that SolarCity traded in an "efficient market."[491] Despite that agreement, Plaintiffs maintain that SolarCity's stock price cannot be trusted as a proxy for value because the market lacked information regarding the full extent of SolarCity's liquidity crisis.[492] I disagree.

The trial evidence reveals that SolarCity accurately disclosed the existence and terms of its debt covenants, that its covenant compliance margins decreased in Q1 and Q2 of 2016, the potential consequences of a breach, its quarterly cash balances and its debt maturities.[493] Indeed, Plaintiffs' expert witnesses, Moessner and Beach, conceded that market participants were aware of the risk that SolarCity might breach its Liquidity Covenant.[494]

---

[491] Tr. 1155:3–5, 2790:10–21 (Beach); Tr. 2653:1–3 (Fischel).

[492] POB at 55–57, 66 (arguing that the market did not appreciate how close SolarCity was to tripping its Liquidity Covenant, that it was deferring accounts payable, that it was delaying the release of guidance on megawatts deployed and suffering credit downgrades).

[493] JX 2121 at 66–79, 83–92, 97–114, 190–92; JX 536 at 4; JX 780 at 64; JX 1072 at 4, 42; JX 1854 at 4, 50; JX 2268 at 4.

[494] *See* Tr. 686:9–20 (Moessner); Tr. 1146:9–22 (Beach).

As for the deferral of accounts payable, Plaintiffs overstate the implications of deferral on SolarCity's overall financial health.  At trial, Serra credibly testified that the cash management strategies implemented by SolarCity reflected how SolarCity "manag[ed] working capital appropriately" in the ordinary course of its business.[495]  These strategies included working with vendors to negotiate net payment terms.[496]  As always, SolarCity paid its bills.[497]

Plaintiffs' argument that the market was not informed of SolarCity's reduced MW guidance fails because it is not true.  The unrebutted trial evidence establishes that SolarCity appropriately and timely disclosed guidance reductions consistent with its internal projections.[498]

Finally, given the credible evidence presented at trial, SolarCity's failure to disclose information related to its credit downgrades was immaterial.  After SolarCity's credit rating was downgraded, Bank of America (SolarCity's principal lender) reacted by not only continuing to transact business with SolarCity but

---

[495] Tr. 1055:5–10, 1058:20–1059:13, 1064:11–1065:7 (Serra).

[496] Tr. 1791:1–1792:10 (Lyndon); JX 794.

[497] Tr. 1834:15–20 (Peter).

[498] Tr. 1692:7–1699:1 (Lyndon); JX 1010 at 5, 23, 29; JX 1858 at 4; JX 3228; Tr. 887:6–13 (Quintero) (conceding that the guidance reductions were all public before the stockholder vote).

seeking to deepen the lender/borrower relationship.[499] If SolarCity's largest lender was undeterred by the change in credit rating, it is difficult to see how or why the market would have viewed the information differently.

The Market's Pre-Acquisition View of SolarCity. When Tesla announced its Acquisition offer (after the market closed on June 21),[500] SolarCity's stock was trading at $21.19 per share,[501] and SolarCity had a market capitalization of approximately $2.1 billion.[502] As explained above, the market understood that SolarCity, like many solar companies, was facing a number of headwinds, in addition to its own liquidity crisis, and yet, despite these issues, SolarCity had value as a stand-alone entity.[503]

Ultimately, the exchange ratio for the Acquisition resulted in Tesla acquiring SolarCity for $20.35 per share of SolarCity common stock—which represents a discount of 84 cents per share compared to SolarCity's unaffected stock price.[504]

---

[499] JX 1355 at 7–8; JX 1430 at 27; Tr. 1235:1–1238:8; 1347:24–1348:24; 1351:19–1352:7 (Van Zijl); Tr. 998:1–9 (Serra).

[500] PTO ¶ 159.

[501] PTO Ex. C at 11.

[502] PTO Ex. D at 14.

[503] Tr. 1155:3–5, 2790:10–21 (Beach) (acknowledging SolarCity operated in an efficient market); Tr. 2653:1–3 (Fischel).

[504] JX 2839 ¶ 12. The parties dispute whether rumors that Elon was considering taking SolarCity private kept SolarCity's stock price inflated until the Acquisition. *Compare* POB

This means that, even *ignoring* synergies, Tesla paid no premium for SolarCity as of closing.[505]

At best for Plaintiffs, as Fischel persuasively testified, the Acquisition price offered by Tesla's Board reflected, at most, a modest premium when measured at the time of contracting:[506]

at 18 ("[I]nvestment websites and newspapers reported the potential transaction, causing SolarCity's stock price to rise nearly 25%, from $18.01 on March 1 to $22.49 on March 3. Beach found that this increase was highly statistically significant, no other information could explain the increase except for the leaks, and SolarCity's stock price continued to be affected through June."), *with* DAB 36 ("The evidence demonstrated that any increase in SolarCity's stock price resulting from those unsubstantiated rumors dissipated over the more than three months between March 2016 and the June 2016 initial offer. As Fischel testified, the correct unaffected date for SolarCity is June 21, 2016; between March and June 2016, there were 'all kinds of events, but no merger-related announcements.'") (citing Tr. 2608:3–2609:4, 2656:2–2656:16 (Fischel)). McBean credibly testified that Evercore "did not believe that there was a market rumor impacting the stock price in June" because "the stock price was in decline that entire period." Tr. 1494:2–1496:2 (McBean). Lazard, Evercore, Bank of America, J.P. Morgan, Morningstar, Oppenheimer and others used the June date (as Fischel did) for the unaffected stock price. *See* Tr. 2743:3–2756:22 (Beach) (relying on JX 2121 at 94; JX 1264; JX 1311; JX 1270; JX 1272; JX 2237; JX 2249; JX 3001). I am likewise persuaded that the June date is the appropriate date upon which to set SolarCity's unaffected stock price.

[505] JX 2249 at 11 (ISS Report) ("These values imply no premium for SCTY at the 0.110 exchange ratio."); JX 2839 at 17 ("After discounting, the median price target implies a value for SolarCity stock of $24.55 as of July 31, 2016 . . . ."); *id.* at 130 (comparing the announced merger consideration and the actual merger consideration to standalone price targets by analysts).

[506] Fischel credibly established that the premiums implied by his analysis were consistent with comparable industry transactions and comparable stock transactions. JX 2839 at 20–21, 141–44.

- At the time of contracting (as opposed to closing), the merger consideration reflected a modest 14% premium to SolarCity's unaffected stock price.[507]

- Analysts covering SolarCity prior to the announcement of definitive Acquisition terms valued it at a median price target of $24.55 per share (as discounted to account for forward price targets), a price that effectively implies no premium to Tesla's offer.[508]

- Comparing the actual Acquisition price to estimates of SolarCity's standalone value at the time of closing (based on comparable companies and indexing) shows Tesla paid only a small premium for SolarCity.[509]

Stockholder Approval Weighs in Favor of Fair Price.   Absent a disclosure violation, this court has found that approval of a merger by disinterested

---

[507] *Id.* at 21.

[508] *Id.* at 16–17, 129–30.

[509] *Id.* at 16–17, 20–21, 36, 128, 132, 168, 208.  Plaintiffs attack Fischel's stock indexing methodology, pointing out that "this Court has rejected it" in past opinions.  POB at 66 (citing *Emerald P'rs*, 2003 WL 21003437, at *35–36; *Highfields Cap. Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 58 n.34 (Del. Ch. Aug. 17, 2007)).  In *Emerald Partners*, the court called the method "counterintuitive" and remarked that "[i]t may be that the approach represents sound finance theory," but "Emerald [] made no effort to cite any finance authority" in which "that theory [was] validated." *Emerald P'rs*, 2003 WL 21003437, at *35. In *Highfields Capital*, the court remarked that the event study and volume study conducted by an expert was based on a "highly speculative" assumption and that a competing expert "testified that such an indexing technique was not commonly relied upon in the financial community." *Highfields Cap.*, 939 A.2d at 58.  I need not determine whether this court has definitively rejected Fischel's stock indexing methodology, as Plaintiffs say, or whether the decisions cited by Plaintiffs simply rejected the methodology as applied under the specific facts of those cases, as Elon says, because I have not relied upon stock indexing to find that the Acquisition price was entirely fair.

stockholders is "compelling evidence that the price was fair."[510]  Here, nearly 85%

of the votes cast by Tesla stockholders—largely extremely sophisticated institutional

investors[511]—were in favor of the Acquisition.[512]

Against the backdrop of Plaintiffs' insolvency hypothesis, Fischel persuasively

testified that the Tesla stockholder vote is "the ultimate market test": "anybody who

believed that Tesla was purchasing an insolvent company, all they had to do was

reject the offer . . . [a]nd, similarly, for Tesla shareholders who thought that it was a

good deal, they could vote in favor of the offer."[513]  Fischel explained that the

affirmative vote of Tesla's minority stockholders was particularly compelling

evidence of fairness given the extensive pre-vote disclosure regarding SolarCity's

financial condition (including a "voluminous discussion" of liquidity) and the

robust, mixed public commentary,[514] including Glass Lewis' characterization of the

deal as a "bailout" of SolarCity with a process "steeped in conflicts."[515]

---

[510] *ACP Master*, 2017 WL 3421142, at *29; *see also Technicolor II*, 663 A.2d at 1176 (stockholder approval constitutes "substantial evidence of fairness").

[511] JX 2237 at 2; Tr. 2529:9–2530:1 (Fischel).

[512] JX 2320 at 2.

[513] Tr. 2518:12–2519:22 (Fischel).

[514] Tr. 2490:7–2491:14, 2494:3–16, 2495:2–14 (Fischel); JX 2839 at 6–7, 26, 162–65; JX 2852 at 38–50, 59–62.

[515] JX 2237 at 4, 7.  Here again, I acknowledge Plaintiffs' arguments regarding the quality (or not) of the Tesla stockholder vote.  Even with these issues in mind, however, I cannot,

While Plaintiffs have identified several disclosure deficiencies they say tainted the Tesla stockholder vote, they seem particularly troubled by the fact that Elon "made false statements and withheld material information about the Solar Roof."[516] Specifically, Plaintiffs contend Elon "secured stockholder approval with false claims that the Solar Roof would be deployed at 'volume' in less than a year from the Acquisition."[517] The argument betrays Plaintiffs' temporal confusion. Elon's remark about the Solar Roof, made at a Tesla stockholder meeting, could not have influenced stockholder approval because he made the remark *after* the special election voting polls had closed.[518] Tesla filings and press releases regarding the Solar Roof presentation were qualified with language that made clear the product was part of Tesla's "vision for the future"[519] and something "the combined company *will be* able to create."[520] Elon's statements, including his tweet, were optimistic—

as factfinder, conclude that such a large majority of Tesla's stockholders would have voted to approve a transaction whereby Tesla would acquire an insolvent solar energy company, as Plaintiffs would have me believe.

[516] POB at 58.

[517] PAB at 2.

[518] JX 2313 at 2, 4 (edited transcript of November 17, 2016 Tesla stockholder meeting).

[519] JX 2220 at 2.

[520] JX 2128 at 1; JX 2156 at 1.

perhaps overly so—but Tesla did, in fact, expect a product launch in mid-2017.[521] Importantly, SolarCity had been working on the Solar Roof since late 2015; it was not a prop created to secure the vote.[522] And it is fully functional today.[523]

### iv. SolarCity's Cash Flows Support a Finding of Fair Price

SolarCity has also provided and will continue to provide valuable cash flows to Tesla. As noted, part of SolarCity's value came from the long-term cash flows it generated.[524] The moment Tesla acquired SolarCity, it became the beneficiary of

---

[521] JX 2197 at 6 ("Production to start in mid-2017"); Tr. 1857:15–18 (Peter); JX 2241 (Elon tweet from November 4, 2016: "first solar roof deployments will start next summer").

[522] Tr. 1848:23–1849:1 (Peter); *see also* JX 2128 at 1; JX 2156 at 1; JX 2206 at 2, 4, 7; JX 2220 at 2; JX 2197 at 6; Tr. 342:6–344:24 (Elon).

[523] *See* JX 2899.

[524] *See, e.g.*, JX 2853 at 16 ("In exchange for incurring [] upfront costs, SolarCity received long-term cash flows . . . ."); *id.* ("SolarCity was consistently financed through the capital markets in order to continue its growth and to generate long-term cash flow streams."). Tr. 930:3–4 (Serra) (testifying that the "cumulative amount of cash flow would be $2.2 billion value today"; Tr. 964:4–7 (Serra) ("Q. So of that 2.2 billion that we talked about, how much of that did you think SolarCity could monetize? A. All of it.") Tr. 1216:2–1217:1) (Van Zijil) ("Q. So the actual cash flow stream that that equates to is more than 2.2 billion? A. Yeah. It would probably be upwards of 3 billion by my reckoning. But I focused on the present value number, which was 2.2. . . . . Q: So by the time the acquisition closed, had that 2.2 billion retained value been diminished by any newer transactions? A. Not to my knowledge, no. Q. Was this 2.2 billion encumbered money? A. My understanding is it was not encumbered in any way. Q. Was it available for monetization? A. In my judgment, yes."); Tr. 2844:2–19 (Gracias) ("Look, we were - - if I remember correctly, it was about $2 billion, a little over $2 billion Tesla paid for the company. And I knew the financials of SolarCity because I was a director there. They had about -- assets worth about $3 billion. And on the balance sheet there were leases, solar leases, that were worth about 3 billion. And Tesla was going to get those leases, plus it

these cash flows. In fact, Tesla has already realized approximately $1 billion in nominal cash flows and expects to realize at least $2 billion more from the legacy SolarCity systems.[525] As Elon noted, "even if we shut down the business, the $3 billion in cash flow is 50 percent higher than the acquisition price that we paid."[526]

### v. Evercore's Fairness Opinion Supports a Finding of Fair Price

Evercore credibly opined that the Acquisition was fair to Tesla stockholders.[527] While this court has been understandably skeptical of fairness opinions in certain circumstances,[528] there is no reason to doubt Evercore in this case. Evercore's analysis and projections were based on "extensive discussion and analysis" between Tesla and Evercore, as well as weeks of due diligence.[529] Indeed, if Evercore was beholden to Elon, as Plaintiffs assert, it is difficult to see why it

---

was going to get all the other infrastructure, the factory in Buffalo, all their assets, and get the customer base, which was -- remember, this is a 20-year lock-in on the customer base that we can then integrate with the rest of our business. That struck me as a very good deal for us, to pay 2-, $2-1/2 billion for a business that, on its face, was going to cash flow to us 3 billion off of leases alone.").

[525] Tr. 349:4–350:23, 404:6–16 (Elon); Tr. 2309:24–2310:4 (Ehrenpreis); JX 2971 at 40, 58; Tr. 2857:2–21 (Gracias).

[526] Tr. 349:4–350:1 (Elon).

[527] JX 2121 at 83.

[528] POB at 67 (citing *Gerber*, 67 A.3d at 420; *In re El Paso P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846, at *21–22 (Del. Ch. Apr. 20, 2015)).

[529] Tr. 1459:12–17, 1461:16–1464:2 (McBean).

120

would immediately inform the Tesla Board about SolarCity's liquidity problems and recommend lowering Tesla's offer to *below* the initial offer range (and the range endorsed by Elon) before SolarCity had even responded to Tesla's initial overtures.[530] McBean credibly testified that Evercore and its fairness committee would "never sign off on a deal or fairness opinion . . . for a fee" because Evercore's "reputation . . . is far too important to us."[531] While one would expect any banker to make that claim, Evercore's conduct, in this case, backed up that bold assertion. The fairness opinion is further evidence of fair price.

### vi. The Price is Justified by Potential Synergies

"The components of value in an acquisition might be considered to be two: the going concern value of the firm as currently organized and managed and the 'synergistic value' to be created by the changes that the bidder contemplates (e.g., new management, cost efficiencies, etc.)."[532] "This second component will

---

[530] JX 1471; JX 1588 at 28, 30; JX 1619; Tr. 1513:18–1515:24, 1573:6–1575:6, 1592:20–24 (McBean).

[531] Tr. 1466:16–1467:19 (McBean).

[532] *Technicolor I*, 663 A.2d at 1143; *see also Weinberger*, 457 A.2d at 711 (holding that "fair price relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, *future prospects*, and any other elements that affect the intrinsic or inherent value of a company's stock") (emphasis added).

vary to some extent among bidders.  It is the expectation of such synergies that allows a rational bidder to pay a premium when he negotiates an acquisition."[533]

Plaintiffs assert that "[t]he Court should not consider synergies at all because they are speculative and Defendant provided no evidence that Tesla has actually realized any synergies."[534]  While I agree that "*speculative* elements of value" should not be considered when appraising a company or assessing fair price,[535] "Delaware law is clear that 'elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered."[536]

At trial, Fischel credibly explained that "the relevant economic question in this case is the value of the purchased assets, what Tesla acquired in the SolarCity transaction, [and] what the value of those assets were to Tesla."[537]  I agree and am

---

[533] *Technicolor I*, 663 A.2d at 1143.  As McBean credibly testified, paying a premium for synergies is standard in M&A deals, especially for a high-growth target like SolarCity. Tr. 1393:2–16 (McBean).

[534] POB at 67.

[535] *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del. 1996) (citing *Weinberger*, 457 A.2d at 713) (emphasis in original).

[536] *In re Dole Food*, 2015 WL 5052214, at *36 (quoting *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 314 (Del. Ch. 2006)).

[537] Tr. 2483:12–16 (Fischel).

convinced synergies were a strong rationale for the Acquisition and they are properly considered in assessing the value of SolarCity in Tesla's hands.

Plaintiffs argue there is no contemporaneous evidence to support cognizable synergies.[538] On the contrary, synergies were a focus of the Tesla Board from the very beginning of its consideration, and there is evidence to support them. At trial, numerous directors testified they were laser-focused on the potential synergies throughout the deal negotiations.[539] Evercore carefully analyzed and discussed

---

[538] POB at 67.

[539] JX 1228 at 3; JX 1238 at 1; Tr. 1982:12–1983:9 (Denholm); Tr. 1389:20–1390:6 (McBean) (testifying that the Board did not approve the deal "to bail out SolarCity" but was "really focused on the strategic rationale and the combination of solar and storage"); Tr. 485:4–21 (Kimbal) ("Q. SolarCity was acquired by Tesla and is now part of the company. Do you think that acquisition made strategic sense? A. Yes. Q. Do you think it made sense for Tesla shareholders? A. Yes, absolutely. Q. Can you explain why? A. We were, at the time, considered a car company, and we had been telling the world forever that we are an alternative energy company. And we needed the world to understand our bigger vision, which we have succeed[ed] at achieving that. But to be honest, the solar industry is going to be the biggest industry in the world. It is much, much bigger than the car industry. We never saw ourselves as purely a car company. And the strategic—it made total strategic sense."); Tr. 2173:22–2174:11 (Denholm) ("Q. Why did you vote for the transaction? A. Because I believed that it was in the best interests of Tesla shareholders to actually continue the mission of Tesla, which was to accelerate the world towards sustainable energy. And the best way to do that was to have the solar generation capability within the four walls of Tesla so that we could continue in terms of the technology journey that it would take to satisfy the mission, and I believed that it was in the best interests of all Tesla's shareholders. Q. If you had not believed that, how would you have voted? A. I would not have voted for the deal."); Tr. 2399:19–2402:15 (Buss) (testifying that "the timing was beautiful" for Tesla to "get this really good asset that was part of our long-term vision really at a great price"); Tr. 2215:14–2217:15 (Jurveston) (testifying that he "thought it was in the best interests of Tesla shareholders" based on synergies and long-term strategy); Tr. 2873:7–19 (Gracias) (testifying that he was not worried about the "very short blip" in integration because, thanks to the Acquisition, Tesla is "disrupting

123

potential synergies with the Tesla Board prior to the Acquisition, contemporaneously projecting $122 million to $235 million in synergies in 2017 alone.[540] And prior to the close of the Acquisition, Tesla identified and disclosed to stockholders three categories of synergies that it expected to realize: (1) cost synergies (from "[s]ales and marketing efficiencies" and "corporate and overhead savings"); (2) revenue synergies (from leveraging Tesla's retail capabilities and the companies' overlapping customer bases); and (3) global strategic synergies (by creating the "world's only integrated sustainable energy company").[541]

Internally, Tesla expected the Acquisition to result in cost synergies of at least $150 million per year,[542] which Fischel confirmed was supported by comparable industry deals and empirical studies.[543] Even if it is not reasonable to assume that

entire industries" and "remaking the way you produce and consume energy in the world"); Tr. 2262:9–22 (Ehrenpreis) (testifying that because of the Acquisition, Tesla is "uniquely, a fully integrated, sustainable energy company and really the only one of its kind" which is "being valued as such").

[540] JX 1735 at 21.

[541] JX 2220 at 1, 4–5; Tr. 2542:16–2543:6 (Fischel).

[542] Tr. 2483:12–16 (Fischel). Evercore contemporaneously confirmed that the $150 million estimate was below the middle of a $122–$235 million range of the "most 'easily identifiable'" cost synergies. JX 1735 at 21.

[543] JX 2839 at 21–24, 145–48.

124

Tesla will enjoy these synergies in perpetuity, the anticipated annual synergies alone support the relatively modest (if any) premium Tesla paid for SolarCity.[544]

The combined company has also achieved revenue synergies through cross-selling its EV, solar and energy storage products. As Reicher testified, the Acquisition allowed Tesla to "capitalize on the solar company's customer base and core competencies in serving those customers."[545] Tesla reported in 2020 that it has seen "an increase in cross-selling within the energy business as more than 40% of our residential solar customers opt for at least one Powerwall."[546]

Plaintiffs point to facts that demonstrate Tesla and SolarCity have yet to combine completely and effectively. For example, post-acquisition, Tesla terminated thousands of its solar employees,[547] including the installation workforce,[548] and solar deployments lowered after Elon repurposed former SolarCity employees to assist with the Model 3 rollout.[549] And Tesla still relies on

---

[544] JX 2220 at 4–5.

[545] JX 2841 at 8.

[546] JX 3182 at 13.

[547] JX 2731 at 5.

[548] Tr. 660:22–661:23 (Moessner).

[549] JX 2863 at 8 ("[F]or about 18 months, almost 2 years, we had to divert a tremendous amount of resources—well, we had to basically take resources from everywhere else in the company and apply them to the Model 3 production, fixing the Model 3 production ramp . . . . So for about 1.5 years, we unfortunately stripped Tesla Energy of engineering

other companies to supply certain parts for its solar business.[550] All true. But the fact that SolarCity has yet to be fully integrated into Tesla does not diminish the substantial synergies already achieved, to say nothing of the massive potential for synergies yet to be achieved.[551] Nor does it account for SolarCity's long-term cash flows that Tesla now collects.

As a final note, while the synergistic effects of the Acquisition are still unfolding, the astronomic rise in Tesla's stock price post-Acquisition is noteworthy. Although the relevant inquiry in an entire fairness analysis is whether the acquisition target was worth the price paid when the deal was consummated,[552] hindsight suggests that Elon is right when he asserts that, once valued as a car company, Tesla

---

and other resources and even took the cell production lines that were meant for Powerwall and Powerpack and redirected them to the car because we didn't have enough cells."); Tr. 347:8–21 (Elon); Tr. 486:12–487:17 (Kimbal).

[550] *See* Straubel Dep. 54:6–24; JX 2147; Tr. 660:19–21, 661:24–662:20 (Moessner).

[551] Reicher's expert report extensively detailed the immense growth potential of the solar industry in particular. *See* JX 2841 at 9–28.

[552] *See, e.g.*, *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 690 (Del. Ch. 1996) (noting that "the defendants have failed to carry their burden of demonstrating the entire fairness of the Asset Sale and Merger *at the time the board approved them*") (emphasis added), *aff'd*, 693 A.2d 1082 (Del. 1997) (TABLE); *Oliver*, 2006 WL 1064169, at *29 ("The BU Defendants have failed to demonstrate that the price paid . . . was *fair at the time of the merger*.") (emphasis added).

is now valued as "a first-of-its-kind, vertically integrated clean energy company."[553] Whether the Acquisition played a large or small part in Tesla's impressive growth is not clear, but there can be no doubt that the combination with SolarCity has allowed Tesla to become what it has for years told the market and its stockholders it strives to be—an agent of change that will "accelerate the world's transition to sustainable energy" by "help[ing] to expedite the move from a mine-and-burn hydrocarbon economy towards a solar electric economy."[554]

*   *   *   *   *

In instances where there are process infirmities, the Court is obliged to study fair price even more carefully. I have done that here. After careful consideration, I am persuaded Elon presented credible evidence that Tesla paid a fair price for SolarCity. Plaintiffs answered by proffering incredible testimony that SolarCity was insolvent, and then provided some "also ran" theories on value that their experts did not ultimately endorse, or at least not persuasively so. Given this, I have no credible basis in the evidence to conclude that a "fairer price" was available, and therefore,

---

[553] DOB at 40. To the extent Plaintiffs are critical of this hindsight look, I note that they have also looked in the rearview mirror to support their fair price argument as they recount the post-Acquisition integration challenges discussed above.

[554] JX 12 at 1; Tr. 86:18–20 (Elon). As of this writing, Tesla's market cap was nearly a trillion dollars. *Tesla, Inc. (TSLA)*, Yahoo! Finance (last accessed Apr. 27, 2022), https://finance.yahoo.com/quote/TSLA/.

no basis to conclude that the price paid was not entirely fair.[555]   Indeed, the price

was, in my view, not "near the low end of a range of fairness,"[556] but "*entirely*" fair

in the truest sense of the word.  That conclusion is not consistent with a finding that

Elon breached his fiduciary duty.[557]  Accordingly, I am satisfied he did not.

## B. Plaintiffs' Other Surviving Claims

Plaintiffs' other surviving claims against Elon include derivative claims for

unjust enrichment and waste.  I address them in turn.

---

[555] Conceivably, given the process flaws, a price "near the low end of a range of fairness" might not have satisfied entire fairness review.  *In re Nine Sys.*, 2014 WL 4383127, at *47; *see also In re Dole Food*, 2015 WL 5052214, at *2 (holding that stockholders were entitled not only to a fair price but a "fairer price").  But I need not entertain that possibility here. With the Tesla Board's deal process front of mind, and after careful consideration, for the reasons just explained, Elon's compelling "evidence on price fairness was ultimately persuasive," such that I can conclude the Acquisition was entirely fair.  *Trados*, 73 A.3d at 66; *see also Valean Pharm. Int'l v. Jerney*, 921 A.2d 732, 748–49 (Del. Ch. 2007) ("The court's finding that ICN's management and board used an *unfair process* . . . does not end the court's inquiry *because it is possible that the pricing terms were so fair as to render the transaction entirely fair*.") (emphasis added); *Oak Hill Cap. P'rs*, 2020 WL 2111476, at *36–43 (finding that the transaction was entirely fair despite a process that "fell short" of being fair).

[556] *In re Nine Sys.*, 2014 WL 4383127, at *47.

[557] I note that while defense verdicts after an entire fairness review of fiduciary conduct are not commonplace—hence the advisability of structuring transactions to avoid such scrutiny as a matter of law—this court and scholars have emphasized that the standard of review is not *necessarily* outcome-determinative.  *See, e.g.*, *Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *28 (Del. Ch. Jan. 25, 2016) ("[E]xperience . . . has shown that the application of entire fairness is not outcome-determinative and that defendants prevail under this standard of review with some degree of frequency."); *id.* at *28 n.21 (collecting extensive case law and commentary).

## 1. Unjust Enrichment

Plaintiffs allege the Acquisition unjustly enriched Elon because the Acquisition "was specifically intended to bailout SolarCity and spread across all of Tesla's stockholders the loss that would otherwise be experienced only by Defendant[] Elon Musk."[558]  The elements of unjust enrichment are: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law.[559]

This claim essentially mirrors Plaintiffs' breach of fiduciary duty claims.[560] Because the Acquisition was entirely fair, there was no underlying impoverishment. And "[i]f there is no underlying [impoverishment], there is no unjust enrichment."[561] The claim fails.

## 2. Waste

Plaintiffs also allege the Acquisition is wasteful, or "so one-sided that no business person of ordinary, sound judgment could conclude that Tesla received

---

[558] Compl. ¶ 304.

[559] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998).

[560] SJ Opinion at *3 n.11.

[561] *Tornetta v. Musk*, 250 A.3d 793, 813 (Del. Ch. 2019).

adequate value in the transaction."[562]   To prevail on this claim, Plaintiffs were obliged to prove that "no person of ordinary sound business judgment could view the benefits received in the transaction as a fair exchange for the consideration paid by the corporation."[563]  "[I]f there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky."[564] In this case, the Acquisition was entirely fair and therefore cannot be considered wasteful.[565]

## C. Fees and Costs

"Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the

---

[562] Compl. ¶ 323.

[563] *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 892 (Del. Ch. 1999) (quoting *Michelson v. Duncan*, 407 A.2d 211, 224 (Del. 1979)).

[564] *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997)).

[565] *See, e.g.*, *Freedman v. Adams*, 58 A.3d 414, 417 (Del. 2013) ("To recover on a claim of corporate waste, the plaintiffs must shoulder the burden of proving that the exchange was so one sided that no business person of ordinary, sound judgment would conclude that the corporation has received adequate consideration.") (quoting *In re the Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006)); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 193 (Del. Ch. 2014) ("It is hard to conceive of a situation where the challenged transactions would not constitute a breach of fiduciary duty, but would constitute waste.").

130

litigation."[566] While he has asked for his counsel fees to be reimbursed, Elon has not provided a reason to stray from the American Rule here. Each party will pay their own attorneys' fees per the terms of counsels' engagement. As for costs, as noted, Elon likely could have avoided the need for judicial review of his conduct as a Tesla fiduciary had he simply followed the ground rules of good corporate governance in conflict transactions. He declined to do so. For that reason, I decline to award him prevailing party costs.[567]

## III. CONCLUSION

For the foregoing reasons, my verdict is for the defense on all claims. A final order and judgment to this effect will be entered today.

---

[566] *Shawe v. Etling*, 157 A.3d 142, 149 (Del. 2017).

[567] Ct. Ch. R. 54(d) ("Except when express provision therefor is made either in a statute or in these Rules, costs shall be allowed as of course to the prevailing party *unless the Court otherwise directs*.") (emphasis added); *Donovan v. Del. Water and Air Res. Comm'n*, 358 A.2d 717, 722–23 (Del. 1976) ("Determining when costs are awarded and when they are not is, in our judgment, a matter of judicial discretion . . . .").